# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MEWBOURNE OIL COMPANY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:24-cv-143-g** |
| | ) | |
| **YUKON TRADING COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEWBOURNE'S MOTION TO EXCLUDE CERTAIN OPINIONS OF YUKON'S PROPOSED EXPERT CURTIS D. HORNE

Christopher M. Hogan, FBA # 19-175
chogan@hoganthompson.com
Samantha L. Thompson, FBA # 20-53
sthompson@hoganthompson.com
Cody Rutowski, FBA # 23-77
crutowski@hoganthompson.com
Hogan Thompson Schuelke LLP
1001 Fannin Street, Suite 4775
Houston, Texas 77002
Telephone: (713) 671-5630
Facsimile: (713) 671-5632

Stephen D. Beam, OBA # 625
P.O. Box 31
Weatherford, OK 73096
Telephone: (580) 302-5023
sbeamlaw@gmail.com

*ATTORNEYS FOR PLAINTIFF MEWBOURNE OIL COMPANY*

April 15, 2025

## INTRODUCTION

Expert testimony offered at trial must be strictly confined to reliable opinions within the expert's sphere of expertise. Most of the opinions of Curtis Horne—a landman whom Yukon has disclosed as a rebuttal expert witness—do not meet this standard and should be excluded.

This case concerns Oklahoma oil and gas operations involving forced pooling, protests of forced-pooling applications, pre-pooling letter agreements, and well participation elections. Although some landmen may have the requisite experience and expertise to opine on issues relevant here,[1] Horne does not. He has not done any work involving forced pooling in Oklahoma in decades. And the limited experience he has with oil and gas operations and forced pooling in Oklahoma did not involve pre-pooling letter agreements or even participation elections. As a result, most of the opinions Horne offers are either unsupported or speculative. This Court should not permit such unsubstantiated opinions to be admitted into evidence. Thus, Mewbourne asks the Court to exclude most of the expert opinions that Horne has disclosed during discovery.

## BACKGROUND

This case revolves around the current and future development of oil and gas in Custer County, Oklahoma.[2] Mewbourne and Yukon each own various oil and gas interests

---

[1] *See* Doc. 20 (disclosing Dorsey Roach, a certified professional landman, as an expert qualified to offer expert opinion testimony about "industry custom and practice relating to pooling orders, pre-pooling letter agreements, and elections made under such orders and agreements").

[2] *Eg.* Doc. 1 ¶¶ 5–23, at 3–7.

in and around Custer County—including interests in the two sections at issue, Section 1, Township 13 North, Range 17 West ("Section 1") and Section 12, Township 13 North, Range 17 West ("Section 12").[3] Mewbourne's and Yukon's interests have been pooled together under two forced pooling orders issued by the Oklahoma Corporation Commission (the "OCC").[4] Before the OCC issued those orders, Yukon protested Mewbourne's pooling applications, and Mewbourne and Yukon eventually resolved those disputes by entering into two pre-pooling letter agreements (the "Section 1 Letter Agreement" and the "Section 12 Letter Agreement," collectively the "Letter Agreements") that modify the pooling orders.[5]

Under those pooling orders and the Letter Agreements, Mewbourne proposed the Abernathy 1/12 CN #2H well (the "Well"), and Yukon had the option to elect to participate in the costs and revenues from that Well.[6] Mewbourne alleges that, under the Letter Agreements, Mewbourne sent Yukon a notice by certified mail on January 8, 2024 that Mewbourne would spud the Well within thirty days (the "Spud Notice").[7] Mewbourne alleges that Yukon received the Spud Notice on January 10 and that, under the Letter Agreements, Yukon had ten days from its receipt of the Spud notice to elect to participate in the Well.[8] Mewbourne further alleges that Yukon did not elect to participate in the Well

---

[3] Doc. 15 § 3.c, at 2.
[4] Doc. 1 ¶¶ 6–7, 13–14, at 3, 5; Doc. 6 ¶¶ 6–7, 13–14, at 2 (admitting Mewbourne's allegations).
[5] Doc. 1 ¶¶ 6–7, 13–14, at 3, 5; Doc. 6 ¶¶ 6–7, 13–14, at 2 (admitting Mewbourne's allegations).
[6] Doc. 1 ¶¶ 18–19, at 6; Doc. 6 ¶¶ 18–19, at 3 (admitting Mewbourne's allegations in part).
[7] Doc. 1 ¶ 20, at 7.
[8] Doc. 1 ¶¶ 20–21, at 7.

within ten days of receiving the Spud Notice and thus, under the Letter Agreements' nonconsent provisions, Yukon relinquished to Mewbourne most of its interests in Sections 1 and 12.[9] Yukon denies receiving the Spud Notice—even though Yukon signed a U.S. Postal Service electronic return receipt for the Spud Notice on January 10.[10]

## ARGUMENT & AUTHORITIES

### I.    Unless relevant and reliable, expert testimony must be excluded.

A witness may offer expert opinion testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. This Rule "imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). "Under Rule 702, the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact . . . ." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). The party offering the expert testimony bears the burden of establishing admissibility under the Federal Rules of Evidence and *Daubert*. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001); *Nacchio*, 555 F.3d at 1241.

As explained below, expert testimony is not relevant or reliable—and thus is not admissible—if (1) an expert is not qualified in the field in which he is offering an opinion,

---

[9] Doc. 1 ¶¶ 20, 27–28, at 7–8
[10] *See, e.g.*, Doc. 6 ¶¶ 51–56, at 15.

(2) the testimony is neither relevant nor supported by good grounds, (3) the testimony is speculative, or (4) the testimony is a legal conclusion.

### A.     An expert must be qualified in the field in which he is offering an opinion.

In analyzing the admissibility of expert testimony, the Court must first determine whether the expert is qualified as an expert in that field. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282–83 (10th Cir. 2018). "[J]ust because a witness has general experience in a field does not necessarily qualify the witness as an expert." *Vigil v. Burlington N. & Santa Fe Ry. Co.*, 521 F. Supp. 2d 1185, 1204 (D.N.M. 2007) (citations omitted). And an expert's opinion that drifts outside the scope of "the reasonable confines of his subject area" and into an area in which the expert is not qualified is inadmissible. *See Ralston*, 275 F.3d at 970 (holding that expert's testimony about specialized area was inadmissible when she admitted she had no skill, training, experience, or education in the specialty); *see also Hauck v. Michelin N. Am., Inc.*, 343 F. Supp. 2d 976, 982 (D. Colo. 2004) (excluding engineer's opinion testimony where the specific topic, tire design and manufacturing, was admittedly outside the scope of the witness's expertise). Expert testimony must be "closely related to a particular profession, business or science and . . . not within the common knowledge of the average layperson," and the witness offering such testimony must have "such skill, experience or knowledge in that particular field as to make it appear that his or her opinion would rest on substantial foundation and would tend to aid the trier of fact." *United States v. Kunzman*, 54 F.3d 1522, 1530 (10th Cir. 1995).

**B.    Expert testimony must be relevant and supported by good grounds.**

"Under the relevance prong of the *Daubert* analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir. 2005). "The 'touchstone' of admissibility is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 647–48 (10th Cir. 1991). An expert's opinion must be supported by "good grounds, based on what is known" and "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (internal quotations omitted).

**C.    Mere speculation is not sufficient for expert testimony.**

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). When an expert opinion "is not supported by sufficient facts . . . or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and will be excluded. *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017) (citations omitted).

**D.    Experts cannot offer legal conclusions as testimony.**

An expert cannot be used to form or explain legal concepts or conclusions. "Because an expert's job is to help the fact finder understand and determine the facts, courts routinely

5

exclude expert opinions that merely provide legal analysis because, after all, legal analysis is the court's job." *Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1148 (D. Utah 2021).

## II. Most of Horne's opinions should be excluded.

Curtis D. Horne is a landman with some experience,[11] but he does not have experience relevant here. Instead, most of Horne's work as a landman has involved title work and acquiring leases.[12]

Although he spent the first few years of his career as a landman living and working in Oklahoma, <u>that was almost forty years ago</u>.[13] Most of his work for the past four decades has been based in Texas[14]—indeed, Horne has lived in Texas for more than thirty years.[15]

Horne's professional experience with forced pooling in Oklahoma is limited to less than a dozen matters—the most recent of which was nearly forty years ago and only two of which involved protests.[16] Horne has never dealt with a pre-pooling letter agreement

---

[11] *See generally* Expert Report of Curtis D. Horne, CPL ("Horne Report"), attached as **Exhibit 1**.

[12] *E.g.*, Deposition of Curtis D. Horne ("Horne Deposition"), attached as **Exhibit 2**, at 38:15 (summarizing his work as involving "[r]unning title," "[l]ocating people," "[n]egotiating leases," and "title opinion curing"); *id.* at 25:23 to 26:2 (similar); *id.* at 30:2–10 (similar); *id.* at 39:17–24 (similar); *see also id.* at 36:5–24 (explaining that his work as a landman was similar to the work done by examiners at a title insurance company). Under LCvR7.1(m), only excerpts of Horne's deposition are included in Exhibit 2. Mewbourne will promptly provide the full transcript upon request.

[13] Horne Deposition at 31:11–16.

[14] *Id.* at 33:10–15; *see also id.* at 40:5–22, 41:16 to 42:21.

[15] *Id.* at 33:15, 38:7–9; *see also id.* at 40:4 to 41:7.

[16] *Id.* at 32:2 to 33:9, 35:8–20, 54:6 to 55:12, 71:19 to 73:2; *see also id.* at 68:20–22 (admitting that none of his prior expert testimony involved forced pooling). Horne does own some small oil and gas interests in Oklahoma that were subject to forced pooling about a decade ago. *Id.* at 55:2–7.

before[17]—in fact, the first pre-pooling letter agreements he has ever read are the Letter Agreements at issue, and he read them only when Yukon retained him.[18] And Horne has never been responsible for sending or receiving participation elections under pre-pooling letter agreements or similar agreements used in oil and gas development.[19]

In short, Horne lacks the relevant experience and expertise to offer most of the expert opinions disclosed during discovery that might be relevant here. As a result, most of the opinions Horne has disclosed should be excluded.

### A.    Horne is not qualified to opine about whether it is industry custom and practice to strictly enforce participation elections.

Horne concedes that "deadlines for elections made under pooling orders, pre-pooling letter agreements, joint operating agreements and similar orders and agreements certainly can be strictly enforced."[20] But he then opines that strictly enforcing those deadlines is not necessarily industry custom and practice.[21] Yet Horne demonstrated during his deposition that he does not have the requisite experience to offer such an opinion.

Horne admitted that he has never been responsible for sending or receiving participation elections under pre-pooling letter agreements or similar agreements used in

---

[17] *Id.* at 35:22 to 36:4; 55:13 to 56:10; *see also id.* at 62:11–13 (admitting that none of his industry presentations discuss pre-pooling letter agreements); *id.* at 68:23–25 (admitting that none of his prior expert testimony involved pre-pooling letter agreements).

[18] *See id.* at 55:13–56:10.

[19] *Id.* at 57:1–11; *see also id.* at 62:14–15 (admitting that none of his industry presentations discuss well elections); *id.* at 69:1–3 (admitting that none of his prior expert testimony involved well elections).

[20] Horne Report at 2; *see also* Horne Deposition at 77:10–22 (conceding that well participation election deadlines can be and have been strictly enforced).

[21] Horne Report at 2; *see also* Horne Deposition at 75:10 to 78:7.

oil and gas development.[22] And he admitted that he has never been involved in a situation in which a party missed an election deadline and later attempted to make a late election.[23] Instead, his opinion was based only on his <u>general impression</u> that oil and gas operators' "attitude" about elections "<u>in the '80s</u> in Oklahoma" was "[l]ess adversarial" and his understanding of the approach that operators in Oklahoma <u>would have taken</u> toward enforcing election deadlines <u>if such a deadline had been missed</u> "<u>in the '80s</u> in Oklahoma."[24]

In short, Horne's opinion about whether election deadlines are strictly enforced is not "based on actual knowledge" of industry custom and practice in Oklahoma this century or even in the 1980s. *Pioneer Centres*, 858 F.3d at 1341–42. Instead, Horne's opinion is based on his "mere subjective belief or unsupported speculation." *Id.* Horne's opinion on this issue thus is unreliable and should be excluded. *See id.*

**B.    Horne's opinion that "many if not most agreements" require an invoice is irrelevant and unsupported speculation on which he is unqualified to opine.**

Yukon has pleaded two affirmative defenses and counterclaims based on its assertion that the Section 1 Letter Agreement required Mewbourne to include an invoice with the Spud Notice to trigger Yukon's deadline to elect to participate in the Well.[25] But as Mewbourne explains in its motion for summary judgment (filed the same day as this

---

[22] Horne Deposition at 57:1–11; *see also id.* at 62:14–15 (admitting that none of his industry presentations discuss well elections); *id.* at 69:1–3 (admitting that none of his prior expert testimony involved well elections).

[23] *Id.* at 78:9–14, 79:10–15.

[24] *Id.* at 79:2–8, 80:1 to 81:3 (emphasis added).

[25] Doc. 6 ¶¶ 3, 5, at 5 (affirmative defenses); *id.* ¶¶ 70, 80, at 18–19 (counterclaims).

motion), the unambiguous language of the Section 1 Letter Agreement contains no such requirement.

Horne nonetheless vaguely opines that "many if not most agreements specifically stipulate that an invoice be provided" by an operator to a nonoperator.[26] To the extent that opinion is relevant to the issues here, that opinion is unsupported speculation that Horne is not qualified to offer. And to the extent that opinion is one that Horne is qualified to offer, it is not relevant here. Horne's opinion about invoices should thus be excluded.

According to Horne, he was not asked to opine about whether most agreements require an operator to provide a non-operator an invoice with a participation election notice—such as the Spud Notice.[27] And he admitted that during his four decades of experience as a landman, he had not encountered an agreement that required an operator to provide an invoice with an election notice.[28] Horne also acknowledged that he does not have any experience with pre-pooling letter agreements like the Letter Agreements.[29] Horne thus lacks any knowledge or experience to offer an opinion that pre-pooling letter agreements or similar agreements often require an invoice, and any such opinion he offers should be excluded. *Pioneer Centres*, 858 F.3d at 1342 (noting that an expert opinion is inadmissible if it "is not supported by sufficient facts . . . or when indisputable record facts contradict or otherwise render the opinion unreasonable" (citations omitted)).

---

[26] Horne Report at 2.
[27] Horne Deposition at 92:19–24.
[28] *Id.* at 94:21–25.
[29] *Id.* at 55:13–56:10.

Moreover, Horne clarified during his deposition that his opinion was that most agreements require an operator to provide a non-operator an invoice "[a]t various times"[30] and that when an invoice is required is "specific to th[e] agreement."[31] Indeed, Horne agreed that under the Section 12 Letter Agreement, Mewbourne was not required to send Yukon an invoice unless and until Yukon timely elected to participate in a well proposed under that agreement.[32] So to the extent Horne has an opinion about whether oil and gas agreements in Oklahoma require an operator to provide a nonoperator an invoice, his opinions do not address <u>when</u> the operator must provide such an invoice—which is the crux of Yukon's affirmative defenses and counterclaims on this issue. Horne's invoice opinion thus "does not logically advance[] a material aspect of the case" and should be excluded. *Norris*, 397 F.3d at 884 n.2.

### C.    Horne is not qualified to opine about the length of a delay that can result from a protest of a forced pooling.

In his report, Horne acknowledges that "the protest of a force pooling [application] can result in a delay of the issuance of the final [pooling] order.[33] But he goes on to opine about the length of such a delay, which he says "can vary from a day to a few weeks to occasionally several months."[34] Horne based that opinion on his personal experience with forced pooling in Oklahoma.[35] But Horne's professional experience with forced pooling in

---

[30] *Id.* at 91:20–23.
[31] *Id.* at 92:13–18.
[32] *Id.* at 87:25 to 89: 17.
[33] Horne Report at 1.
[34] *Id.*
[35] Horne Deposition at 70:25 to 71:7; *see also id.* at 74:25–75:6 (acknowledging that his opinion was based on "[j]ust experience and the material I've reviewed for this case").

Oklahoma is limited to less than a dozen cases, no more than two of which involved a protest[36] and the most recent of which was nearly forty years ago.[37] Horne's opinion about the length of a delay that can result from a protest of a forced pooling thus is unsupported speculation that this Court should exclude because it is unreliable. *See Pioneer Centres*, 858 F.3d at 1341–42 ("To be reliable, expert testimony must be based on actual knowledge, and not mere subjective belief or unsupported speculation.").

### D. Horne is not qualified to opine about certified mail.

Horne has offered several opinions about certified mail that should be excluded. Horne has no special training with certified mail.[38] Instead, the primary basis for Horne's opinions on certified mail is that he has sent and received certified mail.[39] He also did some Google research,[40] and has read information posted at post offices he has visited.[41] Horne thus has not demonstrated that he has any knowledge about certified mail that "is not within the common knowledge of the average layperson." *Kunzman*, 54 F.3d at 1530.

Moreover, the knowledge he does have about certified mail is not relevant to the type of certified mail at issue here. Horne's knowledge of and opinions about certified mail involved the physical green cards that the U.S. Postal Service offers for return receipts.[42]

---

[36] *Id.* at 72:25 to 73:2.

[37] *Id.* at 71:15 to 72:22.

[38] *Id.* at 60:2–9; *see also id.* at 62:16–18 (admitting that none of his industry presentations discuss certified mail); *id.* at 69:8–10 (admitting that none of his prior expert testimony involved certified mail).

[39] *Id.* at 60:22–25.

[40] *Id.* at 9:4 to 10:12.

[41] *Id.* at 60:9–21.

[42] *Id.* at 8:11 to 9:22; Horne Report at 2.

But this case does not involve such a green card. Instead, it involves an electronic return receipt.[43] As the U.S. Postal Service has explained, "[t]he Electronic Return Receipt does everything the hardcopy Return Receipt does but is electronic." *See* U.S. Postal Serv., *Certified Mail Guidebook for Industry* 6 (2024), https://postalpro.usps.com/certified-mail-guidebook. "This means instead of receiving the green card back in the mail, the sender receives a proof of delivery letter (as a PDF) via email attachment by requesting it from the USPS website. The proof of delivery letter includes a digital copy of the recipient's signature." *Id.*; *see also Neilson v. Brantley*, 24-10934, 2025 WL 842805, at *2 (E.D. Mich. Mar. 18, 2025) ("[T]he physical 'green card' is not the only method of proving attempted delivery by certified mail return receipt; the USPS offers electronic verification of return receipt through its certified mail system. . . . The USPS offers electronic delivery confirmation with its certified mail service, which confirms the item was sent by certified mail and provides the same information traditionally included on the physical 'green card.'").

Horne has never signed an electronic return receipt for certified mail.[44] When he sends certified mail, he always uses a physical green card instead of an electronic return receipt.[45] And his only knowledge about the U.S. Postal Service's process for delivering certified mail with an electronic return receipt is based on depositions from this case.[46] Horne thus lacks the necessary knowledge and experience to offer expert testimony about

---

[43] *E.g.*, Horne Report at 3.
[44] Horne Deposition at 59:3–5.
[45] *Id.* at 59:16–18.
[46] *See id.* at 7:20 to 18:13.

the type of certified mail at issue here. *See Pioneer Centres*, 858 F.3d at 1341–42 ("To be reliable, expert testimony must be based on actual knowledge, and not mere subjective belief or unsupported speculation.").

And because this case involves certified mail with an electronic return receipt and not green cards, Horne's testimony about green cards—including the cost of green cards[47] and whether the U.S. Postal Service is going to stop using green cards[48]—is irrelevant and should be excluded. *See Norris*, 397 F.3d at 884 n.2 ("[T]he court must ensure that the proposed expert testimony logically advances a material aspect of the case.").

### E.    Horne is not qualified to opine about whether Yukon received the Spud Notice.

In his report, Horne opines that "there is not sufficient evidence to confirm that Yukon actually ever received the specific spud letter that Mewbourne claims to have sent,"[49] an opinion he reiterated during his deposition.[50] But again, Horne has no relevant experience or knowledge about the delivery of certified mail for which the recipient signed an electronic return receipt. And to the extent Horne is opining on the legal sufficiency of the evidence, his opinion is an improper legal conclusion that should be excluded. *See Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1208 (10th Cir. 2000) (noting that whether evidence is legally sufficient to support a claim or defense is a matter of law that is reviewed de novo on appeal); *see also Vox*, 521 F. Supp. 3d at 1148 ("Because an expert's

---

[47] *Id.* at 8:11–14.
[48] *Id.* at 8:15 to 9:22.
[49] Horne Report at 3.
[50] Horne Deposition at 95:5 to 98:3.

job is to help the fact finder understand and determine the facts, courts routinely exclude expert opinions that merely provide legal analysis because, after all, legal analysis is the court's job.").

## **CONCLUSION**

For the reasons above, Mewbourne asks that the Court exclude the expert opinions disclosed by Horne during discovery discussed above.

Respectfully submitted,

/s/ Christopher M. Hogan
Christopher M. Hogan, FBA # 19-175
chogan@hoganthompson.com
Samantha L. Thompson, FBA # 20-53
sthompson@hoganthompson.com
Cody Rutowski, FBA # 23-77
crutowski@hoganthompson.com
Hogan Thompson Schuelke LLP
1001 Fannin Street, Suite 4775
Houston, Texas 77002
Telephone: (713) 671-5630
Facsimile: (713) 671-5632

and

Stephen D. Beam, OBA # 625
P.O. Box 31
Weatherford, OK 73096
Telephone: (580) 302-5023
sbeamlaw@gmail.com

**ATTORNEYS FOR PLAINTIFF
MEWBOURNE OIL COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a copy of this document has been served on all parties of record on April 15, 2025 in accordance with the Federal Rules of Civil Procedure.


       */s/ Christopher M. Hogan*
       Christopher M. Hogan