# EXHIBIT 2

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF OKLAHOMA
2      MEWBOURNE OIL COMPANY,         )
                                      )
3              PLAINTIFF,             )
                                      )
4      VS.                            ) CASE NO.
                                      ) 5:24-CV-00143-G
5      YUKON TRADING COMPANY,         )
       L.L.C.,                        )
6                                     )
               DEFENDANT.             )
7                                     )
       *********************************************************
8            ORAL AND VIDEOTAPED DEPOSITION OF
9                  CURTIS D. HORNE, CPL
10                    March 25, 2025
11                      Volume 1
12     *********************************************************
13         ORAL AND VIDEOTAPED DEPOSITION OF CURTIS D. HORNE,
14     CPL, produced as a witness at the instance of the
15     PLAINTIFF, was taken in the above-styled and numbered
16     cause on March 25, 2025 from 9:10 a.m. to 11:20 a.m.,
17     before Toyloria Lanay Hunter, CSR in and for the State
18     of Texas, reported by machine shorthand, at the law
19     offices of HOGAN THOMPSON SCHUELKE LLP, 1001 Fannin
20     Street, Suite 4775, Houston, Texas 77002, pursuant to
21     the Federal Rules of Civil Procedure and the provisions
22     stated on the record or attached hereto.
23
24
25

                                              Page 1

1 next to you. That's fine.
2       (Exhibit 72 marked.)
3    A. Thank you.
4 BY MS. THOMPSON:
5    Q. Okay. So you understand that you're here
6 giving a deposition in a lawsuit filed by my client,
7 Mewbourne Oil Company, against Yukon Trading Company
8 LLC?
9    A. I do.
10   Q. Okay. And have you been retained by Yukon as
11 an expert in this matter?
12   A. I have.
13   Q. And are you being compensated for your work in
14 this case?
15   A. I am.
16   Q. And are you being compensated hourly?
17   A. I am.
18   Q. What is your rate?
19   A. $400 an hour.
20   Q. And does your compensation depend on the
21 content of your testimony?
22   A. It does not.
23   Q. Does your compensation depend on the outcome
24 of the case?
25   A. Not at all.

Page 6

1    Q. I'm handing you what's been marked as
2 Exhibit 73.
3       (Exhibit 73 marked.)
4 BY MS. THOMPSON:
5    Q. Is this the expert report you put together for
6 this case?
7    A. It is. I'm just glancing to make sure, but...
8    Q. No worries.
9    A. (Reading.) Yes.
10   Q. At this time, do you have any opinions that
11 you'd like to proffer in this case that are not
12 contained in this report?
13   A. The -- I did my report prior to reading any of
14 the dep-- I think prior to these other depositions being
15 taken. So there are some things from those depositions
16 that I would like to comment on.
17   Q. Okay. Let's go through them.
18      What is the first comment you would like
19 to make based on the depositions?
20   A. Okay. So start with Ms. Cochell's deposition.
21 And I guess I'll first say that I have researched
22 simplecertifiedmail.com online. And I have no issues
23 with the system. It makes sense. I think it's probably
24 a good system. And hence, it's not there.
25      But in reading this deposition, it occurs

Page 7

1 to me that the issue probably arose because of the
2 process that is described here. And so without reading
3 the whole thing back to you, just kind of maybe hit some
4 points. But talking about certified mailed and return
5 receipt requested.
6       Is there any other type of certified mail?
7 Probably not. It talks about the process. You log in.
8 You make a label for mailing. That's all fine. If you
9 -- use return receipt. We use that on everything, yes.
10 It's what I expect. It's extra.
11      They talk a little bit about cost, and I
12 looked it up. The cost is like five-bucks-something
13 electronically. And $4-something if you actually use a
14 green card. They've been using this for sometime.
15      The comment was made that they don't use
16 the green card. It's more work. And because they've
17 been told by a postal carrier that they're getting rid
18 of them and that they can't -- probably can't even get
19 them. Like this morning, you can get them at the USPS
20 website.
21      I did research on this. And I find no
22 indication -- people have asked are they getting rid of
23 it. But I could find no indication online that the
24 postal service intends to quit using the green card.
25   Q. Okay.

Page 8

1       MS. RUDNICKI: Could you just slow down.
2       THE WITNESS: Sure.
3 BY MS. THOMPSON:
4    Q. When you say you did research on this, could
5 you explain a little bit more about what you did to look
6 into this?
7    A. Yeah, I Googled the question, "Is USPS
8 considering discontinuing the use of the green card?"
9 And read several of the hits that came up from that.
10 And just kind of dug down a rabbit hole. But by going
11 to the website this morning and it shows that they still
12 have them available. And if you're not familiar with
13 it, they have a little store online if you want --
14      THE REPORTER: Slow down, please, just a
15 little, sir.
16      THE WITNESS: I'm sorry.
17   A. If you wanted express mail envelopes, if you
18 want boxes, if you want forms, you can order those and
19 they deliver them to your address. And so as of today,
20 those are still available. There's a comment in here
21 also they didn't think they were available anymore.
22 They -- they are.
23 BY MS. THOMPSON:
24   Q. Okay. So you're saying that you looked
25 online. And the USPS is still having green cards

Page 9

3 (Pages 6 - 9)

1  available online.  And you're -- so stop there.
2       That's correct?
3    A.  That's correct.
4    Q.  Okay.  Did you do any research into the
5  availability of green cards in physical USPS stores?
6    A.  I did not.
7    Q.  Okay.
8    A.  Although I can tell you every time I've been
9  to my local post office, they've had them on the shelf
10  there.
11    Q.  When's the last time you remember seeing them?
12    A.  About three weeks ago.
13    Q.  Okay.  Is -- does that cover your additional
14  opinions after reading Ms. Cochell's deposition?
15    A.  No, there's --
16    Q.  Okay.
17    A.  -- there's numerous.  That's just in regard to
18  the green card.
19    Q.  Okay.  Let's go on to the next one.
20    A.  All right.  So talking about the carriers and
21  what they've been told.  Green cards.  (Reading.)  So at
22  the bottom of -- it's page 24 out of her deposition.  I
23  don't have -- the bottom of page 24:
24       "Did you -- have you talked to the
25  mail carriers about how the signature pad works with the
                                                    Page 10

1  different envelopes?"
2       And she says, "No."
3       "Do you know how it works?"
4       "I guess I just understand it based on
5  what they have told me."
6       And he says, "Describe it for me?"
7       "Well, when we get certified mail, if
8  there's a green card, I sign the green card.  You tear
9  it off, give it back to the mail carrier, and then they
10  -- they will scan it.  If we get a stack, which some
11  days we do, they will scan all the barcodes and then
12  hand me the pad to sign --"
13       THE REPORTER:  Slow down, please, when
14  you read, sir.
15    A.  " -- and to print your name and put your
16  address on it for all these that were scanned.
17       "QUESTION:  When you receive that, do
18  you count them and make sure that they -- that they've
19  got all of them scanned?
20       "I don't actually see that on the
21  screen.  You can hear each one beep as they're doing it.
22       "Do you, yourself, count?
23       "No."  And it goes back and forth with
24  the (inaudible.)
25       "Do you, yourself -- when they come
                                                    Page 11

1  back and ask you to sign, do you count how many you're
2  getting?
3       "No.
4       "Do you determine whether or not how
5  many packages your one signature is attached to at that
6  time?
7       "No.
8       "Have you ever asked how that works?
9       "No.
10       "Have you seen certified mail come to
11  you through nonsimply certified mail records?
12       "They're not green cards.  I don't pay
13  attention to that."
14       And so this and just my overall reading
15  the case, to me the issue with Simply-Certified mail is
16  not with the platform, not with their system, but with
17  really the way the mail carrier handles the delivery.
18       And the way in this case Ms. Cochell
19  handles it.  There doesn't seem to be any process for
20  verifying that you got everything -- well, you sign it.
21  That's for everything that was scanned in.  And do you
22  count them?  Well, no.
23       So to me, that's the potential --
24  potential for something being lost or misplaced or it
25  raises questions to me as to the integrity of the
                                                    Page 12

1  process.
2  BY MS. THOMPSON:
3    Q.  Okay.  Just so I understand, so are you saying
4  that the mail carrier after scanning each piece of mail
5  maybe doesn't hand over all of the pieces of mail
6  because no one is checking to make sure they got all of
7  them?
8    A.  It wouldn't be intentional.  But there is --
9  there -- there is room for error in this process in my
10  opinion.  And I said in my report, I didn't see
11  conclusive evidence that this had absolutely been
12  delivered.  And when I looked at the process or lack of
13  process when this happens, that just supports that
14  opinion.
15    Q.  Okay.  So I'm just trying to understand
16  exactly where you think the breakdown in the process is.
17  Okay.  So let's start with Ms. Cochell and when she's
18  actually mailing things out.
19       What is the issue with what she's doing?
20    A.  When she's mailing them out, I didn't -- I
21  didn't bring that up.  It's really on the receipt that I
22  was looking at.  Mailing them out, it appears as though
23  they prepare them.  The one issue I do have with the
24  mail-out -- and it goes to Mr. Gilhorn's letter -- is he
25  puts on here via certified mail.
                                                    Page 13

1    I was taught a long time ago, and it's
2  been reinforced many times since in every place that
3  I've worked with people, you put via certified mail,
4  return receipt requested, and then you put the number --
5  the tracking number on this so that you can identify the
6  letter or the piece of mail being sent.  You can link
7  that to the certified number and the scan and all of
8  that.
9    And so it's a way of assuring -- and then
10 you've got all the backup that comes with it if you do
11 it electronically.  If that number is on here, then you
12 know that letter and if you see it.  If it's not, you're
13 not a hundred percent certain.  There's room for error
14 in that process.  And that also makes me question.
15    Q.  Okay.  And so is the room for error you're
16 saying that it could be something different in the
17 certified mail that's sent out?
18    A.  It would be possible, if you had a bunch of
19 these, to maybe switch two of them; put them in the
20 wrong envelope.  Without having that keyed here and then
21 preferably checked that it's received that what -- the
22 number that's on there.
23    'Cause that's why we've always done it.
24 We do the same thing with FedEx.  We -- you know, we get
25 all of those.  They're logged.  If you put it on the

Page 14

1  letter so you can identify the contents of that
2  particular shipment.
3    Q.  Okay.
4    A.  And so it -- it doesn't prove anything one way
5  or the other.  It just raises the question.
6    Q.  Okay.  And so you're aware that the
7  Simply-Certified has like a memo line that tells you
8  what's in it, correct?
9    A.  It -- depending on what you -- yes.  Depends
10 on what you put in it, yeah.
11    Q.  And that is not sufficient in your mind to
12 link up because why?
13    A.  Well, it could be if it were very descriptive.
14    Q.  Okay.
15    A.  But I don't know that it's -- again, you don't
16 know what's always in that memo line.  And so let's see
17 if I can find it.  If this even shows up on here.
18 That's the confirmation.  A quick scan of this, I don't
19 see a description of the contents.  (Reading.)
20    But that's -- that's been an industry
21 practice for 40-some-odd years.  Every place I've ever
22 worked, it's been at.
23    Q.  So the first problem you're identifying is the
24 lack of the certified number on the letter, correct?
25    A.  Yes.

Page 15

1    Q.  Okay.  What -- what is the -- it sounds like
2  there are other issues.
3    What's the next issue in the -- in the
4  process?
5    A.  I think the fact that they're scanned in tells
6  me it got out.  So that when they're mailed, I didn't
7  see -- there's potential there if there's not a process
8  to make sure that everything was given to you goes out.
9  But once they're scanned in, you're pretty sure it went
10 out.
11    But when they -- in the delivery with the
12 mail carrier, they seem pretty nonchalant.  Well, here,
13 you sign here.  And here's your -- it's not real clear.
14 There's not a count made, here's seven -- one, two,
15 three, four, five, six, seven.  I don't see that being
16 verified anywhere.
17    Q.  And to be clear, are you talking about that
18 the mail is being picked up?  Or when the mail is being
19 delivered?
20    A.  In this case, when the mail is being
21 delivered.
22    Q.  Okay.
23    A.  When it's being picked up, I think the fact
24 that it's scanned in as to that particular piece tells
25 you yes, that was actually sent.

Page 16

1    Q.  Okay.
2    A.  And were all of them?  I don't know.  We're
3  just addressing one.
4    Q.  Okay.  And then the mail is then scanned when
5  delivered as well.  Are you aware of that?
6    A.  The pieces that are delivered are scanned,
7  yes.
8    Q.  Okay.  So you -- so you're saying that there
9  is, though, a potential gap in mail carrier scans but
10 then doesn't actually hand over every single piece; is
11 that correct?
12    A.  If it's not counted.
13    Q.  Okay.
14    A.  That is a possibility.  And then she addressed
15 that here.  (Reading.)
16    "They will scan all the barcodes and
17 hand me the pad to sign.  Print the name."
18    I don't see any-- anybody counting
19 anything.  And they just asked if count?  No.  So not
20 saying it didn't happen.  It's just the opportunity --
21 there's an opportunity that something got missed that
22 (inaudible.)
23    Q.  Understood.
24    So you understand that Ms. Cochell is a
25 Mewbourne employee, correct?

Page 17

5 (Pages 14 - 17)

1    A.  Ms. Cochell?  Yes.
2    Q.  Okay.  So -- but the delivery we're talking
3  about here is at Yukon, correct?
4    A.  Correct.
5    Q.  Okay.  Do you know if they count the mail?
6    A.  I believe in the deposition they say they
7  don't also.  I believe that --
8    Q.  Okay.
9    A.  -- Ms. Johnson said they don't also.
10    Q.  I was just making sure we were talking about
11  the same thing.
12    A.  Yeah, and I looked at this 'cause this was
13  just the best description.  But to me, I really put more
14  of the blame on the carrier.  I -- if -- if
15  Simply-Certified mail is going to be reliable, they need
16  to make sure that the carriers are handling this in a
17  way that it doesn't create questions.
18        And then internally, you would want to, I
19  think, have a process too so that nothing falls through
20  the cracks.
21    Q.  Okay.  Would the issues you're talking about
22  not still be the case if you're doing a physical green
23  card certified mail?
24    A.  Well, it wouldn't be because if it's delivered
25  and that green card is signed, then it is returned and
                                                    Page 18

1  that green card is keyed to that envelope so that you
2  know, in fact, that was -- it wasn't just one signature
3  for all of them.  There's a separate signature on every
4  single green card.
5    Q.  But if no one's counting them, is it not the
6  same problem when the mail carrier just hands you the
7  stack of green cards to sign and then hand back and then
8  handing you the stack?
9        MS. RUDNICKI:  Objection; form.
10    A.  I've never had them hand me a stack of green
11  cards.  I've received these things before.  They hand
12  me.  I sign them.  They would then tear them off and --
13  the carriers that I've worked with.  So I mean, I
14  understand what you're saying.  But yeah.
15        But you would at least want to count the
16  cards and count the pieces and probably key that in and
17  verify the -- the numbers.
18  BY MS. THOMPSON:
19    Q.  Yes.
20    A.  If they'd already been torn off.
21    Q.  But if you're not counting, you have the same
22  issue as with the Simply-Certified?
23        MS. RUDNICKI:  Objection; form.
24    A.  It's a process issue, yes.
25
                                                    Page 19

1  BY MS. THOMPSON:
2    Q.  Okay.  Are there additional opinions you have
3  after reading Ms. Cochell's deposition?
4    A.  Not directly.  That's the one that I really --
5  I said I had not seen that prior to my opinion or
6  writing my opinion and writing my report.
7    Q.  Okay.
8    A.  But that just -- it surprised me when I read
9  it.
10    Q.  Okay.  Other than your opinions after reading
11  Ms. Cochell's deposition, are there any other opinions
12  you would like to proffer that are not in your report?
13    A.  (Reading.)  No, I believe that's it.
14    Q.  Okay.  Okay.  Let's go back to your expert
15  report, which we had marked as Exhibit 73.
16        Could you turn to Exhibit B, which would
17  be at the very back.  It's the list of documents.
18    A.  Yes.
19    Q.  Okay.  Are there any documents that you
20  received from Yukon or counsel for Yukon related to your
21  analysis in this case other than the documents listed on
22  Exhibit B?
23    A.  This was done at the time I submitted my
24  report.  I have since received a number of the
25  depositions.
                                                    Page 20

1    Q.  Okay.  Which depositions did you receive?
2    A.  Give me a minute.  All right.  Thank you.  So
3  deposition transcripts for Chad McDougal, Pam Cochell,
4  Tony Phillips, Karina Edwards, Lestie Johnson.  And some
5  additional exhibits.  I believe Exhibits 58 through 70,
6  I think.
7        MS. RUDNICKI:  And just so it's clear, he
8  has a full copy of this notebook.
9        MS. THOMPSON:  Okay.  So he's received
10  all exhibits from the deposition?
11        MS. RUDNICKI:  Every exhibit.
12        MS. THOMPSON:  Okay.
13        THE WITNESS:  And that was subsequent to
14  preparing my report, receiving the notebook.
15  BY MS. THOMPSON:
16    Q.  Is that all you remember receiving?
17    A.  It is.
18    Q.  Okay.
19        MS. RUDNICKI:  I feel like I need to say.
20        MS. THOMPSON:  Yeah, go ahead.
21        MS. RUDNICKI:  And some of the exhibits
22  that are here are already on --
23        MS. THOMPSON:  Yes.  Yeah, I would expect
24  that.  Yeah, okay.
25        MS. RUDNICKI:  (Indiscernible.)
                                                    Page 21

                                          6 (Pages 18 - 21)

1        MS. THOMPSON: That would be strange if
2   you hadn't given him the key documents.
3        MS. RUDNICKI: The key documents that are
4   already on there.
5        MS. THOMPSON: Yeah, I understand that.
6        MS. RUDNICKI: Okay.
7        MS. THOMPSON: Okay.
8   BY MS. THOMPSON:
9     Q. In formulating your opinions in this case, did
10  you review or rely on any documents other than those
11  listed in Exhibit B or the documents we just talked
12  about you receiving after your report?
13    A. No.
14    Q. Okay. Are you under any mental or physical
15  condition that would prevent you from testifying
16  truthfully today?
17    A. No.
18    Q. What did you do to prepare for your deposition
19  today?
20    A. Reviewed all of the material that we've
21  discussed, the material that was provided to me
22  previously. Obviously, I paid a lot of attention to
23  these depositions that I had not seen before. And so I
24  went through each one of those. Actually, all of them
25  once. And then went back and cross-referenced on all of

Page 22

1   those.
2         Re-read Mr. Roach's report, re-read my
3   report. Just generally reviewed everything to be -- be
4   prepared to -- to be deposed.
5     Q. Did you meet with counsel?
6     A. I did.
7     Q. For how long did you meet?
8     A. About three hours. About three hours
9   yesterday afternoon.
10    Q. Sounds like you have, but which depositions in
11  this case have you read?
12    A. I have read all of the ones that I mentioned
13  here.
14    Q. Okay.
15    A. I received those over the course of the last
16  week or so. I didn't just get them all at the end. So
17  yeah. I read through them as they...
18    Q. Okay.
19    A. Yeah.
20        MS. RUDNICKI: He looked at me because
21  technically he received them as we received them.
22        MS. THOMPSON: Okay.
23        MS. RUDNICKI: And then we sent him a
24  summary.
25        THE WITNESS: Lots of reading.

Page 23

1   BY MS. THOMPSON:
2     Q. Okay. Let's go back to your report here,
3   Exhibit 73. Could you turn to Exhibit A, page 1 of your
4   -- of Exhibit A?
5     A. Yes.
6     Q. Okay. Is this your CV?
7     A. It is.
8     Q. Do you have any updates to your CV since
9   you've submitted this as part of your report?
10    A. No.
11    Q. Okay.
12    A. I had to stop and think if I'd been deposed
13  since then. I haven't, so...
14    Q. Okay. So I'd like to go through your work
15  history a little bit.
16        So it looks like, first of all, you went
17  to the University of Texas at Austin?
18    A. I did.
19    Q. Okay. And did you graduate?
20    A. I did not. I attended for two and a half
21  years.
22    Q. Okay. And were you at the time studying for a
23  specific major?
24    A. I started out biology premed and switched over
25  to general business.

Page 24

1     Q. Okay. And then what did you do after you left
2   U.T.?
3     A. Well, while I was working at UT, I was working
4   in retail. And the reason I left is there was a jewelry
5   company in Austin I was working for. And the manager
6   said if you can get into the management program like
7   right now, you'd have a store within a year, a year and
8   a half. You'd be one of our younger store managers.
9   Would you consider doing that?
10        And without a lot of detail, I did. And
11  so I went to work for -- it was called Stelfox Jewelers
12  in Austin.
13        THE REPORTER: I'm sorry, it was called?
14        THE WITNESS: I'm sorry. It was called
15  Stelfox, S-T-E-L-F-O-X Jewelers in Austin.
16    A. At Highland Mall. They then transferred me to
17  Linz, L-I-N-Z Jewelers in Dallas. Linz opened a store
18  in Oklahoma City in 1981. They transferred me up there
19  as manager. So they were pretty honest on their
20  year-and-a-half time frame.
21  BY MS. THOMPSON:
22    Q. Okay.
23    A. And then just to finish the story, one of my
24  best customers was a broker, an oil and gas lease
25  broker. And we got talking several times. He said come

Page 25

1 see what we do. And I ended up going to work for him in
2 1981.
3    Q. Okay. So that's how --
4    A. That brings you to that -- that brings us to
5 the gap.
6    Q. That was my question was what's with the gap.
7 Jewelry store manager is not what I was expecting, but
8 okay.
9    A. You know, it's funny where life takes you
10 sometimes.
11    Q. Okay. So in 1981, you started working as a
12 landman; is that correct?
13    A. Correct.
14    Q. Okay. So who were you working for?
15    A. A guy by the name of Sam B. Rose, R-O-S-E.
16 And the company is Sam B. Rose Oil and Gas Properties in
17 Norman, Oklahoma. 20011 Iowa 405-364-6920.
18    Q. Good memory. Don't need that much detail.
19    A. As many times as we -- I know. It's just...
20    Q. Okay. And how long did you work for Mr. Rose?
21    A. I worked on and off for Mr. Rose for -- gosh.
22 I don't know. Started in '81 and probably through '85
23 when I started -- when I went out on my own.
24    Q. Okay. So at that time, you started doing land
25 work for yourself as like an independent contractor?

Page 26

1    A. I did. And I was an independent contractor
2 for Sam too. We all were back then.
3    Q. Okay. And were you still in Norman after
4 1985?
5    A. I was in Oklahoma City.
6    Q. Oklahoma City.
7    A. (Indiscernible.)
8    Q. Okay. I see. And were you in Oklahoma City
9 until 1992?
10    A. No. And I was actually just looking at this.
11 Somehow preparing this, the early stuff got cut out.
12 And I don't -- that's why I double checked a couple of
13 times. And I've got a copy of this that goes back.
14       But anyway, no. Things in Oklahoma got
15 really bleak in about 1987 to the point before the
16 bumper sticker said when (indiscernible) Oklahoma City,
17 please turn out the lights. And so I was --
18    MS. RUDNICKI: Slow down. Slow down.
19    A. So no. I began picking up work in other
20 areas, primarily a company in Texas that also had an
21 office in California. They had a bunch of properties
22 out in Consho County, Paint Rock. I helped them clean
23 up a bunch of you would to sell (indiscernible.)
24       That was a period of where you would take
25 the work as you could find it. And it was a really,

Page 27

1 really rough time. We probably lost 80 percent of the
2 field guys in our profession on something else. And
3 that was up until about 1992. I just kind of took it
4 where I could find it.
5 BY MS. THOMPSON:
6    Q. Okay. Let's take that in two chunks. So
7 let's talk about the '81 to '85.
8    A. I'm sorry. Let me point something out. And
9 that's what I'm looking at. This is buried back here
10 in a different time. There was a reason for it. And
11 it's not -- I'm going to change that. It's not as
12 clear. But the -- the early stuff is actually in here
13 starting in 1981. It's in reverse chronological order.
14    Q. I got that.
15    A. Okay. Okay. Good deal. That's why when I
16 was looking at it, you know, you're concentrating --
17    MS. RUDNICKI: She's on page 2. So why
18 don't you get on page 2.
19    THE WITNESS: Okay.
20    MS. RUDNICKI: Okay. Now you are on page
21 2, and she is on page 2.
22 BY MS. THOMPSON:
23    Q. I'm on page 2 talking about, yeah --
24    MS. RUDNICKI: Right here.
25 BY MS. THOMPSON:

Page 28

1    Q. This '81 to '92 time period. We're kind of
2 breaking it up.
3    A. Right.
4    Q. Just seems like there is two different phases
5 to it. So --
6    A. '81 to '92 was clients all different places
7 and really would go -- and some of them were for a day
8 or two and others were for several weeks. Some of them
9 were without travel. But yeah. That was -- that was
10 doing whatever was necessary to eat.
11    Q. Okay. So -- so in this first chunk from '81
12 to '85 when you're working for Mr. Rose, what sort of --
13 what sort of day-to-day work are you doing?
14    A. I was a field landman. I actually ended up
15 working at county 'cause I was curious, 44 of the 77
16 counties in Oklahoma. Now, that doesn't mean a lot of
17 time in each one of them, but I was kind of his fireman.
18       If he had something he needed done quickly
19 or needed something fixed, he would tell me to get in
20 the car and go. And so I went all over the state doing
21 a lot of work for him. And I say "him." I talked to
22 him all the time. Michael Schween and Hal Smith, who's
23 still active in Oklahoma City, were the two crew chiefs
24 we worked with when I was with Sam. And then...
25    Q. And as a field landman, what were you going

Page 29

8 (Pages 26 - 29)

1 out to these sites to actually do?
2     A.  I did all of it.  I didn't just run title.  I
3 didn't just buy leases.  I did all this.  So I would be
4 given a prospect.  And it could be a section.  It could
5 be larger.  And I would go and -- using the public
6 record, I would examine title.
7          I would determine ownership.  I would
8 locate those people.  I would identify any problems in
9 the title that I saw as I went.  I would locate those
10 people.  I would negotiate oil and gas leases --
11          MS. RUDNICKI:  Slow down.
12          THE WITNESS:  I thought I was.
13          MS. RUDNICKI:  I know.
14          MS. THOMPSON:  No, you're not.
15          MS. RUDNICKI:  No.  You're not.  You're
16 going so fast.
17          THE REPORTER:  (Nods head vigorously in
18 agreement.)
19          THE WITNESS:  I'm sorry.
20          MS. RUDNICKI:  And it's really not --
21 it's really for the court reporter.
22          THE WITNESS:  Okay.
23          MS. RUDNICKI:  That we want to...
24          THE WITNESS:  I understand.  I'll slow
25 down.

Page 30

1          THE REPORTER:  Thank you.
2          MS. RUDNICKI:  You're welcome.
3     A.  But whatever was necessary to complete.  And
4 some -- some were large projects.  Some were small
5 projects.  Sometimes there would be other people on the
6 same project.
7 BY MS. THOMPSON:
8     Q.  Okay.
9     A.  But just general field work.  Not -- not
10 in-house work.
11     Q.  Okay.  And at this time period, that's only in
12 Oklahoma; is that correct?
13     A.  From --
14     Q.  '81 to '85.
15     A.  '81 to about '87.
16     Q.  '87.
17     A.  Yeah.
18     Q.  Okay.  '87.  Okay.  So what is [sic] lead
19 broker mean?
20     A.  Lead broker is generally the landman who gets
21 the work from the client and assigns it out to sub
22 brokers, so independent contractors.
23     Q.  And what is crew chief?
24     A.  A crew chief is in between the lead broker and
25 the field brokers.  And he coordinates the field

Page 31

1 activity usually on a prospect basis.
2     Q.  Okay.  So it says that you were a witness
3 before the Oklahoma Corporation Commission in force
4 pooling matters; is that correct?
5     A.  I was.
6     Q.  Okay.  Approximately how many matters?
7     A.  I was looking at that the other day.  A
8 handful.  Probably two to five, three to five.
9 Something like that.  It was for a client in
10 Pottawatomie County.  P-O-T-T-A-W-A-T-O-M-I-E.
11     Q.  Do you remember any specifics about these
12 matters?
13     A.  We were working a project in Pottawatomie
14 County.  And we were getting ready to draw wells.  And
15 in pooling them, I would gather all of the information
16 necessary to testify before the Corporation Commission
17 as to bonus and royalty and terms and that sort of thing
18 so I could inform the hearing officer of what was going
19 on in --
20          THE REPORTER:  So you could inform who?
21          THE WITNESS:  The hearing officer.
22 BY MS. THOMPSON:
23     Q.  So were you testifying on behalf of the
24 prospective operator?
25     A.  Yes.

Page 32

1     Q.  And so were all of these matters for the same
2 operator?
3     A.  Yes.
4     Q.  Were there any protests in any of these
5 matters?
6     A.  Not that I'm aware of.  There may have been
7 after I gave them my testimony.  I don't recall there
8 being any.  But there might have been.  Certainly
9 nothing I dealt with.
10     Q.  Okay.  So then after 1987 -- so in 1987 to
11 1992, is that when you were working in Texas, Arkansas
12 and Montana?
13     A.  '90-- from -- well, I didn't work for
14 Louisiana then.  Mainly Texas properties in that period
15 in '92.  I actually ended up moving to Dallas in 1992.
16 It could have been several other places.  Just --
17          MS. RUDNICKI:  Wait.
18          MS. THOMPSON:  Yeah, yeah, yeah.  Sorry.
19          MS. RUDNICKI:  She's talking about a
20 different time frame.
21 BY MS. THOMPSON:
22     Q.  Yeah.  So '87 to '92.
23     A.  Right.
24     Q.  You indicate -- so you've put together on your
25 resume '81 to '92.  So I'm kind of trying to break it

Page 33

9 (Pages 30 - 33)

1  up. It seems like there is a solely Oklahoma time. And
2  so --
3      A.  '81 to '87 --
4      Q.  Yes.
5      A.  -- was Oklahoma.
6      Q.  So '87 to '92, you also have references to
7  Texas, Arkansas and Montana. So I'm trying to figure
8  out if that is what's happening during that time period?
9      A.  Well, Oklahoma, Texas, Arkansas, Montana all
10 would have -- I worked all of those prior to '87.
11     Q.  Okay.
12     A.  I've also worked Oklahoma and Texas from '87
13 to '92.
14     Q.  Okay. So again, we'll take a chunk.
15         From '81 to '87, what percentage of your
16 work was Oklahoma work?
17     A.  Probably 85 percent.
18     Q.  Okay. And then from '87 to '92, what
19 percentage would you say was Oklahoma work?
20     A.  Probably 25 percent.
21     Q.  Okay. And what was the majority of your work
22 from '87 to '92 geographically?
23     A.  You mean in Texas?
24     Q.  Was it Texas?
25     A.  Yeah.

Page 34

1      A.  And I don't know that PPLAs were common in
2  that time period. I don't believe they were.
3      Q.  I don't know either.
4      A.  I think that's a relatively new thing.
5      Q.  Okay. So then in 1992, you took a job in
6  Dallas with Commonwealth Land Title Insurance Company --
7      A.  Right.
8      Q.  -- is that correct?
9      A.  Right.
10     Q.  What did you do there?
11     A.  So I moved to Dallas. And land work was still
12 hard to come by. And I had seen an ad in the newspaper
13 for somebody with title experience. But it was with a
14 title company. And so I called them. No, no. We need
15 people with title. And I said, well, what do you do?
16 And I told them what I -- okay. Talk to us.
17         I ended up going down there on a temporary
18 basis starting working some files for them. They hired
19 me within about 60 days to be a title examiner in house.
20 And a few months later, I was named Assistant Title
21 Operations Manager.
22     Q.  Okay.
23     A.  I tried to tell them that a landman is nothing
24 more than a field or abstract or examiner.
25     Q.  Okay. So you were working from '92 to '94 as

Page 36

1      Q.  That's what I'm asking.
2      A.  Yeah.
3      Q.  Okay?
4      A.  I didn't know if you wanted the counties.
5      Q.  Oh, no. We don't need to be that specific.
6  If you remember, you can tell me. But we -- we don't
7  need that. Okay.
8          Were you involved with any applications
9  before the Oklahoma Corporation Commission where you
10 weren't testifying?
11     A.  No.
12     Q.  Okay.
13     A.  I may have gathered information in the field,
14 but not in the actually preparation sense, involved in
15 that sense.
16     Q.  Okay.
17     A.  Getting the material together so that they
18 could -- so the in-house landman could file.
19     Q.  But you're not directly involved?
20     A.  No.
21     Q.  Got it. Understand.
22          So at any point in this '81 to '92 time
23 period, were you dealing with PPLAs?
24     A.  No.
25     Q.  Okay.

Page 35

1  a title examiner?
2      A.  And I was actually running the title plant.
3  Hands on, work flow, taking care of problems. My office
4  was between the two title attorneys. And so any issue
5  that came up, I would take it -- actually, I told them
6  I'm going to ask both of you 'cause I want to learn
7  everything from your prospective.
8          And they -- they were great. So it was
9  kind of like a mimi title school too on top of the
10 experience I already had.
11     Q.  And you were living in Dallas at the time?
12     A.  Living in Dallas.
13     Q.  Okay. Then it looks like you went back to
14 being an independent landman in 1994; is that correct?
15     A.  I did. One of the guys that I had hired as an
16 abstractor at Commonwealth had left to go back to being
17 a landman, which is what everybody was trying to do.
18 And he called me and told me that he was working on a
19 project and they needed help down in the Houston area,
20 down in Brenham and Washington County. And it was with
21 Chesapeake.
22         THE REPORTER:  With -- with Chesapeake?
23         THE WITNESS:  I'm sorry, with Chesapeake.
24     A.  And I went down and talked to him and went to
25 work for him.

Page 37

10 (Pages 34 - 37)

BY MS. THOMPSON:

Q. Okay. So you were an independent contractor for Chesapeake?

A. Yes.

Q. Okay. And were you an independent contractor for Chesapeake from 1994 to 2013?

A. No, from '94 until about '96 -- I moved to Houston in '95. Worked -- continued to work for them for a while. And then ended up going to work with various groups in Houston.

Q. Okay.

A. Chesapeake was having cash flow issues.

Q. So when you were working with Chesapeake, what -- what kind of work were you doing?

A. Similar to what I had done before. Running title. Locating people. Negotiating leases. With them, I did more curative work probably than I had done before, where I would -- you know, any issues in title, people would bring them to me. And I would -- I would worked to resolve those.

Actually doing title opinion curing. Once the title opinion had been issued, taking those and meeting those requirements, satisfying those requirements.

Q. And was the work you were doing for Chesapeake

Page 38

based in Texas? Or was it somewhere else?

A. It was in the Austin chalk play in Texas. And that's an area northwest of Houston.

Q. Okay. So after your work with Chesapeake, you said you started to work for various companies?

A. Yes.

Q. Okay. What types of companies were you working for?

A. For oil and gas operators. Originally through a broker named Roger Soape. And then again went back out on my own. They were all -- they were all operators from different places, different projects. Just a wide variety. And I actually had as many as half a dozen or eight landmen working for me as needed.

Q. Okay. And what type of land work were you doing?

A. It's the same sort of thing. Although it becomes more sophisticated as you get -- I think the industry changed some. So not -- not just going to the courthouse and running title and leasing. But taking in-house issues and helping to resolve those.

Working very closely with the title attorneys on satisfying title requirements and really anything else that popped up that was a problem.

Q. Okay. And you said you were working with a

Page 39

broker but then went back to working for yourself.

At what -- what year did you go back to working for yourself?

A. Let's see. 2003/'4. Somewhere in there.

Q. Okay. So during this time, like '97 to 2003-ish time, is there a geographic area you're working on? Or is this kind of all over?

A. In that time period, I worked multiple counties in Texas. I worked Louisiana. I worked a small project in Arkansas. By the way, I worked Montana back when I was still in Oklahoma. But that's a long story. But yeah. Again, where the work was. Things were starting to pick up.

And then by -- by 1999, things -- the industry had recovered some. And I was contacted to begin a project in what turned out to be the Barnett Shale up in the Dallas Fort Worth area.

And so I went up there. I literally went from Houston to Johnson County just south of Fort Worth every week for two years. We were the first company to go in there. And that was for what was initially ended up being -- Devon bottomed out.

THE WITNESS: Who started the shale?

A. But yeah. Anyway, we were the first one up there. I'll think of it in a minute.

Page 40

BY MS. THOMPSON:

Q. Okay. So you were traveling up there, but you were based in Houston?

A. Based in Houston.

Q. Okay. Have you been based in Houston since this time?

A. I have.

Q. Okay. So you said sometime around 2003 or 2004, you started working for yourself again.

And is -- was that the state of affairs from 2003-ish to 2013?

A. Yeah, really -- yeah. I mean, we're all independent contractors for hire. And one project wraps up, I would usually stay with a client as long as they had work. I think with one exception.

Q. Okay. And was your work during this time similar to what you'd been doing before?

A. It was everything I had been doing before and then more getting involved and going with -- to the Texas Railroad Commission doing research there.

Looking at -- kind of working quasi in house putting together units and that sort of thing. More so than I had done previously.

Q. When you say that you were getting more involved with the Railroad Commission, do you mean

Page 41

11 (Pages 38 - 41)

1  putting together applications and filings to the
2  Railroad Commission?
3      A.  Or researching and gathering information so
4  that my client could file.  Most of these companies have
5  in-house people who handle all their filings.
6      Q.  Okay.  So you were researching in the files of
7  the Railroad Commission?
8      A.  Often, yes.
9      Q.  Okay.
10      A.  Also putting together packages on lease sales,
11  bid packages on lease sales, both with the Railroad
12  Commission and also at the county level on county lands
13  we leased.  And they have auctions.  So doing a lot of
14  that type of work also.
15      Q.  When you say you're putting together packages
16  for lease sales, what exactly does that mean?
17      A.  So if a governmental entity owns a piece of
18  property, they'll put it out for public bid.  And you do
19  all the research necessary to try to determine what you
20  want to bid.  And then you make sure the bid gets filed
21  timely.
22      Q.  Okay.  Okay.  So I this is -- somewhere in
23  this time frame is also when you started working as an
24  expert witness; is that correct?
25      A.  Yeah.  Give you a date, I think.  (Reading.)

Page 42

1      Q.  It's the first time it shows up on your CV.
2  So --
3      A.  Yeah --
4      Q.  -- that's why it indicated to me.
5      A.  Yeah, no.  That sounds right.  It occurs to me
6  a lot of this stuff is not dated.  But yeah.  (Reading.)
7  So it's chronological.  These are the cases in which I
8  was either deposed or testified at trial.
9      Q.  Uh-huh.
10      A.  There were some other cases where I was a
11  consulting expert that aren't on here.
12      Q.  Okay.
13      A.  But yeah.  That -- that's -- that's about
14  right.
15      Q.  Okay.
16      A.  2000-- in the middle 2000s.
17      Q.  And how did you get involved in expert witness
18  work?
19      A.  Well, go back a little.  I started teaching
20  seminars for APL, the American Association of
21  Professional Landmen in 2003.  And we used to do a lot
22  of seminars back then.  And so I apparently -- some
23  attorneys thought that was pretty good background to
24  have for an expert.
25          I had never marketed as an expert.  And I

Page 43

1  got a phone call out of nowhere.  And we talked about
2  it, and that's how I started doing it.
3      Q.  Okay.  How did you get involved giving
4  seminars for the AAPL?
5      A.  Got drug into it kicking and screaming.  No,
6  the director of education at the time, the people they
7  had doing these seminars -- and what I started with was
8  called the Certified Professional Landman exam review.
9  And it's a three-day.  And it's day one, day two, day
10  three.  I started doing day one.
11          So the director of education called me and
12  said would you do this.  I said I've never done any
13  public speaking.  Oh, you can do it.  No.  I said no a
14  bunch of times.  And he finally talked me into it.  And
15  I spent a lot of time studying that material 'cause it's
16  eight hours.  It's an eight-hour presentation.
17          The first time I did it was with
18  transparencies, about 400 of them.  And my greatest fear
19  was I was going to knock them over.  And there's nothing
20  like staring into the sun all day.  That's how I
21  started.  And I had no desire to ever start doing that
22  or really to continue after that experience.
23          Oh, you did great.  Please keep doing
24  them.  And now I've done that particular presentation
25  well over a hundred times.  And the only reason I say

Page 44

1  that is as you do these things, then I think you become
2  visible in the industry.  And I've also -- at the same
3  time, was serving as an officer and committee chair and
4  such with our professional association.  And so by
5  references.  I've never really -- I just recently put
6  expert witness on my LinkedIn page.  I've never really
7  advertised it.
8      Q.  You're a certified professional landman --
9      A.  I am.
10      Q.  -- correct?
11      A.  I am.
12      Q.  When did you first become certified?
13      A.  I certified in 1999.
14      Q.  Okay.  So sometime around 2013, it looks like
15  you started a new job for -- is this Percheron?
16      A.  Percheron.  Yeah, Percheron is a large
17  brokerage.  They do not only oil and gas work but
18  right-of-way work and Department of Transportation work.
19          But I had gotten to know the vice
20  president of operations and a couple of their other
21  people through AAPL.  And they had done a private equity
22  merger with Percheron and with a company called --
23  well, yeah.  Well, it was Mason Dixon Energy out of the
24  East Coast and OGM Land in this area.
25          They merged together to become Percheron,

Page 45

12 (Pages 42 - 45)

1 BY MS. THOMPSON:
2    Q.   Okay.  So, Mr. Horne, we just before the break
3 finished talking kind of about your work history; is
4 that correct?
5    A.   Yes.
6    Q.   Okay.  And one of the first things we talked
7 about was your experience testifying for the Oklahoma
8 Corporation Commission, correct?
9    A.   Correct.
10    Q.   And you said you had been involved in three to
11 five forced-pooling proceedings there?
12    A.   Yeah.  And there were a couple of times we
13 went down and didn't get -- we didn't get called.  But
14 -- you know.
15    Q.   Okay.  So that was all we were kind of talking
16 about the 80's.  Since then, have you been involved in
17 any proceedings before the Oklahoma Corporation
18 Commission?
19    A.   I have not.
20    Q.   Okay.  Okay.  So the most recent time you
21 testified before the Oklahoma Corporation Commission in
22 a forced pooling matter would have been around when?
23    A.   Probably 1985, '6.  Somewhere in there.
24    Q.   Okay.
25    A.   I don't think it was '87.  I think it would

Page 54

1 forced pooling, sorry.
2    A.   Really, virtually none.  There's the Mineral
3 Interest Pooling Act.  But it's rarely successful.  So
4 no.  There's not a forced-- effectively, there's not a
5 forced pooling --
6    Q.   So there's --
7    A.   -- process in Texas.
8    Q.   So there's not a need for PPLAs in Texas?
9    A.   No.  And when I was in Oklahoma, I don't think
10 it was a thing yet.
11    Q.   Okay.  Do you have any idea when PPLAs became
12 prominent in Oklahoma?
13    A.   I don't.  I've -- no.  I don't.
14    Q.   Okay.
15    A.   I've heard.  But nothing I could testify to.
16    Q.   I don't know either.
17          When is the most recent time you've been
18 involved in a forced pooling matter in any state?
19    A.   Oklahoma's the only state I'm aware of that
20 has that type of forced pooling.  I may be wrong on
21 that, but it's the only one I'm aware of.  So it would
22 have been -- you know, there's followups on that too
23 with increased incidents on -- again, I get a lot of
24 that for these small mineral interests.  But I just got
25 one the other day, but...

Page 56

1 have been '85 and '86.
2    Q.   And when is the most recent time you've been
3 involved more generally in a forced pooling matter in
4 Oklahoma?
5    A.   I own some mineral interests in Oklahoma.  And
6 so I have been pooled most recently probably ten years
7 ago.
8    Q.   Okay.  What about the most recent time you've
9 been involved in a forced pooling matter in Oklahoma
10 where you weren't the mineral owner?
11    A.   It would have been '87 or so -- I'm sorry,
12 86/87.  Somewhere in there.
13    Q.   Okay.  Have you ever negotiated a PPLA?
14    A.   I have not.
15    Q.   When is the most recent time you've analyzed a
16 PPLA other than the PPLAs in this case?
17    A.   That would be -- yeah.  The PPLA being unique
18 to Oklahoma because of -- because of the pooling in
19 Oklahoma.
20    Q.   Okay.
21    A.   It's not something we have in Texas or any
22 other jurisdiction I'm aware of.
23    Q.   Okay.  And is that because -- as I understand
24 it -- let me know if I'm wrong -- in Texas, there's not
25 really a lot of pooling 'cause the law is different?  Or

Page 55

1    Q.   Okay.  So looking back at your extensive work
2 history that we talked about --
3    A.   44 years.
4    Q.   -- in which, if any, of these positions were
5 you the person responsible for sending or receiving well
6 elections?
7    A.   No, I was not responsible in any of those
8 positions.
9    Q.   Okay.
10    A.   I would work with the person who was in
11 gathering.  But no.  Not directly responsible.
12    Q.   Okay.  In which, if any, of these positions
13 were you responsible for sending or receiving certified
14 mail?
15    A.   In relation to pooling matters?  Or just
16 certified mail.
17          MS. RUDNICKI:  General.
18 BY MS. THOMPSON:
19    Q.   Let's do general.
20    A.   General certified mail?  In almost all of them
21 for various reasons.
22    Q.   What sorts of reasons would you be sending or
23 receiving certified mail?
24    A.   Everything from sending originals to clients
25 at company's meeting request and sending FedEx.  I've

Page 57

15 (Pages 54 - 57)

1  just done a lot of it over the years.
2    Q.  Okay.  Typically, when you mail things, what
3  is the method of mailing that you use?
4    A.  Generally, it will be what my client requests.
5  If I wanted something to get there in a hurry and it's
6  not as dependent upon the proof of delivery, I would
7  usually use FedEx.  And they used to be more reliable
8  than they are.
9         But there are certain things where
10 certified is required.  And usually in regard to
11 regulatory issues, I would use that then.  FedEx was
12 always easier.
13   Q.  Okay.  Approximately how many pieces of
14 certified mail do you mail out in a month?
15   A.  Right now very few.  The nature of the work
16 I'm doing doesn't require certified mail.  But there
17 were times when I might spend -- send 200 pieces out.
18   Q.  And what position were you in when you were
19 needing to send 200 pieces of certified mail out?
20   A.  Contract landman working for an operator that
21 had that -- needed to have that done.
22   Q.  Okay.  And approximately how many pieces of
23 certified mail do you receive in a month?
24   A.  It varies.  I received one the other day.  But
25 I'd say in a year, maybe 12 to 15.

Page 58

1  would do it myself.
2    Q.  Do you have any specialized education or
3  training in certified mail?
4    A.  On the job.
5    Q.  So other than your experience as a landman
6  during this whole time, you don't have any specific
7  education or training on certified mail?
8    A.  No.  And I don't know where I'd get it if I
9  wanted it.  But what I do is, I do read everything.  I
10 read all the requirements when -- any time I'm asked to
11 deliver something in a new way.
12        I mean, so there -- the first time I had
13 certified mail, what do I need to do to do this right?
14 And I would read all the cards.  Read all the material.
15   Q.  And what are -- what are those materials that
16 you're talking about reading?
17   A.  The postal service used to have little fly
18 sheets, you know, available in the post office.  Or
19 they'd have something on the wall that talks about the
20 different ways of sending things.  I still read that
21 stuff when I go to the post office.
22   Q.  So do you have any experience with certified
23 mail other than sending and receiving certified mail?
24        MS. RUDNICKI:  Objection; form.
25   A.  Not that I can think of.

Page 60

1    Q.  Okay.
2    A.  And they tend to come in clusters.
3    Q.  When you receive certified mail, have you ever
4  electronically signed for the certified mail?
5    A.  I've not.
6    Q.  So you have always gotten a green card to
7  sign?
8    A.  If return receipt was requested, yes.
9    Q.  Okay.
10   A.  It's not -- I do get some certified mail that
11 does not have a return repeat.
12   Q.  When you send certified mail, do you request
13 return receipt?
14   A.  Almost always.  It's client specific, but
15 almost always.
16   Q.  And when you do use a return receipt
17 requested, do you always use the physical green card?
18   A.  Yes.
19   Q.  Okay.  Now, are you the one who's actually
20 putting things in the mail for certified mail?
21        Or do you have some sort of secretary or
22 assistant who helps you?
23   A.  I've done it both ways.  But probably
24 90 percent of the time, I do it myself.  I've had
25 secretaries or assistants before.  But not -- I -- I

Page 59

1  BY MS. THOMPSON:
2    Q.  Okay.  Okay.  Have you ever sent something by
3  certified mail and received either a green card or an
4  electronic receipt indicating that the mailing had been
5  received and signed for by the recipient and then had
6  the recipient deny having received the mailing?
7    A.  Not that I can recall.
8    Q.  Okay.  Let me ask it the other way.
9         Have you ever had someone claim that you
10 received something by certified mail where they received
11 either a green card or an electronic receipt indicating
12 the mailing had been received and signed for, but you
13 did not receive the mail?
14   A.  Not that I can recall.
15   Q.  Okay.  Or have you -- sorry.  We'll restart
16 that.  Are you aware of any instance of one of these
17 situations happening?
18   A.  No.
19   Q.  Can we turn to page 3 -- no, wait.  Wrong one.
20 Page 5.
21        MS. RUDNICKI:  Of Exhibit A?
22        MS. THOMPSON:  Yes.
23   A.  Industry Presentations?
24
25 BY MS. THOMPSON:

Page 61

16 (Pages 58 - 61)

1    Q.   Yes.  So as we kind of hinted at before,
2  you've done a lot of presentations in your career over a
3  lot of topics.  Is that --
4    A.   Yeah, when I first started doing this.  This
5  lists it all.
6    Q.   Yes.  And I appreciate that.  It is always the
7  correct thing to do to over include -- yes.
8         Now, in all of these presentations, are
9  any of them about forced pooling?
10    A.   No.
11    Q.   Okay.  Do any of these presentations discuss
12  PPLAs?
13    A.   No.
14    Q.   Do any of them discuss well elections?
15    A.   No.
16    Q.   Do any of these presentations discuss
17  certified mail?
18    A.   No.
19    Q.   Okay.  That's easy.  Okay.  Now, let's turn to
20  page 14 of Exhibit A.  So earlier you explained that
21  these are the cases that you've been deposed in or
22  testified at trial; is that correct?
23    A.   That's correct.
24    Q.   Okay.  And are these in chronological order?
25    A.   I believe they are.

Page 62

1    Q.   Okay.
2    A.   Yes.  They're -- they're meant to be.
3    Q.   Okay.
4    A.   So yeah.  And I've compiled this, I guess.  So
5  yeah.  Just add them on to the end.  So it should be.
6    Q.   So this first one is the oldest one?
7    A.   Yes.
8    Q.   Okay.  Did you submit an expert report in all
9  of these cases?
10    A.   No.  And I'm trying to think which ones I
11  might have.  Is that your next question?
12    Q.   Sure.  Which ones did you submit a report in,
13  to the best of your recollection?
14    A.   Yeah, that's a good -- that's a good question.
15  Let me see here.  (Reading.)  I believe in the AIC
16  Management, I did a short report, which is the third one
17  down.
18    Q.   Okay.
19    A.   The next one, I didn't do a report.  I did a
20  12-hour depo.  But I didn't do a report.  Dickey Chinn.
21  I hesitated on some of these.  I remember doing a lot of
22  work.  Did we actually do a formal report?  (Reading.)
23  Bottom of page 16, District of Columbia, I did a formal
24  report in that one.
25    Q.   Okay.

Page 63

1    A.   The rest of these, I hesitate on some of these
2  'cause I think I did a lot of work that I don't know
3  that it ever really got filed as an expert report in the
4  case.
5    Q.   Okay.  It's also okay if you don't remember.
6  It's fine.
7    A.   No, it's --
8         MS. RUDNICKI:  "I don't know" is a
9  perfectly fine answer.
10  BY MS. THOMPSON:
11    Q.   Yeah, I'm just asking what you remember.
12  Okay.  Did you give a deposition in all of these cases?
13    A.   Either depose-- well, somewhere I testified
14  without being deposed.  But one or the other in all of
15  them.  Let's see if I can remember.
16    Q.   Okay.
17    A.   First, Reichmann, no.  That was a bankruptcy.
18  Cornerstone, yes.  Lengthy deposition on that one.
19  Another bankruptcy.  (Reading.)  Went straight to trial
20  on the next one.  I was deposed at length on that Gregg
21  County case.  Another 12-hour one.  Midway, I testified.
22  Went straight to trial.  I think the Adams v Chesapeake
23  was a brief deposition.  (Reading.)
24         Prospect, I don't think so.  Orca was a
25  trial.  I don't think there was a deposition.  Hanwha

Page 64

1  was an arbitration with a deposition.  And then the
2  arbitration, I believe.  Antero case, another 12-hour
3  one in V&E's office in Dallas.  (Reading.)  Stronghold,
4  testified at trial.  Oil Projects Great American.  I
5  believe I was deposed in that one.
6         MS. RUDNICKI:  Which one?
7         THE WITNESS:  I'm sorry.  The oil
8  Projects v Great American.
9         MS. RUDNICKI:  Thank you.
10    A.   I was deposed on the D.C. one.
11  BY MS. THOMPSON:
12    Q.   Okay.  Were you we obtained by Stronghold or
13  Enverus?
14    A.   Stronghold.
15    Q.   I was just curious.  We've run into them.  So
16  I was just curious.
17    A.   You know that story?  Or...
18         MS. RUDNICKI:  No.  No -- no stories.
19         THE WITNESS:  Oh, no.  I'm not --
20         MS. RUDNICKI:  No stories.
21  BY MS. THOMPSON:
22    Q.   No.  Not -- not on the record.  Like it's
23  going to object.
24    A.   I was just wondering.
25    Q.   Okay.  To the best of your knowledge, has your

Page 65

17 (Pages 62 - 65)

1  testimony ever been limited or struck by a judge?
2      A.  I was advised long after the fact that
3  testimony had been excluded.  Seven years later, I found
4  out about it.  I contacted the law firm.  Oh, yeah.  It
5  was --
6          MS. RUDNICKI:  Real quick.  Is it on that
7  list?
8  BY MS. THOMPSON:
9      Q.  Yeah.  So first question is, which case are
10 you talking about?
11     A.  I -- I had -- it was either -- it was one of
12 the Chesapeake cases.
13     Q.  Okay.
14     A.  And I don't know that the other one has
15 separated.  It's a long story.  But I talked to the
16 attorney.  I said -- "Oh, yeah.  They -- yeah.  It
17 was -- it was challenged.  We -- we settled.  So we
18 didn't contest it."
19         Why?  And one answer was that I gave a
20 legal opinion.  And the other answer was that my report
21 was virtually identical to another case, which was
22 similar.  So yeah.  But I never really found out why.
23 But yes.  That one time is the only time I'm aware of.
24     Q.  Okay.  So you believe it was limited or struck
25 in some way because --

Page 66

1      A.  I believe it was excluded, yeah.
2      Q.  Excluded for the reason of it was a legal
3  opinion --
4      A.  Either I offered, yeah.
5      Q.  -- or it was the same that someone else was
6  offering?
7      A.  No, the same that I had offered --
8      Q.  Oh, okay.
9      A.  -- in a virtually-identical case --
10     Q.  Uh-huh, you got it.  Okay.
11     A.  -- with one of the same parties.  I mean, they
12 did the same thing.  And so it was very similar.  And
13 so...
14     Q.  Okay.  I will tell you, you're nowhere near
15 the only expert I know who has no idea when their stuff
16 gets struck and found out much later.
17         MS. RUDNICKI:  That's true.
18         MS. THOMPSON:  Yeah, we don't need to get
19 into it now, but...
20         THE WITNESS:  No, I -- it -- it didn't go
21 over well.  Let me put it that way.
22         MS. RUDNICKI:  It -- it's one of those
23 personal courtesies that we should afford all our
24 experts.
25         MS. THOMPSON:  Yes.

Page 67

1          MS. RUDNICKI:  Regardless of the outcome.
2          MS. THOMPSON:  And we should be equipping
3  you with the tools to explain why.  'Cause oftentimes
4  it's nothing wrong with your opinion.
5          MS. RUDNICKI:  Right.
6          MS. THOMPSON:  So I understand that.
7          THE WITNESS:  Yeah, well --
8          MS. RUDNICKI:  Like this time.
9          (A brief discussion was held off the
10 record.)
11         THE WITNESS:  It's hard to be a landman
12 and not sound like a lawyer.
13         MS. RUDNICKI:  We disagree.  Right?  The
14 lawyers disagree.  I'm just kidding.
15         THE WITNESS:  You don't understand.
16         MS. RUDNICKI:  Okay.  Now, back to
17 question and answer.
18 BY MS. THOMPSON:
19     Q.  Back to questions.  Okay.
20         So were any of your opinions in these
21 cases involving forced pooling?
22     A.  No.
23     Q.  Were any of your opinions in these cases
24 involving PPLAs?
25     A.  No.

Page 68

1      Q.  Were any of your opinions in these cases
2  involving well elections?
3      A.  No.
4      Q.  Did your opinions in any of these cases
5  involve certified mail?
6      A.  Oh it involved the use of certified mail or
7  the testifying about how cert-- no.
8      Q.  Your opinions did not discuss certified mail
9  in any of these cases?
10     A.  No, no.
11     Q.  So let's go to the first page of your report.
12     A.  Okay.
13     Q.  So we're on Exhibit 73.  And we're --
14     A.  You said 73?
15     Q.  It's 73.  You should have a copy with a
16 sticker on it.  I think --
17     A.  Oh, here it is.  Sorry.  This is with all the
18 attachments.
19         MS. RUDNICKI:  Yeah, give me this.  Let
20 me put this all together.
21         THE WITNESS:  Can I write on it?
22         MS. THOMPSON:  I mean, you can.
23         MS. RUDNICKI:  I would prefer you didn't.
24         THE WITNESS:  No, no.  That's fine.  I'll
25 put my -- I'll put my pen away.  I have tendency to mark

Page 69

18 (Pages 66 - 69)

1 stuff.
2          MS. THOMPSON: Okay.
3          MS. RUDNICKI: Go.
4          THE WITNESS: That's why I asked.
5          (A brief discussion was held off the
6 record.)
7 BY MS. THOMPSON:
8     Q. Okay. Back to report. Exhibit 73.
9          So we have -- your opinions start down
10 here on the bottom of the first page. And so your
11 opinions are in response to the opinions of Dorsey
12 Roach; is that correct?
13    A. Correct.
14    Q. Okay. And so this first one in this final
15 paragraph down here on page 1 is responding to a
16 subparagraph in Mr. Roach's report Subparagraph D,
17 correct?
18    A. Correct. Can I pull his report up too so --
19          MS. RUDNICKI: Yeah, you want to see it
20 side to side?
21          THE WITNESS: Yeah. There okay. Yes.
22 BY MS. THOMPSON:
23    Q. So this opinion here says -- are you ready?
24    A. Uh-huh.
25    Q. Okay. It says, "While the protest of a forced

Page 70

1          Okay. So earlier we talked about the
2 three to five cases you had been involved in for a
3 certain client before the Oklahoma Corporation
4 Commission, correct?
5     A. Correct.
6     Q. Okay. Are there other cases you've been
7 involved with in front of the Oklahoma Corporation
8 Commission?
9     A. Not where I've appeared before the Corporation
10 Commission, but where I was working for a company that
11 did appear. And we did the research and I -- yeah. Saw
12 some of the filings and such.
13    Q. Got it.
14    A. So yeah.
15    Q. Okay. And --
16    A. As an operator.
17    Q. Sure. And so how many of those cases have you
18 been involved in?
19    A. Probably eight to ten.
20    Q. Okay. And that would have been when you were
21 working in Oklahoma in the 80's?
22    A. Yeah, '82 to '87. '81 to '87. '82.
23    Q. Did all of those involve vertical wells?
24    A. Yes.
25    Q. So were you involved in -- so of those eight

Page 72

1 pooling can result in a delay of the issuance of the
2 final order, said delay is case specific and can vary
3 from a day to a few weeks to occasionally several
4 months." Is that correct?
5     A. Correct.
6     Q. Okay. So what is the basis for this opinion?
7     A. The basis is my experience. And it was in
8 response to his statement that a pro-- when it's
9 protested, he went straight to six to eight months. And
10 I thought that was excessive.
11    Q. Okay.
12    A. So my opinion is -- yeah. In my previous
13 experience, that yeah, it can lead to a delay. But it
14 can be a short delay or a longer delay. Not just a...
15    Q. And when you reference your experience, is
16 this your experience with the Oklahoma Corporation
17 Commission?
18    A. Yes.
19    Q. You testified earlier that you've not been
20 involved in an Oklahoma Corporation Commission
21 proceeding involving a protest; is that correct?
22    A. Well, I've been involved in some as a
23 respondent and such that may have been protested. But
24 as far as representing a party, no. Is that?
25    Q. Okay. Let's clarify.

Page 71

1 to ten cases, how many of them involved a protest?
2     A. Probably two.
3     Q. In your experience, how long does it take to
4 go from an application to a final pooling order in an
5 Oklahoma Corporation Commission forced-pooling case with
6 no protest?
7     A. I didn't always know the exact dates. A
8 matter of a few weeks. The ones that I was involved
9 with came back fairly quickly. But again, this was in
10 the '80s. So I don't know.
11    Q. When a protest is filed in a forced-pooling
12 matter before the Oklahoma Corporation Commission, what
13 procedures change as a result of that protest?
14    A. I don't know that I know that. In the support
15 positions, I don't know that that -- the procedure was
16 handled by the in-house landman.
17    Q. Okay. Do you know if there are additional
18 hearings that need to be had?
19    A. I'm sorry?
20    Q. Do you know if there are additional hearings
21 that need to be had?
22    A. Yes. It's my understanding there are.
23    Q. In the two Oklahoma Corporation Commission
24 forced-pooling proceedings you were involved in that had
25 a protest, how long did they take to get to a final

Page 73

19 (Pages 70 - 73)

1 order?
2    A.  It was fairly quickly.  If I remember right,
3 somewhere in the 60- to 90-day range, just based on how
4 we reacted to it.
5    Q.  What do you mean by it depends on how we
6 reacted to it?
7    A.  Well, the work flow in the office and so on.
8 Waiting for this.  And it seems that time frame's about
9 right where we proceed.
10    Q.  Do you remember what the issues were in the
11 two proceedings where there was a protest?
12    A.  I don't.  I don't remember.
13    Q.  Do you remember the outcome in the two
14 proceedings where a protest was involved?
15    A.  I know we ended up drilling a well.  I don't
16 know what the formal outcome was of the proceedings.  We
17 got what we needed to proceed.
18    Q.  Okay.  So you probably assumed the operator
19 was successful in getting the pooling order since they
20 went ahead and drilled?
21    A.  Yeah, I'm sure they were.
22    Q.  Let's hope so.  I guess limitations now,
23 but...
24    A.  Yeah.
25    Q.  Okay.  Any other basis for this opinion other

1    Q.  So you disagree with the contention that it's
2 always strictly enforced because you believe sometimes
3 there are exceptions?
4    A.  I know sometimes there are exceptions, sure.
5    Q.  Okay.
6    A.  I thought the -- I thought the statement was
7 overreaching.
8    Q.  So how would you characterize industry custom
9 and practice on the enforcement of election deadlines?
10    A.  How would I characterize it?
11    Q.  Uh-huh.
12    A.  I'm not sure exactly what you're asking.
13    Q.  Okay.  Let's try again.
14        MS. THOMPSON:  Yeah?  You want to say
15 something.
16        MS. RUDNICKI:  He characterized it as
17 strictly enforced.
18        THE WITNESS:  Oh, you're talking about
19 the enforce -- okay.
20        MS. RUDNICKI:  Yes.  So how -- I think
21 she's asking you how would you characterize it that's
22 different than how he characterized it.
23 BY MS. THOMPSON:
24    Q.  Yeah, that's correct.
25        Does that make sense?

1 than your experience?
2    A.  Did I look outside the material or?
3    Q.  Just any -- what else did you rely on other
4 than your experience in formulating this opinion?
5    A.  Just experience and the material I've reviewed
6 for this case.
7    Q.  Okay.  So if you turn to the next page.
8    A.  All right.
9    Q.  So -- and let me know if I am misinterpreting
10 this.  But my understanding is you are saying that it is
11 not industry custom and practice to strictly enforce
12 election deadlines; is that correct?
13    A.  Not every time.
14    Q.  So what do you mean -- what do you mean when
15 you say that it's not industry custom and practice to
16 strictly enforce deadlines every time?
17    A.  When I read this, I took it -- it sounded to
18 me as though Mr. Roach was saying that -- I don't know
19 if it's exactly -- how should I say this right?  It
20 sounded all encompassing.  It's industry custom and
21 practice in this case that it's always strictly
22 enforced.  And I disagree that it's always strictly
23 enforced.
24    Q.  So --
25    A.  It's a case-by-case basis.

1    A.  It's strictly enforced -- the way that it was
2 written it sounds like there's never any deviation.
3 It's always strictly enforced.  And I disagree with
4 that.  Depending on the relationship of the parties,
5 other things can happen.  So I just thought that was an
6 overreaching statement.
7    Q.  I understand --
8    A.  Yeah.
9    Q.  -- your disagreement with Mr. Roach's
10 statement.  I'm trying to ask, what is your opinion on
11 the industry custom and practice on the enforcement of
12 election deadlines?
13    A.  In the cases that I'm aware of, there was an
14 attempt to work things out first.  And sometimes
15 something -- it could be worked out.  Other times they
16 went ahead and just strictly enforced the terms.
17    Q.  Okay.  So in your experience, typically,
18 there's a conversation.  And sometimes they're strictly
19 enforced and sometimes they're not.
20        Is that -- is that a correct
21 characterization?
22    A.  Yes.
23    Q.  Okay.  And do you have an opinion on whether
24 most of the time they work it out?
25        Or most of the time it's strictly

1  enforced?  Or what kind of percentages you see?
2         MS. RUDNICKI:  Objection; form.
3     A.  I would say more often than not, the cases I'm
4  aware of, they've been able to work something out.  If
5  somebody just flat drawing that line -- it's generally
6  not to their benefit -- or to everybody's benefit, it's
7  to try to work it out.
8  BY MS. THOMPSON:
9     Q.  Okay.  Have you ever been involved in a
10  situation on either side where a election deadline was
11  missed and the party attempted to late elect?
12     A.  Attempted to, I'm sorry?
13     Q.  Late elect into the well.
14     A.  No.
15     Q.  Okay.  So when you're talking about what you
16  typically see, where is it that you're seeing these
17  instances?
18     A.  Can you rephrase?  I'm not understanding.
19     Q.  So you were talking about how you usually see
20  people work out the -- the situation if there's a missed
21  deadline.  But then you said that you haven't personally
22  been involved in that.  So where is it that you're
23  seeing these situations?
24     A.  Yeah, I guess I'm not understanding, so...
25         MS. RUDNICKI:  Let him think through it.

Page 78

1         MS. THOMPSON:  That's fine.
2     A.  Yeah, 'cause it -- the situation I've been
3  involved in when I was working in Oklahoma with the
4  operators is there would be posturing and so on.  But it
5  always seemed to be, gee, I wish -- there seemed to be
6  an attitude towards let's work this out rather than just
7  slam the door.  Because litigation.  And so that -- I
8  mean, does that answer the question or?
9  BY MS. THOMPSON:
10     Q.  Okay.  Let me just -- so I think you're saying
11  that you have been involved in situations where an
12  election has been missed?
13     A.  No, more of where it would look like it was
14  going to be a what are we going to do if it isn't, type.
15  Does that make sense?
16     Q.  Okay.
17     A.  Let's -- let's work with this.  I mean, if we
18  have to, we can enforce it.  But we prefer not to.  And
19  did that lead up to it being missed?  I'm trying to
20  think --
21     Q.  Let me make sure you're understanding.
22         So when I say have you been involved in
23  situations where an election has been missed, are you
24  interpreting that as it was missed and then strictly
25  enforced?

Page 79

1     A.  Well, I'm trying to -- I don't know that any
2  of them ever got to the -- the ones that -- that I
3  worked with in Oklahoma, if it ever got to the point
4  where they were actually missed.
5         But the attitude that we went into them
6  with was let's try to work this out so we don't have --
7  this sounds to me like every time, we're going to
8  strictly enforce everything and be real hard core about
9  it.  And that wasn't -- and maybe I'm misreading this.
10         MS. RUDNICKI:  That's a good answer.
11     A.  Maybe I'm misreading this.  But that was the
12  way I took it is that there was -- with operators in the
13  '80s in Oklahoma, they're -- let's get this -- let's
14  figure out a way to get this done; not; having a real
15  hard core -- well, threatening-type of approach.  But
16  having more work so that we don't end up in that
17  situation.
18  BY MS. THOMPSON:
19     Q.  So my understanding is -- and let me know if
20  I'm wrong -- that your experience is that the general
21  approach to elections was much more congenial and not
22  strict?
23     A.  Less adversarial, yes.
24     Q.  Okay.  And that is your basis for the opinion
25  --

Page 80

1     A.  Yes.
2     Q.  -- is that correct?
3     A.  Yes.
4     Q.  Okay.  I'm going to show you what has
5  previously been marked as Exhibit 8.
6         (Exhibit 8 marked.)
7  BY MS. THOMPSON:
8     Q.  It's the Section 1 letter agreement.
9     A.  8, uh-huh.
10     Q.  Now, you've seen this document before,
11  correct?
12     A.  I have.
13     Q.  And you've read this document before?
14     A.  I have.
15     Q.  I'm not going to hold you to memorizing it.
16     A.  I'm going to say I reviewed it, yes.
17     Q.  Okay.
18     A.  I can't repeat it all to you.
19     Q.  You're free to reference it and to look at it
20  in more detail.  I don't expect you to know everything
21  off the top of your head.
22         Okay.  So this is the PPLA covering
23  Section 1 of this case; is that correct?
24     A.  Yes.  That -- that's the way it's labeled,
25  yes.  And if I remember right, Mr. Roach labeled it.

Page 81

21 (Pages 78 - 81)

1 all or any portion of its interest --" and then it goes
2 on, correct?
3    A. Correct.
4    Q. Okay. So --
5    A. They could elect.
6    Q. So you agree they could elect with less than
7 their full interest, correct?
8    A. Yes.
9    Q. Okay. So when Mewbourne sends an invoice to
10 Yukon, how do they know what percentage Yukon wants to
11 elect into?
12    A. I don't know that they would know. But
13 they're going to base that invoice on what they've
14 calculated Yukon's interest to be. And at which point,
15 I would think Yukon could then amend that or elect to
16 participate with a smaller percentage.
17    Q. Okay. So they would send an invoice for the
18 most that Yukon could elect into; is that correct?
19    A. I would think they would, yes.
20    Q. Okay. So it's kind of like a potential
21 invoice?
22    A. Well, it's an in--
23        MS. RUDNICKI: Objection; form.
24    A. It's an invoice if they elect to proceed --
25 you know, to participate with their full interest. It
Page 86

1 is an invoice. If they wish to participate with less,
2 they could request an amended invoice for that amount.
3 BY MS. THOMPSON:
4    Q. Okay. So it's not necessarily a final
5 invoice?
6        MS. RUDNICKI: Objection; form.
7    A. It could be.
8 BY MS. THOMPSON:
9    Q. But it's not necessarily one?
10        MS. RUDNICKI: Objection; form.
11    A. Probably not. But, I mean, it's an invoice
12 and it is required.
13 BY MS. THOMPSON:
14    Q. Okay. Do you know if the Section 12 letter
15 agreement requires an invoice?
16    A. (Reading.)
17    Q. I can give it to you if you don't know.
18    A. Yeah, I was going to say, I --
19        MS. RUDNICKI: He likes to look at it.
20 BY MS. THOMPSON:
21    Q. That's fine.
22    A. I looked -- I looked at exhibits --
23    Q. I'm going to hand you what was --
24    A. 8, 9 and 10.
25    Q. Yes. What was previously marked as
Page 87

1 Exhibit 10. It is the Section 12 letter agreement.
2        (Exhibit 10 marked.)
3 BY MS. THOMPSON:
4    Q. And if you look at kind of the bottom of page
5 1, top of page 2, it's got some language that you can
6 see is similar but not the same as --
7    A. I'm looking at Paragraph 5.
8    Q. Okay. Do that too.
9    A. (Reading.) "Yukon should elect to participate
10 with all or any portion -- drilling --"
11    Q. It's okay. That'll work.
12        MS. RUDNICKI: Everyone stop. Everyone
13 stop. Deep breath.
14    A. Fourth line, "MOC will invoice Yukon for its
15 working interest share of his well."
16 BY MS. THOMPSON:
17    Q. Okay. If you continue that, it says -- okay.
18 Let's start at the beginning of 5.
19    A. Okay.
20    Q. Since that's where you wanted to go.
21        "MOC agrees that Yukon will not be
22 required to prepay its share of costs in accordance with
23 the terms and conditions under the pooling order. It is
24 agreed by the parties hereto that in the event that
25 Yukon should elect to participate with all or any
Page 88

1 portion of its interest in the drilling of a test well
2 to be drilled under the pooling order, MOC will invoice
3 Yukon for its working interest share of its well costs
4 associated with the test well on a monthly basis through
5 MOC's joint interest billing procedure."
6        Okay. So that is describing a procedure
7 where after you start incurring costs, you start jibbing
8 the working interest owner as you go along; is that
9 correct?
10    A. It appears to be. And then an invoice would
11 be required.
12    Q. Yes. At that time. Once the costs have been
13 -- but that's after the election, is what I'm asking?
14    A. (Reading.) Yeah, well, it says in the event
15 that Yukon should elect to participate.
16    Q. So there are --
17    A. Yes.
18    Q. -- two different procedures for the Section 1
19 letter agreement and the Section 12 letter agreement on
20 what the invoice situation is in relation to the
21 election; is that correct?
22    A. It appears to be, yes.
23    Q. Okay.
24        MS. RUDNICKI: And it is also true that
25 they always both reference invoices.
Page 89

23 (Pages 86 - 89)

1        MS. THOMPSON: Yes. That is true. You
2  are correct on that. It's just the timing that I was
3  trying to get at.
4  BY MS. THOMPSON:
5        Q. Okay. So that actually leads me to question.
6        So in your report, the second paragraph on
7  page 2, in response to Mr. Roach's Subparagraph H.
8        A. Yes.
9        Q. Okay. So this last sentence here,
10  "Additionally, many, if not most agreements specifically
11  stipulate that an invoice be provided"; do you see that?
12        A. I'm sorry. Where?
13        Q. I'm sorry. Let's start again. Okay. Your
14  report page 2.
15        A. Page 2, uh-huh.
16        Q. Paragraph 2.
17        A. Okay.
18        Q. The very last sentence.
19        A. All right.
20        Q. Are we in the same place starting with
21  "Additionally"?
22        A. Yeah, I'm sorry. I -- I --
23        Q. Oh, no. It's okay.
24        A. -- misunderstood something you said in that.
25  So...

Page 90

1        Q. Okay. So let's start again.
2        "Additionally, many, if not most
3  agreements specifically stipulate that an invoice be
4  provided"; is that correct?
5        A. Yes.
6        Q. When you say that, do you mean an invoice at
7  any time? Or an invoice with the election letter?
8        A. Well, at any time would include with the
9  election or with subsequent occurrences, yes.
10        Q. Okay.
11        A. You're going to want to get an invoice to pay
12  on so the calculation's not off.
13        Q. Okay. I'm trying to understand if it is your
14  opinion that most agreements stipulate an invoice be
15  provided upfront when your election needs to be made or
16  whether your opinion is at some point, there's an
17  invoice that's going to be provided whether it's upfront
18  or whether it's later with a jibbing procedure like the
19  Section 12 letter?
20        A. My opinion is more that the AFE is not the
21  invoice, that an invoice provided is the invoice.
22        Q. Okay. I understand--
23        A. At various times.
24        Q. Okay. I understand. And that's what kind of
25  the stuff before this is all about.

Page 91

1        Your opinion is AFE is not an invoice,
2  correct?
3        A. Correct.
4        Q. I understand. I just want to know about this
5  last sentence. It says, "Many, if not most agreements
6  specifically stipulate that an invoice be provided."
7        I'm trying to understand what that means.
8        A. Well, we have two here. One is pro-- it's
9  required at one point and another one is required at
10  another point. But there is an invoice --
11        Q. Okay.
12        A. -- required in both of these.
13        Q. That's what I was trying to understand is
14  whether you meant an invoice is eventually required, or
15  whether you were saying always that an invoice upfront
16  is required?
17        A. It would be required at the point -- well,
18  it's -- it's specific to that agreement.
19        Q. Okay. But it is not your opinion that most
20  agreements require an invoice at the time of election --
21  of the election letter being sent?
22        A. I did not -- I wasn't asked to opine on that.
23  I -- I don't think I made -- I don't think I expressed
24  that opinion, yeah.
25        Q. I'm trying to -- you have a sentence here. I

Page 92

1  just want to know what it means.
2        A. Okay. Sure.
3        Q. So if that's not what it means, that's fine.
4  I'm just trying to figure out what this means.
5        A. Well, and let me just look real quick here.
6  Here. (Reading.) Well, it was in response to -- you
7  know. It is his Paragraph H. "It's industry practice
8  and custom in Oklahoma --"
9        (Reading extremely fast.)
10        MS. RUDNICKI: Stop.
11        MS. THOMPSON: Oh.
12        MS. RUDNICKI: Much slower.
13        THE WITNESS: Oh, I'm sorry.
14  BY MS. THOMPSON:
15        Q. And clearer.
16        A. "It is industry custom and practice in
17  Oklahoma and other oil-and-gas producing states to treat
18  an authorization for expenditure (AFE) like an invoice.
19  A typical AFE provides --" and it goes on to explain the
20  sufficient information.
21        I do not know of anyone who considers an
22  AFE to be an invoice. That's my opinion there. If an
23  invoice is required, get an invoice at whatever point is
24  required.
25        Q. Okay. Are you aware of any other agreement

Page 93

24 (Pages 90 - 93)

1  that you've run across that required an invoice with an
2  election letter?
3         MS. RUDNICKI:  Besides the one in this
4  case?
5         MS. THOMPSON:  Yes.
6         MS. RUDNICKI:  Outside of the one in this
7  case.
8         THE WITNESS:  Outside of this case, no.
9  That's why --
10        MS. THOMPSON:  Okay.
11        THE WITNESS:  Okay.  Yes.
12        MS. RUDNICKI:  She wasn't trying to trick
13  you.
14        MS. THOMPSON:  Yeah, I wasn't.
15        MS. RUDNICKI:  She doesn't do it that
16  way.
17        (A brief discussion was held off the
18  record.)
19  BY MS. THOMPSON:
20   Q.  I'm just trying to figure out.
21        There's no other instance that you're aware of
22  where you've run across an agreement where the invoice
23  is required upfront with the -- with the election
24  letter?
25   A.  Not that I'm aware of.

Page 94

1   Q.  Okay.  Let's go to page 3 of your report.
2        So we talked a little bit about this at
3  the beginning of your deposition when you were talking
4  about Ms. Cochell's deposition.
5        But I want to return to this third
6  paragraph saying, "It is my opinion that there is not
7  sufficient evidence to confirm that Yukon actually ever
8  received the specific spud letter that Mewbourne claims
9  to have sent," correct?
10   A.  Yes.
11   Q.  Okay.  What do you mean by sufficient
12  evidence?
13   A.  The -- let me say this right.  The attitude
14  throughout -- well, it was signed for.  That's evidence.
15  But when I look at the process and I look at the other
16  testimony as to how these letters were handled, how the
17  letter itself was labeled or not labeled, I don't see
18  sufficient proof beyond a reasonable doubt that that
19  letter was delivered.
20   Q.  Okay.  So is that the standard you're using?
21  Beyond a reasonable doubt in your mind?
22   A.  Well -- and I probably shouldn't have said
23  that.  There's a legal definition to that.  I am not --
24  I -- I could not comfortably say that I'm certain they
25  got it because the facts of the situation as I've read

Page 95

1  in the depositions, the process was not sufficient to
2  guarantee that in my opinion.
3   Q.  Okay.  And I just want to know what sort of
4  standard are you trying to meet in your mind when you --
5  when you say this?
6        What is the standard you're applying here?
7   A.  A process that would ensure -- oh.  You've got
8  the mail carrier doing certain things.  You've got the
9  people receiving and several of these that it's rather
10  haphazard.  And in this case, the one with the signature
11  for the three, somebody walking by signs it.
12        But is anything counted?  No.  We don't
13  know.  We just simply don't know that they -- that those
14  three letters were, in fact, delivered, that it was
15  those three letters.
16        Three letters were probably delivered.
17  Was this one that's at issue here, was that one of them?
18  I don't know.
19   Q.  Okay.
20   A.  I know that it was signed and that number was
21  on there.  But was it?  Did anybody count?  Were there,
22  in fact, three handed over?  What happened to them?  If
23  the person who signed it never got it, what happened to
24  them?
25        It's so many different variables in there

Page 96

1  that I -- I could not say -- I'd hate to be in that
2  position having to prove it was done.
3   Q.  Okay.  So when you say there's not sufficient
4  evidence, to you does that mean I, Curt Horne, have not
5  been convinced?  Is that what you're saying?
6        MS. RUDNICKI:  Objection; form.
7   A.  I've not seen sufficient evidence to be
8  confident that that letter was, in fact, delivered as
9  was discussed here.  It's just -- I, quite honestly, was
10  very surprised.  I expected, when I first started
11  looking at this, to see issues with simply --
12  simplecertifiedmail.com.  They're fine.
13        It's the action of the carrier primarily
14  that I have an issue with.  I would hope -- and I know
15  better.  But I would hope that mail carriers would treat
16  this differently and take it seriously.  Okay.  I have
17  for you, thee letters.  Here's the numbers on them.
18        Verify that.  Sign this.  Here they are.
19  Count them one, two, three.  One, two, three to be
20  comfortable that that -- you know.  That it was, in
21  fact, delivered, he would need -- I'm just not there.
22        This is my opinion.  I would not allow
23  that to happen in my office.  And I was just very
24  surprised to see that.
25  BY MS. THOMPSON:

Page 97

1     Q.  Okay.
2     A.  And it's kind of a laissez faire attitude of
3  the mail carrier.
4     Q.  So --
5          MS. RUDNICKI:  I know you're close, but I
6  got to go to the bathroom again.
7          MS. THOMPSON:  Okay.
8          MS. RUDNICKI:  Only a four-minute break
9  this time.
10         MS. THOMPSON:  Okay.  We can go off the
11 record.
12         THE VIDEOGRAPHER:  Off the record at
13 11:14.
14         (A break was taken from 11:14 a.m. to
15         11:20 a.m.)
16         THE VIDEOGRAPHER:  Back on the record,
17 11:20.  Please proceed.
18 BY MS. THOMPSON:
19    Q.  Thank you for answering my questions today,
20 Mr. Horne.  That's all I have.
21         MS. THOMPSON:  Pass the witness.
22         MS. RUDNICKI:  That's it.
23         THE WITNESS:  You're good?
24         MS. RUDNICKI:  We're good.
25         MS. THOMPSON:  I told you I was short.

Page 98

---

1     THE WITNESS:  All right.
2          THE VIDEOGRAPHER:  That concludes today's
3  deposition.  Off the record at 11:20.
4          (Whereupon, the deposition was concluded
5          at 11:20 a.m., and further the deponent
6          saith not.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

---

1                  CHANGES AND SIGNATURE
2  PAGE LINE     CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 100

---

1      I, CURTIS D. HORNE, CPL, have read the
   foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3
4
   _____
5  CURTIS D. HORNE, CPL
6
7  THE STATE OF _____)
   COUNTY OF _____)
8
       Before me, _____, on
9  this day personally appeared CURTIS D. HORNE, CPL, known
   to me (or proved to me under oath or through
10 _____) (description of identity
   card or other document)) to be the person whose name is
11 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
12 consideration therein expressed.
       Given under my hand and seal of office this
13 _____ day of _____, 2025
14
15 _____
   NOTARY PUBLIC IN AND FOR
16 THE STATE OF _____
   COMMISSION EXPIRES: _____
17
18
19
20
21
22
23
24
25

Page 101

26 (Pages 98 - 101)

**Page 102**

1    IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF OKLAHOMA
2    MEWBOURNE OIL COMPANY,    )
                                )
3        PLAINTIFF,             )
                                )
4    VS.                        ) CASE NO.
                                ) 5:24-CV-00143-G
5    YUKON TRADING COMPANY,     )
     L.L.C.,                    )
6                               )
         DEFENDANT.             )
7                               )
                                )
8    ***********************************************
             REPORTER'S CERTIFICATION
9        DEPOSITION OF CURTIS D. HORNE, CPL
                 March 25, 2025
10
11       I, Toyloria Lanay Hunter, Certified Shorthand
12   Reporter in and for the State of Texas, hereby certify
13   to the following:
14       That the witness, CURTIS D. HORNE, CPL, was duly
15   sworn by the officer and that the transcript of the oral
16   deposition is a true record of the testimony given by
17   the witness;
18       That the deposition transcript was submitted to
19   _____ to the witness or to the
20   attorney for the witness for examination, signature and
21   return to me by _____;
22       That the amount of time used by each party at the
23   deposition is as follows:
24   MS. THOMPSON.....01:48:56
25

**Page 103**

1    That pursuant to information given to the deposition
2    officer at the time said testimony was taken, the
3    following includes counsel for all parties of record:
4    Samantha L. Thompson, Attorney for MEWBOURNE OIL COMPANY
5    Leah Rudnicki, Attorney for YUKON TRADING COMPANY,
6    L.L.C.
7        I further certify that I am neither counsel for,
8    related to, nor employed by any of the parties or
9    attorneys in the action in which this proceeding was
10   taken, and further that I am not financially or
11   otherwise interested in the outcome of the action.
12       Further certification requirements pursuant to Rule
13   203 of TRCP will be certified to after they have
14   occurred.
15       Certified to me this 4th day of April, 2025.
16
17
18        _____
          Toyloria Lanay Hunter
19        Texas CSR No. 7978
          Expiration Date: 09/30/2026
20        VERITEXT LEGAL SOLUTIONS
          FIRM REGISTRATION NO. 571
21        300 Throckmorton
          Suite 1600
22        Fort Worth, Texas 76102
          Tel: 817.336.3042
23
24
25

**Page 104**

1        FURTHER CERTIFICATION
         The original deposition was/was not returned to the
2    deposition officer on _____;
         If returned, the attached Changes and Signature page
3    contains any changes and the reasons therefor;
         If returned, the original deposition was delivered
4    to Samantha L. Thompson, Custodial Attorney;
         That $_____ is the deposition officer's charges
5    to the Plaintiff for preparing the original deposition
     transcript and any copies of exhibits;
6        That the deposition was delivered in accordance with
     Rule 203.3, and that a copy of this certificate was
7    served on all parties shown herein on and filed with the
     Clerk.
8        Certified to me this _____ day of
     _____.
9
10
11
12        VERITEXT LEGAL SOLUTIONS
          FIRM REGISTRATION NO. 571
13        300 Throckmorton
          Suite 1600
          Fort Worth, Texas 76102
14        Tel: 817.336.3042
15
16
17
18
19
20
21
22
23
24
25

**Page 105**

1    leah@rudnickifirm.com
2        April 4, 2025
3    RE: Mewbourne Oil Company v. Yukon Trading Comapny LLC
4    DEPOSITION OF: Curtis D. Horne , CPL (# 7230193)
5        The above-referenced witness transcript is
6    available for read and sign.
7        Within the applicable timeframe, the witness
8    should read the testimony to verify its accuracy. If
9    there are any changes, the witness should note those
10   on the attached Errata Sheet.
11       The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14       According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18        Yours,
19        Veritext Legal Solutions
20
21
22
23
24
25

27 (Pages 102 - 105)