Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA


MEWBOURNE OIL COMPANY,        )
                              )
        Plaintiff,            )
                              )
-vs-                          ) CASE NO. 5:24-CV-00143-G
                              )
YUKON TRADING COMPANY, L.L.C.,  )
                              )
        Defendant.            )



VIDEOTAPED DEPOSITION OF DORSEY TOLIVER ROACH
TAKEN ON BEHALF OF THE DEFENDANT
IN OKLAHOMA CITY, OKLAHOMA
ON OCTOBER 23, 2024



REPORTED BY:  TRENA K. BLOYE, CSR

---

Page 2

1           A P P E A R A N C E S
2
3
4    For the Plaintiff:
5         CHRISTOPHER M. HOGAN
          CODY RUTOWSKI
6         HOGAN THOMPSON SCHUELKE LLP
          1001 Fannin Street
7         Suite 4775
          Houston, Texas 77002
8         chogan@hoganthompson.com
9
10   For the Defendant:
11        LEAH T. RUDNICKI
          THE RUDNICKI FIRM
12        6305 Waterford Boulevard
          Suite 325
13        Oklahoma City, Oklahoma 73118
          405-445-7421
14        leah@rudnickifirm.com
15
16   Video Operator:
17        Bruce Rodgers
18
19
20
21
22
23
24
25

---

Page 3

1            T A B L E   O F   C O N T E N T S
2
3
4    DORSEY TOLIVER ROACH              Page
5      Direct Examination by Ms. Rudnicki       6
6    Jurat Page                   172
7    Correction Sheet             173
8    Certificate                  174
9
10            INDEX OF EXHIBITS
11

12   Exhibit         Description      Page
13   Exhibit 1    Deposition Notice and Subpoena   6
14        Duces Tecum
15   Exhibit 2    Roach Summary of Opinions       8
16   Exhibit 3    12/29/23 Plunkett letter     42
17   Exhibit 4    12/29/23 Redman letter       42
18   Exhibit 5    Section 1 Pooling order      83
19   Exhibit 6    9/12/23 Email chain with     85
20        attachment
21   Exhibit 7    Affidavit of Dorsey T. Roach   102
22   Exhibit 8    9/29/21 Letter agreement     105
23   Exhibit 9    10/31/23 Letter agreement    109
24   Exhibit 10   Exhibit A to 10/31/23 Letter   110
25        agreement

---

Page 4

1       INDEX OF EXHIBITS, CONTINUED
2

3    Exhibit         Description      Page
4
5    Exhibit 11   Mewbourne Section 12 Pooling   125
6        Order
7    Exhibit 12   11/1/23 Email chain          127
8    Exhibit 13   11/22/23 Email chain with    135
9        attachments
10   Exhibit 14   11/1/23 Email chain          137
11   Exhibit 15   Continued 11/1/23 email chain  137
12   Exhibit 16   12/8/23 Edwards letter       138
13   Exhibit 17   1/25/24 Chapman letter with    139
14        attachments
15   Exhibit 18   12/22/23 Giffhorn letter with  143
16        attachment
17   Exhibit 19   1/8/24 Giffhorn email        145
18   Exhibit 20   2/1/24 Email chain           147
19   Exhibit 21   1/24/24 Email chain with     152
20        attachments
21   Exhibit 22   1/4/24 Email chain           154
22   Exhibit 23   7/8/24 Email chain with      157
23        attachments
24   Exhibit 24   7/8/24 Email chain           169
25          * * * * * * * * * *

---

1 (Pages 1 to 4)

Dorsey Roach                                                    October 23, 2024

                                                    Page 5
1        STIPULATIONS
2
3
4        IT IS HEREBY STIPULATED AND AGREED BY and
5   between the parties hereto, through their respective
6   attorneys, that the videotaped deposition of DORSEY TOLIVER
7   ROACH may be taken on behalf of the Defendant on the 23rd
8   day of October, 2024, in Oklahoma City, Oklahoma, by Trena
9   K. Bloye, Certified Shorthand Reporter for the State of
10  Oklahoma, by notice pursuant to the Federal Rules of Civil
11  Procedure.
12
13
14
15
16            * * * * * *
17
18
19
20
21
22
23
24
25

                                                    Page 6
1        VIDEO OPERATOR:  Going on the record.  The
2   court reporter will swear in the witness.
3            DORSEY TOLIVER ROACH,
4   after having been first duly sworn at 9:03 a.m., deposes
5   and says in reply to the questions propounded as follows,
6   to wit:
7            DIRECT EXAMINATION
8   BY MS. RUDNICKI:
9   Q   Good morning, Mr. Roach.
10  A   Good morning.
11  Q   Can you give your full name for the record?
12  A   Including my middle?
13  Q   Yes, just give it all.
14  A   It's Dorsey Toliver Roach.
15  Q   And do you go by any other names?
16  A   No.
17          (Exhibit 1 was marked for
18          identification.)
19  Q   I'm gonna hand you what I have marked as Exhibit
20  No. 1.
21      MR. HOGAN:  Do you have a copy?
22      MS. RUDNICKI:  Oh, sorry.  I even wrote No. 1
23  on it for you.
24      MR. HOGAN:  Oh.  I'm going to circle it.
25  Q   (By Mr. Hogan) And I'll represent to you that what

                                                    Page 7
1   I've handed you as Exhibit No. 1 is Defendant's Notice to
2   Take Deposition of Dorsey T. Roach.  Do you see that?
3   A   Yes.
4   Q   Have you seen this document before?
5   A   No.
6   Q   You have not seen it before?
7   A   No, I don't believe so, no.
8   Q   No.  Okay.  If you look at page 3 of the stapled
9   Exhibit 1 you will see a subpoena on the back.  Do you see
10  that?
11  A   Yes.
12  Q   Have you seen that before?
13  A   No.
14  Q   Okay.  How about the Subpoena Duces Tecum that's
15  attached as Exhibit A, have you seen that before?
16  A   Uh, I -- no.
17  Q   Okay.  Let's take just a hot minute, then, and why
18  don't you look at Exhibit A, page 1, and just read it.  Let
19  me know when you have taken -- since you haven't seen it
20  before, I'm just giving you time to read it.
21  A   Sure.
22          (The witness reviewed the document.)
23  Q   (By Ms. Rudnicki)  And as you're looking at the
24  page 1, just to help you follow along, the first part here
25  is definitions.  Agree?

                                                    Page 8
1   A   Yes.
2   Q   And there is 1 through 9 definitions that then get
3   used in the document request later on.  In looking at those
4   definitions, do those look like topics that you are
5   prepared to speak about today for your deposition?
6   A   On the documents requested?
7   Q   The definitions.
8   A   Oh, definitions.
9   Q   Um-hum.
10  A   I believe so, yes.
11  Q   Okay.  Now go ahead and take a look at the
12  documents requested in relation to those.
13          (The witness reviewed the document.)
14  A   Okay.
15  Q   Okay.  You have had an opportunity.  And there are
16  seven different categories of things requested.  Would you
17  agree?
18  A   Yes.
19          (Exhibit 2 was marked for
20          identification.)
21  Q   Okay.  Now I'm going to hand you what's marked as
22  Exhibit No. 2.  And I believe this, what I've handed you,
23  Exhibit No. 2, is the Summary of Opinions and what is being
24  referred to as the report.  Do you agree with that?
25  A   Yes.

                                              2 (Pages 5 to 8)

Dorsey Roach                                                          October 23, 2024

Page 9

1     Q   And so if we look at the definitions, we're going
2   to look at Exhibit 1 and Exhibit 2 together for context.
3   If you go to that Exhibit A, page 1 of Exhibit 1, and then
4   on Exhibit 2 the definition of 7, No. 7 under the
5   definitions, "Report" means "Summary of opinions of Dorsey
6   T. Roach, CPL," given in this lawsuit.  And then I think we
7   established Exhibit 2 is that report.
8     A   Yes, that's correct.
9     Q   Okay.  And just so that we can -- this lawsuit is
10  the United States District Court for the Western District
11  of Oklahoma, Case No. CIV-24-143-G; correct?
12    A   Yes.
13    Q   And you are here to provide opinions and have been
14  retained by the attorneys representing Mewbourne Oil
15  Company in this matter; correct?
16    A   Yes.
17    Q   And be Mewbourne Oil Company is named as the
18  Plaintiff in this case?
19    A   Yes.
20    Q   And are there other cases in which you have been
21  retained by the attorneys representing Mewbourne to be an
22  expert?
23    A   Yes.
24    Q   How many other cases?
25    A   There's one other case that's just -- just

Page 10

1   commenced.  It -- I haven't really done anything yet.
2     Q   Do you know what -- what county is that in, do you
3   remember?
4     A   I don't recall.  I don't know that I have been
5   furnished any materials on it yet.
6     Q   Do you recall doing an affidavit for Mewbourne in
7   another case?
8     A   An affidavit?  Yes, I believe so.
9     Q   Okay.  Can you recall doing any reports, expert
10  reports other than this one in front of us for Mewbourne?
11    A   No, I believe this is it.
12    Q   This is the first full report you have done?
13    A   I believe this is the first full report, yes.
14    Q   And so we have the report and then you recall the
15  affidavit in a state court case in Oklahoma?
16    A   Yes.
17    Q   Correct?
18    A   Yes.
19    Q   Do you recall doing any other affidavits for
20  Mewbourne?
21    A   No.  Let me back up.  Maybe about 18 or 19 years
22  ago there was a case involving Mewbourne.  And I don't even
23  remember -- I remember who it was with, but I don't
24  remember what exactly my role was.  I signed something for
25  the attorney representing Mewbourne, but I don't recall and

Page 11

1   I probably don't have any records of that either.
2     Q   Okay.  So that was, what you just described is one
3   other instance you recall working for or on behalf of
4   Mewbourne in some capacity related to a lawsuit?
5     A   I wasn't really working for Mewbourne.  I was
6   just -- they asked me to be, not a witness, but more of
7   a -- just a -- I think it was a fact witness, perhaps, in
8   that particular case.
9     Q   So not as an expert witness?
10    A   No.  No, definitely not.
11    Q   Okay.  So to wrap that up into a tight little bow,
12  you have not been -- you have not issued an expert report
13  for Mewbourne in any other case than this one?
14    A   Not that I recall.
15    Q   And what you talked about from 18 or 19 years ago
16  was not in the capacity as an expert --
17    A   That's correct.
18    Q   -- witness.  Sorry, Trena.
19        Do you recall when you were retained in this case?
20    A   I really don't recall.  It's October.  I'm pretty
21  sure it was over the summer, but I just can't recall
22  exactly when.
23    Q   In the year 2024?
24    A   Yes.
25    Q   We're in the year 2024 right now; right?

Page 12

1     A   Yes.
2     Q   So it's October 22nd, 2024.
3     A   Yes.
4     Q   23rd?
5     A   23rd.
6     Q   23rd.  You were not retained by the lawyer for
7   Mewbourne in 2023 to your recollection?
8     A   I don't think so.  I think it was -- it goes back
9   that far.
10    Q   Mewbourne has been represented by other lawyers
11  other than their current lawyers in some of the cases
12  against my client, including Dale Cottingham.  Have you
13  ever done any work for Dale Cottingham?
14    A   No.
15    Q   What about Bradley Walsh?
16    A   No.
17    Q   And Steven Beam is a lawyer in this case as a
18  local lawyer.  Have you worked with Mr. Beam in cases other
19  than this one to your knowledge?
20    A   No.
21    Q   Who is your employer?
22    A   Whoever is willing to send me a check.  I work for
23  myself.
24    Q   You're self-employed?
25    A   Yes.

3 (Pages 9 to 12)

Dorsey Roach                                                        October 23, 2024

Page 13

1    Q   And do you do your expert services, expert witness
2    services in litigation through UnitPro Land Consultants
3    LLC?
4        A   Yes.
5        Q   And are there any other owners or members of
6    UnitPro Land Consultants LLC other than yourself?
7        A   No.
8        Q   Are there any employees other than yourself?
9        A   No.
10       Q   Do you use any other staff or assistants in
11   preparing expert reports?
12       A   No.
13       Q   Other than expert witness engagements, what kind
14   of work does UnitPro Land Consultants LLC do?
15       A   I do some consulting for companies, especially
16   companies that are trying to negotiate, either they receive
17   or want to send out an operating agreement.  I oftentimes
18   review these contracts and give my recommendations as to
19   additions and deletions to those contracts.
20       Q   Since you have been doing the consulting work, you
21   mentioned joint operating agreements.  Are you being hired
22   on behalf of the operator or non-operators in those
23   instances?
24       A   Both.
25       Q   If you could apply a percentage how often do you

Page 14

1    think you get hired by a -- non-expert witness work, how
2    often do you get hired by a non-operator versus an
3    operator?
4        A   It's -- it's probably 50/50.
5        Q   The -- kind of using the same parameters, instead
6    of doing non-operator versus operator, what is the
7    geographic location of the work that you are performing as
8    a consultant?
9        A   Pretty much all oil and gas producing states.
10       Q   Is there any concentration in one area?
11       A   I would say probably Texas is probably where I
12   have -- you know, not that they represent a majority of the
13   states, just I probably have more in Texas than I do other
14   states.  Oklahoma would probably be a close second.
15       Q   And when we're applying the, you know, percentages
16   or majority, et cetera, when you're thinking about that in
17   terms of geography, what are you using as your units, like
18   the number of wells, the number of clients, the number of
19   money?  Which one are you kind of thinking of?
20       A   Can you repeat that question?  I'm not sure I
21   understand it.
22       Q   So we're saying that the majority is in Texas,
23   just simply because there is a lot more going on in Texas
24   than there are in other states.  Underlying that, what were
25   you thinking of when you were saying that?  The number of

Page 15

1    wells or the number of clients?
2            MR. HOGAN:  Objection to form.
3        A   Oh, I'm probably looking at the number of
4    lawsuits.
5        Q   (By Ms. Rudnicki) Oh, interesting.  Okay.  So what
6    I was trying to get at is non-lawsuit expert work.
7        A   Okay.
8        Q   So non-expert work, so not related to any
9    litigation.
10       A   Okay.
11       Q   Okay?  And you told me that you do consulting work
12   for operators and non-operators.  And I believe when we
13   were talking about that, we were not talking about expert
14   witness work.
15       A   Okay.
16       Q   Is that accurate or did I misunderstand what you
17   were saying?
18       A   Well, I guess in response to your question, you
19   know, what percentage of my work is done in Oklahoma versus
20   other states that is not oil litigation related.  And I
21   would probably still say Texas is still probably the state
22   that I probably receive most from.  But I receive requests
23   from all over the United States and Canada.  So, but, yeah,
24   Texas, probably a few more in Texas, but not that many more
25   than I have Oklahoma.  There's probably, surprisingly

Page 16

1    there's not as much here because of the forced pooling.
2        Q   Not as much requests for consulting services of
3    agreements between operators and non-operators in Oklahoma
4    than in Texas due to the forced pooling?
5        A   Yeah.  The forced pooling has removed negotiations
6    of contracts throughout this state.
7        Q   And so the consulting work that you're doing that
8    is not related to expert witness work --
9        A   Yes.
10       Q   -- is the consulting work for negotiating
11   agreements?
12       A   I would say for the most part.  There's all kinds
13   of little unique things that operators ask me to do and
14   just do investigations, try to figure out why aren't they
15   getting paid an override on a well that's been drilled, and
16   just -- it could be anything and everything.  It's, you
17   know, just when people kind of don't know, you know, how to
18   look at something or need some help in gathering facts,
19   what have you, I do that.
20           I mean, it's -- I can't really say it's just this.
21   It's a real wide variety of things.
22       Q   In the -- when was the last time you did a
23   consulting job not related to an expert witness engagement
24   relating to a PPLA?
25       A   Oh, gosh.  You know, this would be non-litigation

4 (Pages 13 to 16)

Dorsey Roach                                          October 23, 2024

Page 17

```
 1   usually, the PPLAs.  I have probably done five or six in
 2   the last few years reviewing and consulting with clients
 3   about these.  So not that many, but, you know, I have a few
 4   scattered here and there.
 5       Q   And so my question was when was the last time you
 6   were hired for that?  So you think it was about five years
 7   ago?
 8           MR. HOGAN:  Object to the form.  Sorry.  You
 9   can answer.
10       A   No.  It's been more recent than that.  I just
11   can't recall.  It's not that much of what I do, so I can't
12   really say for sure when the last one was.  But I have
13   done, I know, four or five in the last few years.
14       Q   (By Ms. Rudnicki)  Four or five in the last -- I
15   converted -- I messed those up in my question.  So four or
16   five of those related to PPLAs, what state were they in?
17       A   All Oklahoma.
18       Q   When I say PPLA, what does that mean?
19       A   Oh, pre-pooling letter agreement.
20       Q   And I use that acronym because you use it in your
21   report, and I think it's a common acronym in the industry.
22   Yes?
23       A   Yes.
24       Q   But is it a common acronym in every state?
25       A   I'm not familiar with the PPLAs, or at least their
```

Page 18

```
 1   being referred to as PPLAs in other states.  You know,
 2   Texas doesn't have forced pooling so you don't have those
 3   in Texas.  And a lot of those states, Arkansas, you have to
 4   use their form of operating agreement so there is no PPLAs
 5   there.  West Virginia is the most recent state to have
 6   forced pooling, and they are just still trying to figure it
 7   out.  And I have been doing a lot of consulting --
 8       Q   Up there?
 9       A   -- in West Virginia on this, because the people
10   there don't have a clue as to what to do or how to do it,
11   and not that I do either on some of this.  But usually --
12   sometimes we used to refer to these as just letter
13   agreements 40 years ago when I first was involved with
14   preparing PPLAs and negotiating PPLAs.  We just called them
15   letter agreements.  Side letter agreements is what we
16   referred to them as when we were negotiating.
17           And so there is still some of that that goes on in
18   other states, the side letter agreements that, you know,
19   you agree not to -- whatever it might be.
20       Q   People can do any kind of agreement; right?
21       A   I don't know about that, but people do all kinds
22   of agreements.
23       Q   Fair enough.  In the PPLAs that you had in the
24   last couple of years in Oklahoma, what counties were they
25   in?
```

Page 19

```
 1       A   Oh, gosh.  I'm all over Oklahoma.  I mean, I have
 2   so many things from, you know, the Arkoma Basin down to
 3   Southern -- probably most has been in western, northwestern
 4   Oklahoma, though.
 5       Q   And where are the wells at issue here?
 6       A   Oh, these are in Custer County, Western Oklahoma,
 7   Anadarko Basin.
 8       Q   And so how many of the PPLAs were in a similar
 9   location to the wells in this case?
10       A   I don't recall, but I imagine there have been
11   several in the Anadarko Basin.  I can't recall where
12   exactly, so -- but usually just anything in the Anadarko
13   Basin is actually pretty close.
14       Q   Were any of those consulting engagements that you
15   had on negotiating PPLAs in Western Oklahoma with
16   Mewbourne?
17       A   No.
18       Q   Were -- same question, but was Mewbourne on the
19   other side?
20       A   No.
21       Q   Same question, but with Yukon Trading, have you
22   looked at any other than in this case between Yukon Trading
23   and any other company?
24       A   No.
25       Q   Do you recall the names of the companies that were
```

Page 20

```
 1   involved in those PPLAs?
 2       A   I really don't recall now.
 3       Q   How many clients in the last five years have you
 4   worked for?
 5       A   I would say at least 20 or 25.
 6       Q   And in the back, on your list of cases in your
 7   report, on Exhibit D, your list of testimony.
 8       A   Yes.
 9       Q   There are 29 different ones listed.  Not all of
10   them are different clients, but almost all of them are
11   different.  Is that about consistent with how many you have
12   or do you think that would be double?
13       A   Well, I mean, I -- I very rarely ever have the
14   same client multiple times.  Sometimes I do.  I've had one
15   client that I have probably been in six or seven cases for
16   down in Texas.  But probably for the majority, most of
17   these you see, it's probably just one time for each of
18   these clients.
19           There's other cases I've been involved with that I
20   didn't present testimony.
21       Q   And then there's other situations where you were
22   the consultant not involved in litigation; correct?
23       A   Yes.
24       Q   And so if we took all of those together and put
25   them in one big list of your clients, do you think it's
```

5 (Pages 17 to 20)

Dorsey Roach                                      October 23, 2024

Page 33

1    But now, the paper that's referenced here, is when
2  we were still in the drafting process and it was to kind of
3  give everyone advance notice as to what our committee was
4  doing.
5    Q  Did you get the opportunity to go to Victoria,
6  Canada?
7    A  I was supposed to go.
8    Q  Oh, you didn't get to go?
9    A  I was sick.  I had health issues and I was unable
10 to travel just right at that time.  So one of the other
11 committee members took the paper I wrote, I drafted it, and
12 he just went up to deliver it.
13   Q  Well, the only reason I ask is because I was there
14 and I didn't remember seeing you.  So I was very confused.
15 Now this all makes sense.
16   A  Yeah, yeah.
17   Q  Since 2018 have you written a paper or published
18 an article or given a presentation as to the new AAPL model
19 form participation agreement other than the one you
20 described working on related to Paul Yale's?
21   A  Yes.  I gave my first one less than 30 days ago.
22   Q  Okay.  I kind of thought that might be the case,
23 which is why I asked the question.  Where and what?
24   A  It was an in-house seminar for Marathon in
25 Houston.

Page 34

1    Q  Was anything that you prepared for them specific
2  to Marathon?
3    A  No.
4    Q  So that was one that you could also provide a copy
5  of that I wouldn't be able to get it anywhere else but from
6  you; is that right?
7    A  Yes.
8    Q  And did you give it live in Houston?
9    A  Yes.
10   Q  How often do you give in-house presentations?
11   A  I probably do one or two a year.
12   Q  Are there specific companies that contact you
13 regularly?
14   A  No.  That was my second one for Marathon.  But the
15 first one was probably 10 or 12 years ago.
16   Q  Does the model form participation agreement deal
17 with elections?
18   A  Yes.
19   Q  Is there any relation to the model form
20 participation agreement that has been developed relating to
21 elections that, in your opinion, pertain to this litigation
22 here?
23      MR. HOGAN:  Objection to the form.
24   A  No.
25   Q  (By Ms. Rudnicki)  Why not?

Page 35

1    A  Well, this particular litigation deals with
2  elections that are alleged not to have been made or failure
3  to make an election.  I'm trying to recall with all the
4  different provisions.  This is a fairly complex agreement.
5  I'm trying to think of where we might have -- or where I
6  may have -- or where our committee may have addressed
7  failure to make an election.  As I suspect, I can't
8  remember where, but there is probably in some of these
9  provisions there is probably something to that effect of
10 failure to make an election on one of these various
11 options, but I just can't recall.
12   Q  And that's fair.  If you go to page 3 of your
13 report, which is Exhibit No. 2.  And again, I numbered
14 them.
15   A  Which page?
16   Q  Three.
17      MS. RUDNICKI:  Did I number yours?
18      MR. HOGAN:  Yeah.  Thank you.
19      MS. RUDNICKI:  You're welcome.
20   Q  (By Ms. Rudnicki)  Okay.  So if you look at the
21 very top, the second paragraph, "Over the last 15 years I
22 have also been employed as an expert witness and as an
23 expert consultant in a number of oil and gas related
24 litigation cases involving lands in Oklahoma.  And my
25 qualifications as an expert witness in pulling orders,

Page 36

1  pre-pooling letter agreements and joint operations have
2  previously been accepted by Oklahoma courts."  Did I read
3  that accurately?
4    A  Yes.
5    Q  Okay.  We've been talking about PPLA, and that is
6  what is listed right after the word pooling orders where it
7  says pre-pooling letter agreements.  Do you agree?
8    A  Yes.
9    Q  Which of the cases listed on Exhibit D dealt with
10 pre-pooling letter agreements?
11   A  I don't believe any of those listed on Exhibit D
12 dealt with pre-pooling letter agreements.  Most of these
13 cases were outside the state of Oklahoma.  But as --
14   Q  Real quick.  So none of these listed deal with a
15 pre-pooling letter agreement to your recollection on
16 Exhibit D?
17   A  Not that I recall.
18   Q  Okay.  So we're going to eliminate what's on
19 Exhibit D as being related to that.  But your paragraph
20 says in the last 15 years.
21   A  Yes.
22   Q  To be fair.
23   A  That's correct.
24   Q  And so now I would like to ask you the specific
25 question of what cases do you recall working on related to

9 (Pages 33 to 36)

Dorsey Roach                                                     October 23, 2024

Page 37

1   PPLAs?
2       A   You know, I don't -- a lot of the cases I'm
3   thinking of, I can remember being there and I remember
4   testifying.  But these were at the Corporation Commission.
5   They were protested hearings with a threat of litigation, I
6   guess.  But I was testifying.  And it is considered to be a
7   court of law, so that's the reason why I listed it down.
8       Q   Oh, time out.  Let me -- if it's okay.
9       A   Yeah.
10      Q   Unless you --
11      A   I'm done.
12      Q   I realize I did that.  Because I'm thinking about
13  have you testified at the Oklahoma Corporation Commission
14  in the past five years?
15      A   Yes.
16      Q   Okay.  Did you list those on prior testimony for
17  Exhibit D?
18      A   No, I didn't list those.
19      Q   Could you provide a list of those subsequent of
20  where you have testified at the Oklahoma Corporation
21  Commission?
22      A   I can try.  I don't know because --
23      Q   Do you know what lawyer you worked with?
24      A   Yes.
25      Q   Who?

Page 38

1       A   Fred Gist.
2       Q   I worked at Hall-Estill.
3       A   I know.
4       Q   Okay.  I know Fred.  Other than Fred Gist?
5       A   Don't ask Richard Grimes.
6       Q   Okay.
7       A   He was the opposing attorney.  I really can't
8   recall.
9       Q   How about companies?  Who were you working for
10  when you were testifying out there?
11      A   You know, I don't even remember.  I have also had
12  a case with -- oh, gosh.  I remember, what was his name,
13  Russell Walker was involved in another case I was with
14  PPLAs.  And I don't remember if I was working with Russell
15  or against him.  I just don't recall.
16      Q   Okay.  And just to make sure I got the timeframe
17  right, so in the last five years would be 2019 forward.
18  Have you testified in the commission -- I know the ages of
19  the people we're talking about, so --
20      A   Yes.  The Fred Gist case, and again, as I recall
21  it was within the last five years.  Probably about five
22  years ago.
23      Q   19 -- pre-pandemic?  Do you remember?
24      A   I don't recall.
25      Q   Do you recall what company you worked for when you

Page 39

1   worked for Russell Walker?
2       A   No, I don't.  And like I said, I can't remember if
3   I was working for Russell Walker or --
4       Q   Or if he was on the other side?
5       A   Yeah, I can't recall, but there was another case
6   that involved him.
7       Q   In the last five years have you testified in any
8   other states other than Oklahoma in a corporation
9   commission type forum?
10      A   Yes, one.
11      Q   Where?
12      A   Arkansas.
13      Q   I knew it.  And what were you doing in Arkansas?
14      A   Testifying.
15      Q   On what topic?
16      A   Gosh, it was -- I think there was several issues,
17  but I can't even recall what those issues were now.
18      Q   I'll switch it.  Instead, how about did it have to
19  do with a PPLA in Arkansas?
20      A   I really do not recall.
21      Q   Okay.  Do you think it was in the 2000s or the
22  19s?
23      A   Oh, it was in the 2000s, yeah.
24      Q   Okay.  Who did you work for -- what was the
25  lawyer's name when you were in Arkansas?

Page 40

1       A   They were out of Fort Smith, and so I drove to
2   Fort Smith and we all drove down to where the Arkansas Oil
3   and Gas Commission is in southeastern Arkansas.  I had
4   never been there.  But we attended the commission hearings
5   for an entire day there.
6           MS. RUDNICKI:  If you don't mind, I'd like to
7   take a quick break.
8           MR. HOGAN:  Yeah.
9           VIDEO OPERATOR:  Off the record.
10          (A break was had from 9:55 to 10:11 a.m.)
11          VIDEO OPERATOR:  Back on the record.
12      Q   (By Ms. Rudnicki)  Mr. Roach, we took a quick
13  break and we were talking about cases, I think, before we
14  went on break.  And I just wanted to follow up and see if
15  you had thought of any other cases that you might want to
16  add.
17      A   Well, the very last case, number 29, I forgot to
18  mention that I did work for Hogan & Thompson on the
19  Breedlove, Marathon Breedlove case.  I forgot about that.
20      Q   Okay.  All the other ones have the law firm -- oh,
21  21 doesn't have the law firm.  BP America Production
22  Company versus Southland Royalty Company in Wyoming.
23      A   Yes.
24      Q   County of Sweetwater.
25      A   Yes.

10 (Pages 37 to 40)

Dorsey Roach                                                          October 23, 2024

Page 45

1  screenshot of the screen did it look like
2  Yukon_Abernathy_0007?
3      A  Yes.
4      Q  Okay.  Did you want to clarify something on that?
5      A  No.
6      Q  Okay.  So was it also -- you just didn't put the
7  file name.  So like if it was a PDF, Mewbourne
8  Complaint.pdf?
9      A  No.  I have never done that before with anything.
10     Q  Understood.  I'm just getting the how you did it;
11  right?
12     A  Yes.
13     Q  So if you were taking the exact name there would
14  be more to it than this list?
15     A  Well, if you're saying did I leave out PDF, yes, I
16  left out PDF.
17     Q  And so if -- were any of these .msg, message?
18     A  Oh, yeah, if there was an MSG there I didn't take
19  that.  I just -- to me it just wasn't relevant to put that
20  in.
21     Q  Okay.  And so these two letters, see how they are
22  described without reference to the Bate number?
23     A  Yes.
24     Q  Were they like this on your screen?
25     A  No.  I think that these were sent to me, as I

Page 46

1  recall, by email.  So I think that's how I received these.
2  And I added those two items.  I have wanted to make sure it
3  was complete.
4      Q  And you added these items here, but you didn't add
5  them to the share site?
6      A  No.  I don't think I could do that to the share
7  site.
8      Q  Who decided what you reviewed?
9      A  Well, the attorneys furnished me this information.
10  And so it seems like I may have had a question or two, but
11  this is what I was provided by the attorneys.
12     Q  Do you think you asked a follow-up question that
13  resulted in them emailing you these two last bullets on
14  Exhibit B?
15     A  No, I don't think so.  That was not initiated by
16  me.
17     Q  They just provided it to you extra?
18     A  Yes.
19     Q  And there is not Bates numbers on those documents,
20  if you look at Exhibit 3 and 4.  Is that accurate?
21     A  Yes.
22     Q  And the other documents you looked at did have
23  Bates numbers?
24     A  Yes.
25     Q  Do you know what Bate numbers are?

Page 47

1      A  Yes.
2      Q  Okay.  You have been doing this a long time;
3  right?
4      A  Yes, for a while.
5      Q  So if you look at the 1, 2, 3, 4 down it starts
6  with the MOC_Abernathy and there is two like that.  And
7  then it says Yukon_Abernathy.  Do you see that?
8      A  Yes.
9      Q  Do you know what those designation differences
10  mean?
11     A  Which -- I didn't follow you there.
12     Q  Okay.  So you agree that all of the -- the
13  MOC_Abernathy and the number and the Yukon_Abernathy and a
14  number listed, those are all Bates numbers.
15     A  That's my understanding.
16     Q  Do you know what it means when it is M-O-C rather
17  than Yukon on a document?
18     A  I would assume that these are the documents that
19  were provided by either Mewbourne or documents provided by
20  Yukon.
21     Q  That's my understanding too.  So when you looked
22  at them did you know these were produced by MOC and these
23  were produced by Yukon?
24     A  That's what I assumed by seeing MOC.
25     Q  Did you ever ask to make sure that all the

Page 48

1  documents that were provided by Yukon were also provided by
2  MOC or vice versa?
3      A  No.  I just assumed that these were all the
4  pertinent documents.
5      Q  And if there are other documents in this case that
6  have been produced that are not listed here, that would not
7  be part of your opinions in this case as reflected in this
8  report?
9      A  I think that's -- that would be correct.
10     Q  So if you're provided additional documents it may
11  have an effect, one way or another, on your opinions?
12     A  I mean, it could, an additional document could.
13  But I think I had everything I needed right here.
14     Q  And that was going to be my next question.  Is
15  there any other documents that you think you need or would
16  be helpful to provide the context around what was going on
17  at the time that this all occurred?
18     A  No.
19     Q  Did you talk with anyone at Mewbourne about the
20  situation that occurred and when it occurred?
21     A  I have talked with one Mewbourne employee, Greg
22  Shepherd.  And -- but I only had a specific question and he
23  answered that question for me.
24     Q  And what was that question?
25     A  It was regarding the 2H well bore that was lost,

12 (Pages 45 to 48)

Dorsey Roach                                                        October 23, 2024

Page 49

1  and then their commencement of the 2HR I think is what it's
2  called. And just -- I asked him real quickly what happened
3  to -- to -- that resulted in having to abandon the 2H well
4  and then commence the 2HR well.
5      Q  And why did you have that question?
6      A  I wanted to know if it was -- I thought it was
7  very important that -- to know if the rig was released, if
8  the 2HR well was in close proximity to the rig, was it
9  skidded over to that 2HR location, and what happened to the
10  2H well that resulted in their abandoning the well and
11  skidding the rig.
12      Q  And did they -- they eventually plugged that first
13  2H well; right?
14      A  That's my understanding. I haven't seen anything
15  to say they plugged it, but I assume they probably did.
16      Q  Did he say whether or not it had been plugged when
17  you talked to him?
18      A  I didn't even ask him that and he didn't mention
19  it.
20      Q  Is that because it doesn't matter for what you
21  were doing?
22      A  Right. He answered the questions that I had.
23      Q  Okay. What were the answers to the questions?
24      A  That the 2H well lost circulation at about three
25  or 400 feet I believe, and that they couldn't get around

Page 50

1  the junk in the hole because of the shallow depth of the
2  well, and so they just skidded the rig a very, very, very
3  short distance and just continued drilling as a single
4  continuous operation.
5      Q  And is there a significance to a single continuous
6  operation in your mind for this case in these two wells?
7      A  Yes.
8      Q  What is it?
9      A  It's my understanding now and it always has been
10  that when a wellbore is lost -- and there is so many
11  different reasons why wells -- wellbores are lost while
12  drilling that it makes a difference if the rig was released
13  and moved off the location versus skidding the rig and
14  continue drilling. And I think there is case law that
15  supports my opinion in this matter.
16      Q  And do you know what case law that is?
17      A  The case law is just when you skid a rig it's just
18  a continuous operation, a single continuous operation.
19  Without going into any other detail that's what I am -- how
20  I've been trained is to understand that difference between
21  releasing the rig versus skidding it.
22      Q  Are you relying on your understanding of the case
23  law in order to render that opinion?
24      MR. HOGAN: Objection to form.
25      A  I'm not sure I understand your question.

Page 51

1      Q  (By Ms. Rudnicki) Are you relying on your
2  understanding of the case law that you just described to me
3  in order to render the opinion that it was a continuous
4  operation?
5      MR. HOGAN: Same objection.
6      A  I think that, yes, I think just the facts involved
7  in this case that the initial well only went down to three
8  or 400 feet and they lost the well at that depth and then
9  they just skidded the rig and continued drilling. So, yes,
10  that's -- my understanding is that is a single, continuous
11  operation.
12      Q  (By Ms. Rudnicki) Right. And you referred to case
13  law that supports your opinion. Do you recall that
14  testimony?
15      A  Yes. I've --
16      Q  So --
17      A  Go ahead.
18      Q  So in my understanding, you are relying on those
19  opinions to support your own opinion and so I'm asking you
20  what are those cases and what states are they in?
21      A  I couldn't answer that question. I mean, this is
22  a knowledge that I've developed over 45 years.
23      Q  So this case could have been in 1979?
24      A  It may have been. I don't know.
25      Q  Is there a specific case that you are thinking of

Page 52

1  when you refer to case law in order to support your
2  opinions?
3      A  Is there --
4      Q  A specific case that you are thinking of when you
5  refer generally to case law to support your opinions?
6      A  No, there is not a specific case that I recall.
7      Q  And if there was a specific case that you were
8  relying upon would that be something that you would
9  typically list in your reports?
10      A  Yes.
11      Q  Do you list case law in your reports regularly?
12      A  Sometimes I do.
13      Q  When was the last time?
14      A  Probably here in the last six months or so.
15      Q  When was the last report you did other than this
16  one?
17      A  Gosh, I've done probably three or four this year.
18  I can't remember when the last one was, though, just off
19  the top of my head.
20      Q  And the three or four you have done in the year
21  2024, have any of them dealt with PPLAs?
22      A  No.
23      Q  Can you think of any reports that you have done
24  related to PPLAs?
25      A  No.

D&R REPORTING & VIDEO, INC.
(800)771-1500 depo@drreporting.com

**EXHIBIT 1**
**Page 9 of 18**

Dorsey Roach                                                    October 23, 2024

Page 53

1    Q  To your knowledge are there any other participants
2    that would be in the same category as SPIR and JSR, other
3    than the ones that are listed here?
4        MR. HOGAN:  Objection.  Form.
5    A  I don't know what you mean by in the same
6    situation.  I don't understand what you mean there.
7    Q  (By Ms. Rudnicki)  Well, you told me that it's
8    your understanding that these two are somehow affiliated or
9    related to Yukon; right?
10   A  Yes.
11   Q  Are you aware of any other entities that are like
12   these are in relation to Yukon?
13   A  I don't know.  I really don't know.
14   Q  Did you ask?
15   A  I didn't ask, no.
16   Q  Do you know whether or not there are other
17   entities that were treated differently than this that did
18   not send letters?
19   A  No.
20   Q  Did you ask?
21   A  No.
22   Q  At your time in UnitPro Land Consultants do you
23   have mail handling procedures?
24   A  Well, I've -- up until recently I had a P.O. Box
25   at a, what's it -- a USP (sic.) store, and so I would have

Page 54

1    all my business mail sent there and kept it separate from
2    my residential mail.  But that's the only mail handling
3    that I can think of that's associated with my company.
4    Q  Have you done any, with your company, mailouts for
5    elections under PPLAs?
6    A  Not with my company, no.
7    Q  Have you been on the receiving end at your company
8    for elections?
9    A  No.
10   Q  Have -- do you have other companies that you
11   currently are affiliated with other than UnitPro Land
12   Consultants where you would be doing those types of
13   mailouts or receiving those types of mailouts for the last
14   three years?
15   A  No.
16   Q  When was the last time you were required to send a
17   certified mail while working at UnitPro Land Consultants?
18   A  I haven't done any certified mail for a while, but
19   I have done certified mail many times over the years.
20   Q  Before or after the pandemic?
21   A  Probably before the pandemic.
22   Q  Before or after 2015?
23   A  I don't recall.
24   Q  Can you recall a certain instance where you mailed
25   something via certified mail in the last 10 years?

Page 55

1    A  I know I have, but I just can't recall.
2    Q  From a professional standpoint or from a personal
3    standpoint?
4    A  Professional.
5    Q  And in what context would that have been?
6    A  I really don't recall.  I just know I've done a
7    lot of green cards over the years.  And I know that I've
8    done several here in the last 10 years.
9    Q  What's a green card?
10   A  That certified mail, when you send certified mail,
11   you do it through what's often -- at least in companies we
12   refer to it as green cards.  It's what the recipient signs
13   and is returned back to the sender, evidence that the --
14   whatever was being sent was delivered.
15   Q  And how are those green cards -- what do they look
16   like?
17   A  They are about the size of a post card and they
18   are usually taped onto an envelope that's being mailed.
19   And the recipient will sign it and then gets to the mail,
20   and the green card shows that it was received by the
21   evidence of someone signing the green card, and the green
22   card is then sent back to the sender.
23   Q  Is there, in your experience, does the green card
24   associate with more than one envelope?
25       MR. HOGAN:  Objection.  Form.

Page 56

1    A  I have never seen it associated with more than one
2    envelope.
3    Q  (By Ms. Rudnicki) Have you ever prepared a
4    certified mailing that had a certified mail green card
5    associated with more than one envelope?
6    A  I never have, no.
7    Q  In your practice of sending out certified mail, do
8    you put the certified mail number on the letter that is
9    associated with it that you put in the envelope?
10   A  Could you repeat that again?
11   Q  Um-hum.  Okay.  So we're going to do a certified
12   mail.  We're going to use a green card.  One of the reasons
13   you use a green card or certified mail is because you get a
14   certified number.  Agreed?
15   A  Yes.
16   Q  Do you put that certified number on the letter
17   that goes in the envelope to which the certified is
18   associated?
19   A  The companies I've worked for and where I've
20   worked, and even now I do, but not all parties do that, but
21   I always have.  It's always been the way I was trained was
22   to put that number on.  But I don't know that it's
23   mandatory or required or anything like that.  It's just
24   probably a good practice to do that.
25   Q  And why is that a good practice?

14 (Pages 53 to 56)

Dorsey Roach                                                    October 23, 2024

Page 57

1    A  Well, it says the -- what's being mailed to the
2  green card.
3    Q  To that number?
4    A  To that number on the green card, yes.
5    Q  And so the green card that we're talking about
6  that looks like a post card, it has a number on it, and
7  then that number is also on the letter and it's on the
8  envelope?
9        MR. HOGAN:  Objection.  Form.
10   A  Typically it's not going to be on the envelope
11 because the green card is attached to the envelope and it's
12 on the green card.
13   Q  (By Ms. Rudnicki)  There's not two pieces in your
14 recollection?
15   A  Not in my recollection.  When you take the green
16 card off at leaves two strips on the side where the card
17 was attached, but there is nothing on those two little
18 strips.  It's sticky and attaches to the envelope.
19   Q  Is there a barcode that you're aware of?
20   A  I don't recall a barcode, but I'm not saying there
21 aren't barcodes.  I just don't recall ever seeing them.
22   Q  Did you -- have you seen the actual green cards in
23 this case?
24   A  I haven't seen the actual green cards, the real
25 deal.  I've seen copies of the green cards.

Page 58

1    Q  And when you say the copies of the green cards,
2  you think you've seen the actual post card type post card?
3    A  Yes.
4    Q  So in the circumstance that you described and
5  recall using the green cards, at the end of the day would I
6  have a green card -- if I pulled it all together I would
7  have a green card, an envelope, and a letter, and maybe
8  something else in there?
9    A  Yes, there is something else.  There's a little
10 white piece of paper that has the same number on it as the
11 green card.  And so that way you -- you retain a -- it's
12 not a green card, but it's associated with the green card.
13 And you retain that for your files so if you ever have to
14 go back and make reference to something that was sent by
15 certified mail, you can reference the number on the --
16 anyway, it's just a little thing you can put in your file.
17   Q  Have you ever heard of a company called Simple
18 Certified?
19   A  No, I have not.
20   Q  Are you aware -- have you ever used a service
21 other than USPS in order to complete your certified mail?
22   A  I don't recall ever receiving any -- using any
23 other company, just USPS.
24   Q  And in the times that you recall using the green
25 cards and sending the green cards, did you have those

Page 59

1  materials in your office to use or did you go to the post
2  office to get the materials to mail it?
3    A  We would -- I mean, everywhere I've been we have
4  always kept a supply of green cards.  And so we wouldn't
5  have to, every time we wanted to send something, we didn't
6  have to go to the post office to get what we needed.  And
7  so we've always just had them there in the office.  And
8  then, you know, the companies I've worked for, the Postal
9  Service will just come pick up the mail every day and they
10 pick up the stuff that was going to go out by certified
11 mail.
12   Q  And then it would get processed accordingly by the
13 USPS the way you described?
14   A  Presumably.
15   Q  Yes, presumably.  And you understand there is a
16 dispute as to whether or not my client actually received
17 this document.  You know there is a dispute about that;
18 right?
19   A  Yes.
20   Q  Okay.  We're going to go back to Exhibit 3 and 4,
21 which is the JSR letter.  And I'm just going to go with
22 SPIR.  I don't know what it's supposed to be.  S-P-I-R.
23 And I keep spelling it every time.  It's capital letters
24 and I'm going to go by SPIR.  Why were these important to
25 you?

Page 60

1    A  Well, these are parties that acquired their
2  interest through Yukon Trading as the exhibits reflect.  So
3  these were parties that would have been either named in the
4  pooling or they would have been subject to the pooling,
5  because Yukon Trading was named in the pooling.  And so
6  they would be in the same boat as Yukon Trading as far as
7  any notices and payments due for well costs.
8        So it's to show that there were other
9  participants, or I should say there were other respondents
10 under the pooling who were subject to the same letter
11 agreements that Yukon had entered into.  They were subject
12 to those.  They acquired their interest from Yukon.  And
13 they didn't seem to have any trouble sending an election
14 letter and mailing in their checks for their share of dry
15 hole costs.
16   Q  Okay.  So I'm going to break that down a little
17 bit.  Because at one point you said these particular
18 entities are subject to the pooling order, and then you
19 corrected and said, no, they would be respondents under the
20 pooling.  What's the difference?
21   A  Oh, if you are a respondent and you are not
22 dismissed, then you are subject to the pooling order.  So
23 if you start out as a respondent and then eventually, once
24 the order issues, you are subject to the order.  I just
25 kind of -- when you mention names, usually most people will

15 (Pages 57 to 60)

Dorsey Roach                                                    October 23, 2024

Page 69

1   industry doesn't really look at midwestern, even though
2   Ohio and a few states like that have oil and gas activity.
3   So I think they are usually considered to be part of the
4   Appalachian.
5       Q   Okay.  So in looking at the list of -- okay.  So
6   in response to the request that we made for No. 5, you
7   wouldn't have anything that's responsive to this because
8   you didn't -- that is where you're a party.
9       A   That's correct, I'm not a party to any of this so
10  I wouldn't have anything to provide.
11      Q   Is there anything other than the documents that
12  you've listed in your reports being reviewed upon that you
13  can specifically think of that's like a letter agreement, a
14  PPLA, that you are specifically relying upon in rendering
15  your opinions in this case?
16      A   You're asking if prior cases I've been involved
17  with have influenced my decision in this case?  Is that --
18      Q   Um, no.  I'm asking whether or not you're
19  considering, in rendering the opinions in this case, did
20  you look at, pull up in your mind a specific agreement or
21  document?
22      A   No.
23      Q   Okay.  Let's skip down to No. 7 in the subpoena
24  duces tecum.  And this one is about training material or
25  presentation materials or any documents used by or shared

Page 70

1   by UnitPro Land Consultants in which the topic is proper
2   handling of mailouts for elections to participate in wells.
3   Do you have anything like that?  I can be more specific if
4   you would like me to break it down.
5       A   That would be helpful.
6       Q   Okay.  So, for example, in the presentations that
7   are listed on your attachment, none of those deal with how
8   to do a proper election mailout; right?
9       A   Well, actually, the -- when you say "proper,"
10  there's nothing that specifies proper.  It says what the
11  agreements provide is the different ways you can send out a
12  notice.  It can be by U.S. mail, it can be by courier.  So
13  there is several different ways to send notices.
14      Q   Okay.  That's fair.  Do you have a specific
15  presentation that is dedicated to operations, procedures of
16  doing mailouts for an oil and gas company?
17      A   Well, I'm going to say that my presentations, I
18  definitely address -- like in operating agreements it
19  specifies what information has to be included in a proposal
20  that's mailed out to the other parties.  The agreements
21  also provide the election periods, how long those election
22  periods are and depending upon the -- what it's for.
23          And in the materials I have there is also -- or
24  there's a distinction made between 30-day election clocks
25  and when your election is due versus 48-hour election

Page 71

1   clocks and when your election is due, and it's different.
2       Q   So you do have presentations like that?
3       A   Yes.  And I believe some of this is in the AAPL
4   materials that I present.
5       Q   Okay.  When you present for AAPL, do you present
6   on behalf of UnitPro, like is it branded UnitPro or is it
7   like an AAPL brand?
8       A   It depends.  I teach -- I used to teach.  I'm
9   retired now from speaking, actually, this year.  I would
10  teach CPL reviews where I was presenting AAPL's materials.
11  And for operating agreement seminars or of anything else, I
12  was presenting my materials.
13      Q   Are there any seminars that you do that are
14  specific to PPLAs?
15      A   No.
16      Q   In thinking through the training and the
17  presentations you have given, do you recall doing a slide
18  on PPLs?
19      A   No, I do not.
20      Q   Is there any -- do you recall doing any articles
21  or -- let me start with articles -- articles where the
22  primary subject was PPLAs?
23      A   No, I have not.
24      Q   Okay.  During one of the breaks we talked about
25  you being an adjunct professor at OU and other places.

Page 72

1       A   Yes.
2       Q   Yes?
3       A   Yes.
4       Q   In any of those courses do you recall doing a
5   section or providing materials specific to a PPLA?
6       A   No, I did not.
7           MS. RUDNICKI:  Okay.  I'm going to take a quick
8   break.  It's been almost a full hour.
9           VIDEO OPERATOR:  Off the record.
10          (A break was had from 11:03 to 11:20
11          a.m.)
12          VIDEO OPERATOR:  Back on the record.
13      Q   (By Ms. Rudnicki) Mr. Roach, we took a quick
14  break.  Is there anything from the second session that you
15  would like to change or alter?
16      A   No.
17      Q   Or complete?
18      A   No.
19      Q   Okay.  We've been talking about your report, which
20  is Exhibit 2.  And I wanted to ask you kind of a broad
21  question, which is what were you asked to do in this case
22  by the lawyers that hired you?
23      A   They wanted me -- well, they asked me to review
24  the facts and provide my opinion as to whether or not I
25  felt that Yukon had or had not made a proper election under

18 (Pages 69 to 72)

Dorsey Roach                                        October 23, 2024

Page 73

1 the pooling for the drilling of the 2H well. And so I was
2 provided with what they felt were all the pertinent
3 documents that related to that, so I reviewed those and
4 offered my opinion.
5    Q  Did you provide them a verbal opinion as well as a
6 written opinion?
7    A  I probably did. I probably discussed it with them
8 before I started writing the opinion to know whether or not
9 I should start writing the opinion. So if they wanted me
10 to go ahead and commence with that. So I'm sure I
11 discussed it with them briefly and then drafted my opinion.
12   Q  Are there any other previous drafts of this
13 report?
14   A  No, no.
15   Q  Do you use a word processor to prepare your
16 reports?
17   A  Yes.
18   Q  What kind?
19   A  Oh, word processor? No. I use my computer. Is
20 that what you --
21   Q  Do you use Word, Microsoft Word?
22   A  Yeah.
23   Q  Microsoft 365 or is it a desktop edition?
24   A  Well, that's a good question. I think that's 365
25 now. Microsoft kindly downloaded that into my computer

Page 74

1 without my knowledge or consent and it's been screwed up
2 ever since.
3    Q  I think that has been everyone's experience with
4 Microsoft currently.
5       MR. HOGAN: Yep.
6    Q  (By Ms. Rudnicki) Did you begin preparing -- you
7 prepare all your own reports?
8    A  I do.
9    Q  Is there a master that you copy and paste your
10 professional background from?
11   A  I do, but I always go through it before I just
12 copy and paste. I go through it, or after I've copied and
13 pasted it I go through it just for any updates or anything
14 else I need to add to it or if I think anything needs to be
15 changed. But it doesn't change that much, maybe just when
16 I have a new -- well, when I was on the participation
17 agreement committee, you know, that was something new I
18 added. So that's about all my background -- I mean,
19 everything else it's a constant, it doesn't really change.
20   Q  If the -- do you sometimes include experience that
21 you think is pertinent versus other experience that's not
22 pertinent for a particular report? And if you don't
23 understand what I'm saying, I can break it down. I can
24 tell by your face you're kind of like, Huh?
25   A  Yeah, if you could, please.

Page 75

1    Q  Okay. So if I look at this expert report it
2 starts with, "I am competent to provide factual statements
3 and opinions in this case." But it doesn't say which case
4 this is, it doesn't say what the facts are, not yet, right,
5 in the beginning. Is this going to be the same in most of
6 the reports you do, or do you rewrite this paragraph every
7 time?
8    A  It sometimes changes. And sometimes attorneys
9 might ask me if -- you know, I might read them, you know,
10 kind of my -- or run by them my -- you know, what I'm
11 putting together. And sometimes they have special
12 requests, could you put that into your introduction or into
13 this or that; and so I do, I just type it up and put it in.
14   Q  Do you recall whether or not the lawyers in this
15 case asked you to supplement anything or add anything
16 that's in your expert background and qualifications?
17       MR. HOGAN: I'm going to instruct the
18 witness -- we're in federal court. Right? Yeah. I'm
19 going to instruct him not to answer under federal rules for
20 expert disclosure.
21   Q  (By Ms. Rudnicki) Okay. So did you copy and paste
22 from your own version paragraphs one, two, three, four, and
23 five of your expert report?
24       MR. HOGAN: You can answer that.
25   A  Yes, this is what I prepared. This is pretty much

Page 76

1 found in most of my expert reports the identical same
2 thing, so there is a lot of cutting and pasting. Sometimes
3 I may leave something out that I don't think is pertinent
4 anymore, and I usually delete it altogether in the future
5 too. And sometimes I add stuff and keep it in there.
6       So, you know, this is just my -- it is kind of a
7 standard cut and paste, but then slightly modified and
8 individualized for each case.
9    Q  (By Ms. Rudnicki) So if you look at the last two
10 paragraphs on page 3 -- I mean the top two paragraphs on
11 page 3 where it says, "During my 47 years as a landman,"
12 and then "over the past 15 years," are those two unique?
13 You can go ahead and read them.
14   A  No. Those -- I may have -- I mean, that's -- this
15 is what I wrote. I can't remember if it was in earlier
16 opinions or not, if it was written just like this. But
17 this is -- this is all what I wrote.
18   Q  Right. But is it -- what I'm asking is the copy
19 and paste. Is it a copy and paste or do you think you
20 tailored these two paragraphs for this report?
21   A  I really don't recall.
22   Q  Okay. And one of the reasons I'm asking is it
23 specifically says in that second paragraph, like we talked
24 about earlier, pre-pooling letter agreements, and that you
25 have previously been accepted by Oklahoma courts as an

19 (Pages 73 to 76)

Dorsey Roach                                                    October 23, 2024

Page 77

1   expert witness.
2           But I don't know that we have identified any
3   pre-pooling letter agreement cases where you have been
4   accepted as an expert witness in an Oklahoma court, have
5   we?
6       A   Well, I mentioned the corporation commission
7   hearings, which is deemed a court of law, and so I guess I
8   was including that.  I can't recall under the cases I've
9   been involved with -- there's many cases I've been involved
10  with that are not listed because I never testified.  And so
11  I think that --
12      Q   And we went through those --
13          MR. HOGAN:  Sorry.  I think he was in the
14  middle of his answer.
15          THE WITNESS:  Yeah, I haven't finished.
16          MS. RUDNICKI:  Go ahead.
17          THE WITNESS:  But there is many times that I
18  have written reports or the case is settled or a motion for
19  summary judgment is granted and I don't get to testify, but
20  I have addressed a number of issues.  And I probably have
21  just as many, if not more, those kinds of cases versus the
22  ones I have actually testified in.
23          So it is litigation in these instances, but I
24  just don't get far enough where I get to testify.
25      Q   (By Ms. Rudnicki)  What cases or clients do you

Page 78

1   remember working with where your qualifications were
2   accepted by an Oklahoma court involving a pre-pooling
3   letter agreement?
4       A   Well, again, I've referenced the Oklahoma
5   Corporation Commission.
6       Q   And those dealt with pre-pooling letter
7   agreements?
8       A   Well, there was, you know, protested hearings,
9   which is the equivalent of litigation.  And there were
10  PPLAs involved in that.  And so I was involved -- I wasn't
11  necessarily -- well, I know that at some of these pooling
12  hearings, though protested hearings, and I have testified
13  at a number of these, that under my testimony I've
14  addressed the PPLAs and what's the issue, why aren't the
15  parties able to settle or what's the -- what's blocking
16  this.  And so, yes, I have testified in those cases.
17      Q   What client and/or case or well or area, if you
18  can tell me, were those in?
19      A   I can't recall.  I really don't recall.
20      Q   Can you name any client that you recall doing what
21  you just described in testifying in front of the
22  Corporation Commission about a PPLA?
23      A   I can't recall.  I really can't.
24      Q   Okay.  And if we go to page -- oh, same page.  So
25  page 3 it says a summary of your opinions.  At the top is

Page 79

1   the heading.  And then if you go to the end, it ends.  So
2   that's the only section is the summary of opinions.
3           Is there a different document that spells out all
4   the opinions or is this your opinions, other than what I
5   asked you about or expand upon?  Is this a summary or is
6   this the opinions?
7       A   This is -- well, I look at it as being the same
8   thing.  This is a summary of the opinions on the various
9   matters that I see in this case.
10      Q   Oh, did you identify what opinions you were going
11  to render in this case?
12      A   I decided what opinions I was going to render.
13      Q   And did you decide which issues you were going to
14  look at?
15      A   As I read through the petition and the response in
16  this case, that helps identify the areas I'm going to focus
17  on.
18      Q   And so you did make those decisions?
19      A   Yes.
20      Q   And so if you go to the page 1 of your report it
21  says "Summary of Opinions of Dorsey T. Roach, CPL."  Do you
22  see that?
23      A   Yes.
24      Q   And so is the summary of opinions this whole
25  report?

Page 80

1       A   It's a -- yes, the summary of opinions is my
2   entire report.
3       Q   And then the very first sentence here says you've
4   been retained by attorneys representing Mewbourne Oil
5   Company, shortened to Mewbourne, to provide my opinions in
6   this case about the following.  And there is one, two,
7   three, four, five bullets.
8       A   Yes.
9       Q   The five bullets that are listed here, you say you
10  are to provide your opinions about the provisions.  What
11  other facts are you looking at when you're deciding the
12  opinions other than these documents?
13          MR. HOGAN:  Objection.  Form.
14      A   Well, I just think my experience of working
15  Oklahoma (sic.) is -- is behind formulating my opinions.
16      Q   (By Ms. Rudnicki)  And I apologize.  I knew my
17  question wasn't worded correctly.  What I'm looking for,
18  facts in this case.  What are the basic facts in this case
19  that gives rise to this dispute?
20          MR. HOGAN:  Objection.  Form.
21      A   The issues appear to be did Yukon receive notice,
22  advance notice of spud, the spudding of the well.  Other
23  issues, did Yukon make a timely election to participate in
24  the proposed well, was -- was Mewbourne required to submit
25  an invoice with the notice at the same time with the

20 (Pages 77 to 80)

Dorsey Roach                                                              October 23, 2024

Page 137

1          identification.)
2      Q  Here is Exhibit No. 14, and if you'll look at the
3   dates and the times.  And it's a continuation of one of the
4   other emails we saw, buts this is the completion showing
5   that the PPLA for Section 12 and that 35 that is attached
6   as Exhibit 9 to your deposition was eventually entered
7   into, and it was sent back at 8:23 a.m. on November 1st.
8          I'm just confirming the dates because you said you
9   were concerned about the dates on whether or not it was
10  done before the hearing.
11         And you haven't seen that document before?
12     A  I think I've seen one of the -- no, I have not
13  seen this.
14         (Exhibit 15 was marked for
15         identification.)
16     Q  Okay.  This one is just a continuation of that
17  one.  And you'll see that it's 9:40 a.m.  Thanks for the
18  information.  And in the email right below, do you see
19  where it says from Greg Shepherd, Wednesday, November 1st,
20  2023, 9:29.  Chad and David.
21         And Greg says, "It should spud in January."  And
22  he's responding to the question posed by Chad at November
23  1st, 2023, at 9:27.  Do you see that?
24     A  Yes.
25     Q  I know we just got it resolved, but do you have an

Page 138

1   idea of the spud date for the Abernathy 2H well?  Did it
2   spud in January?
3      A  I think it was spud on, as I recall -- and I may
4   be wrong on this, but it seems like it was February 2nd of
5   2024.
6      Q  Maybe February 6?
7      A  I -- I don't know.  I can't recall.
8      Q  Okay.  February 2nd is the date in the letter by
9   which it was to be spud.
10        Exhibit No. 16?
11        MR. HOGAN:  Yep.
12        THE WITNESS:  Yes.
13        (Exhibit 16 was marked for
14        identification.)
15     Q  (By Ms. Rudnicki) Sixteen.  This is listed on your
16  report as one of the number ones with Bate Numbers 00017.
17  So you have seen this document; right?
18     A  Yes.
19     Q  And what is this document?
20     A  It is Yukon exercising its option for deferred
21  election in the drilling of the Abernathy 1/12 CN 2H.
22     Q  And explain what a deferred election is?
23     A  It means that -- I think the better way to do it
24  is to provide an example.  The pooling order states that
25  all elections have to be submitted on or -- within 20 days.

Page 139

1   And this is just a private agreement between Yukon and
2   Mewbourne whereby Yukon does not have to make its election
3   within 20 days.  It's going to be given an extension of
4   time to make its election.
5      Q  And so it's just exercising its right to use that
6   deferred election in this letter?
7      A  Yes.  That was something that was negotiated by
8   the parties in the PPLA.
9          (Exhibit 17 was marked for
10         identification.)
11     Q  Okay.  I'm going to hand you what is marked as 17.
12  And this is MOC_Abernathy 205.  And I will tell you that it
13  is not listed on your Exhibit B.  Okay?
14     A  Yes.
15     Q  And just confirm that you have not seen this
16  before.
17     A  No, I have not.
18     Q  Have you spoke to Cole Chapman?
19     A  I don't know Cole Chapman, so, no, I have not.
20     Q  Okay.  If you look at the back on page 208, what
21  is that?
22     A  This is, I guess, the U.S. Postal Service is now
23  doing electronic, but it's a -- it's the equivalent on what
24  we used to call the green card.  And it just -- this is
25  what the U.S. Post Office would send back to the sender to

Page 140

1   state that the -- whatever was sent, the envelope or what
2   have you, was delivered and what time and what day.
3          Well, this one is for when it was given by
4   Mewbourne.  I'm looking at the date up here 8/22/24.  But,
5   yet, it's referring to a -- when the U.S. post office
6   received from Mewbourne a certified letter to be delivered
7   to Yukon.
8      Q  Is this the way you remember green cards looking?
9      A  Not in the old days, it's not.
10     Q  Have you done one where you generated one of
11  these?
12     A  I haven't, no.
13     Q  Do you see down at the bottom where it says, "The
14  above information is for the sole use of
15  simplecertifiedmail.com clients and represents information
16  provided by the United States Postal Service."
17     A  Yes.
18     Q  And are you familiar with simplecertifiedmail.com?
19     A  I guess I am now.  I've never heard of them
20  before.
21     Q  Was that on your green cards?
22     A  On my green cards?
23     Q  On the green cards you were talking about.
24     A  The ones that I used to send, no, that was not
25  available, that service was not available.

35 (Pages 137 to 140)

Dorsey Roach                                                          October 23, 2024

Page 141

1    Q  Go to the very last page of this particular
2  stapled.  And it says it's 210 at the bottom.  What is
3  that?
4    A  This is the post office -- this is a proof of
5  delivery of a certified letter to Yukon as the recipient of
6  the letter.  And it shows the Yukon Trading's signature of
7  having received the letter.  And it shows what date and
8  what time the certified letter was delivered to Yukon.
9    Q  What's the difference between 209 and 210?  I mean
10 sorry.  210 and 208?
11      MR. HOGAN:  Objection.  Form.
12   Q  (By Ms. Rudnicki)  Which one of those is the
13 supposed green card?
14      MR. HOGAN:  Same objection.
15   Q  (By Mr. Hogan) If you know.
16   A  Well, I think one of them is just showing -- 208
17 is just showing that the post office received an item to
18 deliver as certified mail, and it shows when it was
19 delivered to the post office.  And the second one, 210, was
20 showing it was delivered and here is the date and time it
21 was delivered.
22   Q  If you look at the very bottom of 210, underneath
23 where it say Yukon Trading Company it says Item ID.
24   A  Yes.
25   Q  And it says 14 15 20 Consent.

Page 142

1    A  Yes.
2    Q  And if you look at 208, it says the same thing;
3  right?
4    A  Yes.
5    Q  Do you know who put that information in, whether
6  it's done at simplecertified.com or by the Yukon person or
7  by the USPS?
8    A  Well, being that I am not a client of Simple
9  Certified Mail, I'm not sure -- you know, I haven't used
10 this service.  But it would appear that whoever entered
11 that, it was probably the sender.  And this is a reference
12 to what the purpose of the envelope or the certified mail
13 is.
14   Q  But since you're not a certified mail -- Simple
15 Certified Mail and you haven't done it this way, you don't
16 really know how all this works?  You can just tell me what
17 it says on a piece of paper.
18   A  Well, again, I'm not a client of
19 SimpleCertifiedMail.com.
20   Q  Are you an expert at certified mail?
21   A  I have sent many, many, many, letters by certified
22 mail.
23   Q  But none like this.
24   A  Right.  This is probably a fairly new service.
25   Q  Do you know whether it's reliable?

Page 143

1    A  I don't know anything about it.
2      MS. RUDNICKI:  Eighteen?
3      MR. HOGAN:  Yep.
4      THE WITNESS:  Yes.
5        (Exhibit 18 was marked for
6        identification.)
7    Q  (By Ms. Rudnicki)  I hand you what I have marked
8  as 139.
9      MR. HOGAN:  Marked as 18; right?
10   Q  (By Ms. Rudnicki) I'm sorry.  Marked as 18, but
11 has Bate number 139 on the bottom right-hand corner.  And I
12 will tell you that on your Exhibit B you have 138, which I
13 actually believe might be an email.  Have you seen this
14 before, 139?  Oh, wait.  You have.  139.
15   A  Yes.
16   Q  Sorry.  It was right there.
17   A  Yeah.
18   Q  Sorry.  I was looking in the wrong spot.  So you
19 have seen this.  What is this?
20   A  This is a well proposal letter from Mewbourne to
21 Yukon dated December 22nd, 2023.  And in accordance with
22 the PPLA Yukon is entitled to a deferred election, it's
23 exercised that deferred election, and is deferred until
24 Mewbourne notifies them of its intention to move forward.
25 And I think this is what that letter is saying, is that the

Page 144

1  well is being proposed pursuant to the pooling order, which
2  would also include, as between Yukon and Mewbourne, the
3  PPLA.
4    Q  Is the PPLA referenced in this letter?
5    A  No, I do not believe it is.
6    Q  Is this the spud notice?
7      MR. HOGAN:  Objection.  Form.
8    A  I don't think this is the spud notice.  I think
9  that what this is doing is referencing the well, making
10 sure that everyone knows which well it is, what the
11 location is going to be for the well exactly.
12     But most importantly, this is an allocation well,
13 and what Mewbourne is telling Yukon is that we're going to
14 initially start out by allocating 50 percent of the costs
15 of drilling this well to -- to Section 1 and 50 percent of
16 the cost of drilling this well to Section 12.
17     And I think it says, Please note, in the same
18 paragraph, "the allocation factor is subject to change
19 based upon the final surveys," once they know how much of
20 the lateral is underlying Section 1 versus Section 12.  And
21 it might turn out to be 55/45 or 60/40 or 49/51.  It could
22 be something different.
23   Q  (By Ms. Rudnicki) Do you know what it ended up
24 being in the Abernathy 1/12 CN 2R?
25   A  No, I don't.  I haven't seen any information that

36 (Pages 141 to 144)

Dorsey Roach                                                          October 23, 2024

Page 161

1    A  They need to -- one -- there is several reasons.
2    But one is that they need to make sure that if someone is
3    not participating, if they own 45 percent and it's the
4    drilling of a well, $10 million dollar well that means that
5    the operator is going to have to cough up an extra $4 1/2
6    million.
7        And so that's one reason why an operator needs to
8    know, you know, who is participating, what the elections
9    are so it can make sure it has 100 percent subscription to
10   the drilling of a well and can spread out.  If someone is
11   not going to participate, they offer the interest under the
12   JOA, they offer it under the JOA.  It's a requirement that
13   they must do that to the other parties, the non-consent
14   interest to the other parties.
15   Q  And in the rest of that paragraph you talk about
16   the $10 million for services and materials to vendors and
17   contractors out of its own pocket.
18       That $10 million, is that an estimate in a random
19   well or is this in this well specific?
20   A  No.  This is just a random well.  I'm just pulling
21   numbers out of the air on that.
22   Q  Okay.  And when you say that they would have to
23   pay it out of its own pocket, meaning the operator would
24   pay it out of its own pocket, wouldn't they also receive
25   the revenues associated with that same interest?

Page 162

1    A  Yes.
2    Q  Right?
3    A  Yes.
4    Q  So, although they would be out the upfront costs,
5    if the well paid out in a year or two years and they got
6    all their money back, they will still get their money in
7    interest thereafter after they got all their money back;
8    right?
9    A  Yes.  But if the well is a dry hole or if the well
10   never pays out then they are out quite a sum of additional
11   funds.  So it can go either way.
12   Q  Right.  Which is why they have pre-paying and they
13   have those kind of options, and sometimes they defer it,
14   sometimes they don't.
15       But if you have a non-operator that is
16   participating in 99 percent of your wells, do you think
17   that you're going to be stiffed on that?  Is that why they
18   wouldn't allow them to participate?
19       MR. HOGAN:  Objection.  Form.
20   A  I don't know.
21   Q  (By Ms. Rudnicki)  Did you --
22   A  Well, let me say this.  I say I don't know.  I
23   know that Yukon failed to make a timely election to
24   participate, and so Mewbourne had already taken the
25   position that they failed to make an election and proceeded

Page 163

1    on with its plans.
2    Q  But they did not make that decision as of January
3    18th; right?
4    A  No, not by January 18th they hadn't.  The 10-day
5    election period was still running.
6    Q  Um-hum.
7    A  But they were waiting for Yukon -- Mewbourne was
8    waiting for Yukon to make an election to either participate
9    or relinquish its interests.
10   Q  And Yukon was waiting on Mewbourne to send the
11   notice; right?  That's the position of the parties.
12   A  Yeah.  The notice was sent and delivered and
13   received and green card returned, so I think there's a full
14   circle.
15   Q  Okay.  You know there is no green cards in this
16   case; right?  Has someone finally told you that?
17   A  Well, I know that it appears that nowadays things
18   are done probably in a little bit different style, a
19   different manner than they have in the past, but it still
20   serves of the same purpose and does the same thing.
21   Q  That's not my question.  Have you seen a green
22   card, as you described at the beginning of this deposition,
23   in this case that shows there is a piece of paper that's
24   green with the white part that matches the envelope and the
25   letter?

Page 164

1    A  No, I haven't seen a green card.  I have seen the
2    U.S. Postal Service and the document -- or the company,
3    whatever it is, .com.
4    Q  Simple Certified that you didn't even know about
5    until today when I showed it to you.
6    A  Yes.
7    Q  Right?
8    A  That's right.
9    Q  Okay.
10   A  And --
11   Q  So when you wrote your report and said --
12   A  May I please --
13   Q  Let me finish real quick.
14       MR. HOGAN:  Well, hold on.  He was in the
15   middle of an answer.  I do think if there is more you had
16   on the answer, you need to complete it.
17       THE WITNESS:  Yeah, I mean --
18       MS. RUDNICKI:  Hold on.  The question is,
19   "Simple Certified that you didn't even know about until
20   today when I showed it to you."
21       You said, "Yes."
22       And I said, "Right?"
23       And you said, "That's right."
24   Q  (By Ms. Rudnicki)  You want to add on to that?
25   A  Yeah.  I mean, the green cards is, you know, what

41 (Pages 161 to 164)

Dorsey Roach                                                October 23, 2024

---

Page 165

1   I'm familiar with and the process.  I understand there may
2   be different ways to now send certified letters, and
3   apparently there is, you know, new, 21st century ways to do
4   it and new services that are offered.  And some companies
5   probably find that very helpful and reasonable and cost
6   saving or time saving.
7        And so, you know, yeah, but you're right, there is
8   no green card.  But there is a -- or, well, there is notice
9   from the post office that they delivered that envelope,
10  that letter.  There's also confirmation that someone at
11  Yukon signed for the letter, and then there is also -- I
12  mean, it -- the post office sent back to Mewbourne the fact
13  that they did deliver that item to Yukon.
14      Q  And so based on your understanding the way green
15  cards work, there would be a different signature per green
16  card per envelope; correct?
17      A  Yes.
18      Q  Do you know whether or not there was a different
19  signature for each envelope that was delivered on January
20  10th?
21      A  No, I do not.
22      Q  Have you even attempted to determine that?
23      A  No, I haven't.
24      Q  Do you know that you have the documents available
25  to you that have been produced by both of those parties

---

Page 166

1   that you could make that determination and you could have
2   investigated this, but you did not?
3       A  No.
4          MR. HOGAN:  Objection to form.
5       Q  (By Ms. Rudnicki)  What is the basis for Mewbourne
6   discretion in not allowing an extension in this case?
7          MR. HOGAN:  Objection.  Form.
8       A  Why they didn't grant an extension only Mewbourne
9   can answer that question.
10      Q  (By Ms. Rudnicki) Did you ask Mr. Shepherd?
11      A  No, I did not.
12      Q  Have you asked anyone?
13      A  No, I have not.
14      Q  Are you familiar with pool busting?
15      A  Familiar with what?
16      Q  Pool busting.  Pooling, busting, busting pools,
17  pooling orders, that kind of thing, busting a pool.
18      A  Besting a pool.
19      Q  Bust, b-u-s-t.
20      A  Oh, busting.  I still don't understand.  Busting a
21  pool --
22      Q  No.  I'm asking you if you are familiar with that
23  phrase, yes or no.  And it sounds like the answer is no.
24      A  The answer is no.
25      Q  Does the AFE that was provided with the well

---

Page 167

1   proposal show the proportionate costs that was to be
2   submitted by Yukon to Mewbourne?
3       A  Not on the AFE, no.
4       Q  Anywhere?
5       A  No.
6       Q  If a party does not receive a certified mail --
7   no.  If a party does not receive a letter that is supposed
8   to be sent, how would it know that it received it?
9          MR. HOGAN:  Objection to form.
10      A  Well, I imagine there would be several things that
11  a party, if they are expecting a notice, and if it doesn't
12  arrive when they expect it, they can contact the party that
13  is supposed to send it and ask them.
14      Q  (By Ms. Rudnicki) And they did that here; right?
15      A  They inquired about when will you be sending out
16  the notice, and they said, Well, we'll be sending it out
17  next Monday or what have you, and it turned out they sent
18  it out on the 8th and it was delivered on the 10th of
19  January of this year.
20       You know, if -- and to me this is the
21  responsibility of every non-operator is to manage your
22  interest.  Don't expect someone else to manage it for you.
23  And so, you know, they could have inquired further.  They
24  should have known or did know when the well was going to
25  spud and that --

---

Page 168

1       Q  Oh, they did?
2       A  Well, in the proposal -- was it end of December
3   when Mewbourne sent out the proposal letter or it had other
4   information, but had an AFE attached, they said -- I think
5   it was their -- or it may have been some emails they were
6   anticipating spudding the well in late January.
7        So I think Yukon should have known that, well, we
8   haven't made an election yet and time is coming close, we
9   ought to inquire and look into this.
10      Q  And they did, didn't they?
11         MR. HOGAN:  Objection.  Form.
12      A  Not until after the election period had passed.
13      Q  (By Ms. Rudnicki) And the election period comes on
14  the date it was delivered; right?  And we already know
15  there is an issue as to whether or not it was delivered,
16  and my client takes the position that it was not delivered
17  to them.  Just assume with me that that is the case.  They
18  don't have any notice that they got it.  Okay?
19       Whether you want to agree with me or not, that's
20  the situation.  Those are the facts in this case.  That's
21  the allegation.  Do you agree with that or not?
22      A  I don't agree with that.
23      Q  You don't agree that's the allegation?
24      A  Oh, I agree that's the allegation.
25      Q  Are you capable of, based on that allegation, of

---

42 (Pages 165 to 168)