# UnitPro Land Consultants, LLC
**Pooling and Unitization Land Specialists**

Dorsey T. Roach, CPL
Managing Member/ Owner

## IN THE UNITED STATE DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MEWBOURNE OIL COMPANY | § | |
| v. | § | Case No. CIV-24-143-G |
| YUKON TRADING COMPANY, LLC | § | |

### SUMMARY OF OPINIONS OF DORSEY T. ROACH, CPL

My name is Dorsey T. Roach, CPL and I have been retained by attorneys representing Mewbourne Oil Company ("Mewbourne") to provide my opinions in this case about the following:

- the provisions of the pre-pooling letter agreement that Mewbourne and Yukon Trading Company, L.L.C. ("Yukon") entered into on September 30, 2021 (the "Section 1 Letter Agreement");

- the provisions of Order No. 722379 entered by the Oklahoma Corporation Commission ("OCC") on December 28, 2021 (the "Section 1 Pooling Order");

- the provisions of the pre-pooling letter agreement that Mewbourne and Yukon Trading Company, L.L.C. ("Yukon") entered into on November 1, 2023 (the "Section 12 Letter Agreement");

- the provisions of Order No. 738501 entered by the OCC on November 20, 2023 (the "Section 12 Pooling Order"); and

- the correspondence between Mewbourne and Yukon related to Yukon's election or failure to timely elect whether to participate in the Abernathy 1/12 CN #2H Well.

Any opinions I may render in this case are based upon my own experiences, observations, and perceptions, as reflected by the factual statements and opinions set forth below.

My hourly rate for expert witness services is $225/hour.

EXHIBIT 2
Page 1 of 16

EXHIBIT 2

## PROFESSIONAL BACKGROUND AND EXPERT QUALIFICATIONS

I am competent to provide factual statements and opinions in this case and am qualified as an expert based upon my knowledge, skill, experience, training, education, and specialization in joint operating agreements and joint operations. I hold a B.B.A in Petroleum Land Management from the University of Oklahoma, obtained in 1977. I am currently and have been a member of the American Association of Professional Landmen since 1977, and a Certified Professional Landman since 1986. From 1983–2008, I served as an adjunct professor at the University of Oklahoma and taught a variety of oil and gas topics including model form operating agreements and joint operations.

I began my career with Exxon Corporation ("Exxon") where I specialized as a pooling and unitization landman (joint operations). I have held various staff and management positions with Exxon, Mesa Petroleum Co., Crawley Petroleum Corporation, Union Pacific Resources Company, the Williams Cos. and Cheyenne Petroleum Company where my duties and responsibilities were primarily joint operations, joint operating agreements, well trades and participation agreements. I am currently the managing member of UnitPro Land Consultants, LLC, where I offer consulting and expert witness services to members of the oil and gas industry. I am an author and have given hundreds of presentations and seminars on joint operations, joint operating agreements, well trades and participation agreements to such organizations as the American Association of Professional Landmen ("AAPL"), the Southwestern Legal Foundation, the Rocky Mountain Mineral Law Foundation, the Houston Mineral Bar, the Texas, Oklahoma, Kansas and Arkansas Bar Associations, the Oklahoma Marginal Well Commission, the Oklahoma Corporation Commission and many local landmen's associations and other industry-related organizations. I also served as an adjunct professor at the University of Oklahoma (1983-2008) and Tulsa University (2007-2015) where my primary lecture topics were joint operating agreements and well trades.

I served as Chairman of the AAPL 1989 Operating Agreement Revision Committee that drafted the AAPL Form 610-1989 Model Form Operating Agreement, and I also served as a member of the AAPL Operating Agreement Task Force that drafted the AAPL Form 610-1989 (Horizontal) Model Form Operating Agreement, and the AAPL Form 610-2015 Model Form Operating Agreement. From 2016–2022, I served as Chairman of the AAPL Participation Agreement Drafting Committee that is responsible for drafting the first industry model form participation agreement. My curriculum vitae, containing additional details regarding my career, is attached hereto as Exhibit "A." Articles I have written that were published are listed on Exhibit "C". Testimony given in prior cases are listed on Exhibit "D".

EXHIBIT 2
Page 2 of 16

2

During my forty-seven (47) years as a landman, I have often been involved in leasing, drilling, developing, operating, acquiring and selling properties with other companies and individuals in the State of Oklahoma and in other oil and gas producing States.

Over the past fifteen (15) years I have also been employed as an expert witness and as an expert consultant in a number of oil and gas related litigation cases involving lands in Oklahoma, and my qualifications as an expert witness in pooling orders, pre-pooling letter agreements, and joint operations have previously been accepted by Oklahoma courts.

## SUMMARY OF OPINIONS

In my opinion, the Section 1 Pooling Order, the Section 12 Pooling Order, the Section 1 Letter Agreement, and the Section 12 Letter Agreement contradict Yukon's allegations, claims, and defenses against Mewbourne as set out in Yukon's Answer and Counterclaims. Under those Pooling Orders and the Letter Agreements, Mewbourne gave Yukon all the information it needed to elect whether to participate in the Abernathy 1/12 CN #2H Well before the deadline for Yukon to make an election under those orders and agreements. Because Yukon failed to make an election before that deadline, Yukon is deemed to have elected to non-participate—and industry custom and practice is that such an election should be and is strictly enforced. Yukon thus has relinquished all of its interests in Sections 1 and 12 (except for its interest in the Abernathy 1 AP #1H Well) to Mewbourne in and to the common source of supply in the spacing unit covered by the Section 1 Pooling Order and the Section 12 Pooling Order at the non-participating highest royalty farmout terms provided for in the Section 1 Pooling Order and the Section 12 Pooling Order.

A summary of my further opinions on this matter are as follows:

a. The purpose of each State's oil and gas conservation laws is to prevent waste and protect correlative rights. A State's oil and gas regulatory agency establishes rules and regulations that support and promote these conservation laws. In Oklahoma, as in most States, spacing units are established for the drilling of all wells drilled in the State. Spacing units describe the lands and formations that are being pooled into the spacing unit. A spacing unit is the amount of acreage allotted for the drilling of one well to a given depth and objective formation. Due to the diversity of ownership within most spacing units, parties owning drilling rights must pool their respective interests for the drilling of a proposed unit well that will be jointly owned. A decision must also be made as to who will serve as the unit operator. Among other things, a unit operator is responsible for conducting all drilling, completion, and production operations in the unit and well.

EXHIBIT 2
Page 3 of 16

3

b. In most States, the owners of working interests will attempt to reach a voluntary agreement to govern operations in a spacing unit including the designation of an operator. These voluntary agreements are almost always in the form of an operating agreement, more commonly referred to as a "Joint Operating Agreement" or "JOA." JOAs are a reflection of industry customs and practices, and address everything from title examination, title failure, operator duties and responsibilities, the drilling of the initial well, the drilling of subsequent wells, the types and amounts of insurance to be carried for the joint account, establishment of non-consent penalties for non-participation in an operation, operator invoices, non-payment of an operator's invoices, defaults and remedies for non-payment of invoices, bankruptcy, and a long list of many other subject matters.

c. In the event the parties owning drilling rights cannot reach a voluntary agreement on the pooling of their respective interests under a JOA, then many States provide that an owner of drilling rights can apply with the regulatory agency and request an order that forces the uncommitted owners in the spacing unit to make an election to either participate in the proposed well by paying their share of drilling and completion costs, or relinquish their drilling rights in the unit. This process is called "forced pooling" (it is called "Integration" in Arkansas). Pooling orders require elections from the respondents usually within 20 days. No election is deemed an election not to participate and to relinquish their drilling rights to the operator in accordance with the order. Therefore, JOAs and forced pooling each accomplish the same thing just in different ways. A JOA is a voluntary agreement and provides a clear and orderly development of the unit that protects all parties, whereas a force pooling order is an exercise of the police power of the state that forcibly pools an uncommitted owner and does not provide for the same rights and protections as a JOA. Both JOA's and forced pooling orders contain provisions that require timely elections. And neither allows for any exceptions to these deadlines unless agreed to in writing with the operator.

d. When a forced pooling hearing is protested, this can delay the issuance of a final forced pooling order by up to 6–8 months, and in some cases even longer. It is common for a protesting party to use its protest as leverage to negotiate with the pooling applicant what is known as a Pre-Pooling Letter Agreement, or "PPLA". PPLA's provide that the protest will be withdrawn in exchange for certain rights not otherwise offered or available under a forced pooling order. The Section 1 and Section 12

**EXHIBIT 2**
**Page 4 of 16**
4

       Letter Agreements are examples of the types of provisions commonly found in industry PPLA's.

e. The American Association of Professional Landmen ("AAPL") publishes the model form operating agreements that are used almost exclusively by the oil and gas industry for governing joint operations. The first AAPL model form JOA was the AAPL Form 610-1956 Model Form Operating Agreement. The AAPL model form JOA has been revised several times since 1956 resulting in the release of the 1977 JOA, the 1982 JOA, the 1989 JOA, and the 2015 JOA. The AAPL Form 610-2015 Model Form Operating Agreement is the most recent revision to the AAPL form and reflects current industry customs and practices. With this new AAPL form came new provisions for drilling horizontal laterals beginning with the information required in connection with a well proposal. The information required to be included in a 2015 JOA include the type of well-being proposed (horizontal or vertical), objective depth and formation, surface location and terminus, total measured depth, displacements, utilization of rigs (if a spudder rig is to be employed), stimulation operations including staging and sizing, and the estimated drilling and completion costs. An AFE that sets forth a breakdown of the drilling and completion costs is required to be attached to the well proposal letter. In my experience, operators generally include the same information in a well proposal regardless of whether that proposal is made under a JOA or under a pooling order. Mewbourne's well proposal letters and AFE's contained all of this information.

f. It is industry custom and practice in Oklahoma and other oil and gas producing States that elections made under pooling orders (such as the Section 1 Pooling Order and the Section 12 Pooling Order), pre-pooling letter agreements (such as the Section 1 Letter Agreement and the Section 12 Letter Agreement), joint operating agreements, and similar agreements are strictly enforced. This includes elections to participate, affirmative elections not to participate, and a failure to make a timely election that is deemed an election not to participate. Indeed, even if a non-operator makes an election before its election deadline, that election is strictly enforced, and the non-operator is not allowed to change its election even if it attempts to change its election before its original election deadline. And although an operator has the discretion to extend the deadline to make such an election, the operator is under no obligation to do so.

g. Election deadlines are necessary for an operator to know who is participating in a well, or other proposed operation, and who is not. If

**EXHIBIT 2**
**Page 5 of 16**
5

less than all parties elect to participate, the operator must either offer a proportionate share of the non-participating interests to those parties that elected to participate, absorb the interest itself, or withdraw the proposal. Operators must also make sure that each participant either pays in advance its share of costs of a proposed operation or makes arrangements to pay their share of well costs, especially when the operator is sometimes paying out over $10 million for services and materials to vendors and contractors out of its own pocket. This explains why operators often cash-call the participants in an operation to pay their share of costs in advance.

h. It is industry custom and practice in Oklahoma and other oil and gas producing States to treat an Authorization for Expenditure ("AFE") like an invoice. A typical AFE provides a non-operator with all the information that an invoice would contain except for calculating the non-operator's share of the amount of the expenditure based on the non-operator's interest in the operation. The information included in the AFE that Mewbourne provided Yukon is well within industry standards and includes more detailed information than would normally be included in just an invoice.

i. Under the Section 1 Letter Agreement and the Section 12 Letter Agreement, Yukon had the option to make a deferred election whether to participate in the Abernathy 1/12 CN #2H Well in lieu of the election provided for in the Section 1 Pooling Order and the Section 12 Pooling order. After Yukon exercised its option to make a deferred election, Mewbourne sent Yukon a spud notice on January 8, 2024, that Yukon received on January 10. Once Yukon received that spud notice, Yukon had ten days to elect to participate in the Abernathy 1/12 CN #2H Well—meaning Yukon's deadline to make an election under the Section 1 Letter Agreement and the Section 12 Letter Agreement was January 20. Yukon did not make an election before that deadline and thus failed to timely make an election. As a result, under the Section 1 Letter Agreement and the Section 12 Letter Agreement Yukon is deemed "to have relinquished all its non-participating working interest in and to the common source of supply in the spacing unit[s] covered by" the Section 1 Pooling Order and the Section 12 Pooling Order "to Mewbourne at the non-participating highest royalty farmout terms provided for" in the Section 1 Pooling Order and in the Section 12 Pooling Order.

j. If Mewbourne spud the Abernathy 1/12 CN #2H Well with a rig capable of drilling to the total objective depth for that well within thirty days of when Yukon received the spud notice for that well, then Yukon would

EXHIBIT 2
Page 6 of 16

6

    not be entitled to make an election for any other operations—including substitute or replacement wells or sidetracking operations—under the Section 1 Pooling Order, the Section 12 Pooling Order, the Section 1 Letter Agreement, the Section 12 Letter Agreement, or industry custom and practice (or any combination thereof).

k. It is my opinion that a non-operator who claims only after the deadline to make an election has already passed that the non-operator did not receive an election notice (1) that the operator sent by certified mail and (2) for which the non-operator signed when it was delivered did in fact receive the election notice and claims to not have received the notice only to excuse its failure to make a timely election.

l. Yukon received an AFE dated June 28, 2023, for the Abernathy 1/12 CN #2H Well within a month of when Mewbourne sent the spud notice. Yukon thus had all of the information it needed to calculate its share of the dry hole costs for that well regardless of whether Mewbourne included an invoice with the spud notice for that well. As a result, it would be immaterial under the Section 1 Pooling Order, the Section 12 Pooling Order, the Section 1 Letter Agreement, the Section 12 Letter Agreement, and industry custom and practice if Yukon did not receive an invoice with the spud notice for the Abernathy 1/12 CN #2H Well. When Yukon received that spud notice, Yukon had all the information it needed to elect whether to participate in the Abernathy 1/12 CN #2H Well. Indeed, at least two other non-operators—JSR Oil and Gas Properties, LLC ("JSR") and SPIR Energy Management, L.L.C. ("SPIR")—timely elected to participate in the Abernathy 1/12 CN #2H and paid their respective share of the estimated dry hole cost ("DHC") for that well under the Section 1 Letter Agreement without receiving an invoice but instead relying on the same AFE Yukon received.

Respectfully submitted,

*/s/ Dorsey T Roach/*

Dorsey T Roach, CPL

**EXHIBIT 2**
**Page 7 of 16**

7

# EXHIBIT "A"

## RESUME
### DORSEY T. ROACH, CPL

12304 Kingsbrook Road  (405) 242-2234
Oklahoma City, OK 73142  (405) 301-5068

| | |
|---|---|
| **EDUCATION** | Bachelor of Business Administration, *University of Oklahoma*, Norman, Oklahoma (1977), majoring in Petroleum Land Management |
| | Heritage Hall College Preparatory School, Oklahoma City, Oklahoma (1972) |
| **RELEVANT EXPERIENCE** | **UnitPro Land Consultants, Inc.**, Tulsa, Oklahoma (2004-2006), and **UnitPro Land Consultants, LLC**, Oklahoma City, Oklahoma (2006 – Present) *Managing Member/Owner* (2004 – Present) |

- Expert witness services for O&G litigation
- Prepare and negotiate Operating Agreements, Exploration Agreements, Participation Agreements, Well Trades and other land contracts for clients
- Conduct seminars for industry organizations and companies

**Cheyenne Petroleum Company**, Oklahoma City, Oklahoma
*Area Land Manager* (2006-2009)
- Processed exploration and development prospects and projects in Canada and the Midcontinent, Gulf Coast, South Texas and Ohio Basin regions of the U.S. for possible company participation
- Prepare and negotiate land contracts including, but not limited to, Confidentiality Agreements, Exploration Agreements, Participation Agreements, Operating Agreements and Well Trades
- Seek prospect and/or project participation opportunities

**The Williams Companies**, Tulsa, Oklahoma
*Director of Land* (2001-2004), *Land Manager* (2000-2001)
- Managed a land department (landmen, lease records and division order analysts) consisting of 25 employees
- Responsible for hiring and training land department personnel
- Prepared and managed both G&A and capital budgets for department
- Negotiated major land deals including Exploration Agreements, Participation Agreements and Operating Agreements
- Coordinated and managed land due diligence on all major acquisitions and divestitures
- Generated strategies and ideas for growth and expansion of the E&P organization in the Gulf Coast, South Texas, Midcontinent, San Juan Basin and Green River Basin
- Developed strategies for an active lease acquisition and horizontal drilling program in the Hartshorne CBM and Caney Shale plays in the Arkoma

EXHIBIT 2
Page 8 of 16

Basin

**Union Pacific Resources Company,** Fort Worth, Texas
*Staff Landman* (1997-2000)
- Assisted team and management in developing strategies for active horizontal drilling program in the Austin Chalk play of East Texas
- Supervised lease brokers involved with lease acquisitions and title curative
- Negotiated and prepared land contracts with industry partners including Operating Agreements and Well Trades
- Responsible for compliance with regulatory rules, regulations and orders
- Served as a mentor and helped train entry-level landmen

**Crawley Petroleum Corporation,** Oklahoma City, Oklahoma
*Land Manager* (1994 – 1997)
- Managed a land department consisting of 4 employees
- Supervised lease brokers involved with lease acquisitions and title curative
- Negotiated and prepared all land contracts with industry partners including Exploration Agreements, Participation Agreements, Operating Agreements and Well Trades
- Responsible for compliance with regulatory rules, regulations and orders
- Active in the Anadarko Basin, Anadarko Shelf, Golden Trend, Nemaha Ridge, Texas Panhandle, Permian Basin and Powder River Basin

**Mesa, Inc.,** Dallas, Texas; Amarillo, Texas
*Land Supervisor* (1991-1994), *Senior Landman* (1987-1991)
- Areas of responsibility included Oklahoma, Louisiana, Powder River Basin, San Juan Basin and Gulf of Mexico
- Supervised lease brokers involved with lease acquisitions and title curative
- Negotiated and prepared land contracts with industry partners including Participation Agreements, Operating Agreements and Well Trades
- Responsible for compliance with regulatory rules, regulations and orders
- Coordinated and managed land due diligence on Tenneco acquisition, and Midcontinent and San Juan Basin divestitures

**Exxon Corporation,** Houston, Texas; Oklahoma City, Oklahoma; Midland, Texas; Los Angeles, California, Anchorage, Alaska (temporary assignments) *Senior Petroleum Landman* (1986-1987), *Land Supervisor* (1982-1986), *Senior Landman* (1981-1982), *Landman* (1977-1981)
- Supervised pooling and unitization land staff consisting of 10 employees
- Negotiated and prepared land contracts with industry partners including Participation Agreements, Operating Agreements and Well Trades
- Responsible for compliance with regulatory rules, regulations and orders
- Trained entry-level landmen
- Assisted management in developing strategies for active drilling program in the Anadarko Basin following Penn Square Bank failure
- Areas of responsibility included Midcontinent (1981-1987) and California/Alaska (1977-1980)

**EXHIBIT 2**
**Page 9 of 16**
9

| | |
|---|---|
| **OTHER EXPERIENCE** | **University of Oklahoma, Petroleum Land Management Program**<br>• *Adjunct Professor* (1983-2009), Topics included pooling, unitization, operating agreements, regulatory agencies, title opinions, title curative, and land administration<br><br>• *Chairman*, Steering Committee (1995-1997), responsible for designing the restructuring of the Petroleum Land Management Program into the Energy Management Program<br><br>**The University of Tulsa, Energy Management Program**<br>• *Adjunct Professor* (2007 – 2015), Topics include Pooling, Unitization, Well Trades and Operating Agreements<br><br>**American Association of Professional Landmen**<br>• *Seminar and CPL Review Instructor* (1984-Present)<br>  • Topics include Pooling, Unitization, Operating Agreements, Well Trades and Participation Agreements<br>• *Institute and Conference Speaker* (1985-Present)<br>  • Various topics and issues relating to Operating Agreements<br><br>**Conference and Institute Speaker**<br>• Oklahoma, Texas, Kansas and Arkansas Energy Bar Associations<br>• Council of Petroleum Accountants Societies (COPAS)<br>• North American Petroleum Accountants Conference (NAPAC)<br>• Numerous local/regional landman organizations<br>• Numerous regional and national industry organizations |
| **MEMBERSHIPS** | **American Association of Professional Landmen** (1977-Present)<br>• *Certified Professional Landman* (1986-Present)<br>  • CPL No. 3311<br>• *Chairman*, 1989 Operating Agreement Revision Committee<br>• *Consultant*, 2002 Operating Agreement Task Force (CBM Modifications)<br>• *Member*, 1989 (Horizontal) Operating Agreement Task Force<br>• Member, 2015 Operating Agreement Task Force<br>• *Chairman*, Model Form Participation Agreement Drafting Committee<br><br>**Oklahoma City Association of Professional Landmen** (1981-Present)<br>• *Chairman*, Industry and Regulatory Affairs Committee (1984)<br>• *Secretary* (1985)<br>• *Treasurer* (1986)<br>• *Co-Chair*, Governmental Action Committee (2008-2009)<br><br>**Tulsa Association of Professional Landmen** (2000-Present)<br>• *President* (2004-2005)<br>• *Chairman*, Education Committee (2000-2004)<br>• *Chairman,* Scholarship Committee (2001-2005) |

**EXHIBIT 2**
**Page 10 of 16**
10

# EXHIBIT "B"

## DOCUMENTS CONSIDERED

- Mewbourne' Complaint
- Yukon's Answer and Counterclaim
- Mewbourne's Answer to Yukon's Counterclaim
- MOC_Abernathy_000017
- MOC_Abernathy_000139
- YUKON_Abernathy_000007
- YUKON_Abernathy_000011
- YUKON_Abernathy_000014
- YUKON_Abernathy_000015
- YUKON_Abernathy_000017
- YUKON_Abernathy_000049
- YUKON_Abernathy_000060
- YUKON_Abernathy_000072
- YUKON_Abernathy_000086
- YUKON_Abernathy_000107
- YUKON_Abernathy_000138
- YUKON_Abernathy_000230
- A letter from JSR to Mewbourne dated December 29, 2023 in which JSR told Mewbourne that it "elects to participate in" the Abernathy 1/12 CN #2H Well and included a check for JSR's "proportionate share of the estimated DHC as per the AFE dated 06/28/2023" as well as an executed copy of that AFE.
- A letter from SPIR to Mewbourne dated December 29, 2023 in which SPIR told Mewbourne that it "elects to participate in" the Abernathy 1/12 CN #2H Well and included a check for SPIR's "proportionate share of the estimated DHC" (meaning dry-hole costs) "as per the AFE dated 06/28/2023" as well as an executed copy of that AFE.

EXHIBIT 2
Page 11 of 16

# EXHIBIT "C"

## Published Articles

1. **The Maintenance of Uniform Interest Provision – Are You at Risk?**
   Presented to and published by the American Association of Petroleum Landmen
   June 1999 (1st publication)

2. **Evolution of the AAPL Form 610-Model Form Operating Agreement**
   Presented to and published by the American Association of Professional Landmen
   January 1984 (1st publication)

3. **JOA Calculations – What Happens When a Lease Goes Bad**
   Presented to and published by the National Association of Lease and Title Analysts
   September 2007

4. **Current Issues Involving Operating Agreements**
   Presented to and published by the American Association of Professional Landmen
   September 2003 (1st publication)

5. **The 2005 COPAS Accounting Procedure – Is It Really Better?**
   Presented to and published by the Council of Petroleum Accountants Societies of North America, April 2008 (1st publication)

6. **Exploration Agreements, Participation Agreements and Operating Agreements - What Every Landman Should Know**
   Presented to and published by the American Association of Professional Landmen
   December 2009 (1st publication), February 2010

7. **JOA's, Exploration Agreements and Participation Agreements - What's the Difference?**
   Presented to and published by the Arkansas Bar Association, February 2010

8. **Select Issues Involving Operating Agreements**
   Published in The Landman (American Association of Professional Landmen magazine)
   September/October 2010

9. **Joint Operations in Down Economic Times: Practical Applications for the New 2015 JOA**
   Presented to and published by the American Association of Professional Landmen
   AAPL 2016 Annual Conference, Orlando, Florida

10. **What's New In the 2015 Model Form JOA?** (co-authored with Fred MacDonald, J.D.)
    Presented to and published by the Rocky Mountain Mineral Law Foundation
    RMMLF Institute on the New AAPL 2015 Model Form Operating Agreement,



November 2016, Houston, Texas, and December 2017, Denver, Colorado.

11. **A New AAPL Model Form Participation Agreement: A Comprehensive Form For Structuring Deals and Providing Deal Terms**
Presented to and Published by the American Association of Professional Landmen, June 2018, AAPL 2018 Annual Conference, Denver, Colorado; Also published by the Rocky Mountain Mineral Law Foundation RMMLF 2018 Annual Oil and Gas Institute July 2018, Victoria, Alberta, Canada

12. **Old and New Issues Involving Operating Agreements**
Published by the American Association of Professional Landmen, The Landman magazine, September/October 2021

13. **Negotiations**
Chapter 10 of the American Association of Professional Landmen's Study Guide for the AAPL Certified Professional Landman review and exam
Co-authored with Owen M. Barnhill, CPL, June 2022

**EXHIBIT 2**
**Page 13 of 16**
13

# EXHIBIT "D"

## PRIOR TESTIMONY

1. Case: David L. Blake, et al v. Cabot Oil & Gas Corporation, et al (Cause No. 06-2-8965-VC, 24th Judicial District Court, Goliad County, Texas)
   Client: Cabot Oil & Gas Corporation (Farnsworth & VonBerg)

2. Case: Longfellow Exploration Partners Limited, et al v. SandRidge Energy, Inc., et al (Case No. 4:09-cv-00045-RAJ, U.S. District Court, Western District of Texas, Pecos District)
   Client: SandRidge Energy, Inc. (Locke Lord Bissell & Liddell)

3. Case: Marbob Energy Corporation, et al v. BP America Inc., et al (Case No. CV-2010-647 and Case No. CV-2010-648, 5th Judicial District Court, Eddy County, New Mexico)
   Client: Marbob Energy Corporation and Concho Energy (Cotton Bledsoe Tighe & Dawson)

4. Case: Hawkins & Hawkins v. Nance Petroleum Corporation (Case No. 2007-C-012, District Court, Northwest Judicial District, State of North Dakota, County of McKenzie)
   Client: Hawkins & Hawkins (Poulson, Odell & Peterson)

5. Case: Bishop Petroleum, Inc. v. Indian Oil Company, et al (Case No. 2009-34720, District Court of Harris County, Texas)
   Client: Indian Oil Company, et al (Farnsworth & VonBerg)

6. Case: Carbon Economy, LLC, et al v. SM Energy Company, et al (Case No. CV-11-4, District Court of Beckham County, Oklahoma)
   Client: SM Energy Company (Wilguess & Garrett)

7. Case: Cardinal River Energy, et al v. Unit Petroleum Company, et al (Case No. CJ-2008-7388, District Court of Oklahoma County, Oklahoma)
   Client: Cardinal River Energy et al (Kirk & Chaney)

8. Case: Roger Wheeler, et al v. Crest Resources, Inc., et al (Case No. CJ-2010-6340, District Court, Tulsa County, Oklahoma)
   Client: Crest Resources, Inc. (Conner & Winters)

9. Case: Sally Stanford v. Jack Stanford Estate, et al (Oklahoma Co. Probate Court)
   Client: Sally Stanford

EXHIBIT 2
Page 14 of 16
14

10. Case: Crimson Exploration. et al v. Allen Drilling Acquisition Company, et al (Cause No. 12,991, District Court, Madison County, Texas, 278th Judicial District)
    Client: Allen Drilling Acquisition Company, et al

11. Case: Wicklund Pet. Corp. v. Thos. Meason (District Court, Tulsa County, Oklahoma)
    Client: Wicklund Petroleum (Mitchell DeClerck Firm)

12. Case: Union Pacific RR and Ivy Energy, Inc. v. Williams Production RMT Co., et al (Case No. 10cv371, District Court of Garfield County, Colorado)
    Client: Ivy Energy, Inc.

13. Case: Enduro Operating LLC v. Echo Production, Inc., et al (Case No.: D-503-CV-2013-134, Fifth Judicial District Court, Eddy County, NM)
    Client: Echo Production, Inc.

14. Case: Summa Engineering, Inc. v. Venus Energy, LLC, et al (Case No. CJ-2012-10, District Court, Grant County, Oklahoma)
    Client: Venus Energy, LLC, et al

15. Case: Kenneth W. Cory, Ltd. V. Apache Corporation (Case No. CJ-2014-1, Roger Mills County District Court, State of Oklahoma)
    Client: Kenneth W. Cory, Ltd.

16. Case: Osage Exploration & Development, Inc., et al vs. Stephens Energy Group, LLC (Case No. CJ-2014-239, Logan County District Court, State of Oklahoma)
    Client: Osage E&D, Inc., U.S. Energy Development Corporation

17. Case: Mardan Energy Corporation, et al vs. Faulconer 1996 LP, LLP, et al (Cause No. 10-12363-278-06, District Court, Madison County, Texas)
    Client: Crimson Exploration, Inc., Crimson Exploration Operating, Inc. Gulfwest Oil Company and Gulfwest Oil & Gas Company

18. Case: Anderson Energy Corporation, et al vs. Dominion Oklahoma Texas Exploration & Production, Inc., et al (Sutton County, Texas District Court, Cause No. 005419)
    Client: EnerVest Operating, LLC

19. Case: Encana v. Vanguard, (U.S. Bankruptcy Court, Southern District of Texas, Houston, Texas, Case No. 17-30560)
    Client: Encana Oil & Gas (USA) Inc.

20. Case: Ultra Petroleum Corporation (Debtor) v. Gasconade Oil Co., et al v. Ultra Resources, Inc., et al (U.S. Bankruptcy Court, Southern District of Texas, Houston, Texas, Chapter 11, Case No. 16-32202)
    Client: Ultra Petroleum Corporation

**EXHIBIT 2**
**Page 15 of 16**
15

21. Case: <u>BP America Production Company v. Southland Royalty Company, LLC</u> (State of Wyoming, County of Sweetwater, Third Judicial District, Civil Action NO. C-17-313-J)
    Client: BP America Production Company

22. Case: <u>Ankor E&P Holdings Corporation v. Yazoo Venture, LLC, et al</u> (District Court of Harris County, Texas, 61st Judicial District)
    Client: Ankor E&P Holdings Corporation (1. Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, LLC, and 2. Johnson DeLuca Kurisky & Gould P.C.)

23. Case: <u>City of Wewoka Oklahoma v. Alice Blakeney, et al</u> (District Court, Seminole County, Oklahoma, State of Oklahoma, case No. CV-2011-10)
    Client: Oklahoma Medical Research Foundation (Gable Gotwals Firm)

24. Case: <u>Charles A. Lundberg, et al v. EnerVest Operating, LLC, et al</u> (District Court, Karnes County, Texas, 218th Judicial District, Cause No. 17-10-00252)
    Client: Charles A. Lundberg, Catherine H. Lundberg and Mithrail Holdings, LLC (Burns Charest LLP)

25. Case: <u>Anthem Resources, LLC v. Oklahoma Energy Acquisitions, LP, et al</u> (District Court, Kingfisher County, State of Oklahoma, Case No. CV-2019-78)
    Client: Lu-Ray Petroleum, LLC (Moricoli Kellogg & Gleason, PC)

26. Case: <u>Warwick-Athena LLC and Texas Crude Energy LLC v. Burlington Resources Oil and Gas Company, LP</u> (District Court, Live Oak, Texas, 156th Judicial District, Cause No. L-19-0031-CV-B)
    Client: Warwick-Athena LLC and Texas Crude Energy LLC (Gibbs & Bruns, LLP, Pierce & O'Neill, LLP)

27. Case: Crimson Exploration, Inc. v. Allen Drilling Acquisition Company (District Court, Madison County, Texas, 278th Judicial District, Cause No. 12,991)
    Client: Allen Drilling Acquisition Company (Jackson Walker LLP)

28. Case: Vaquero Partners I, L.P. and Madison Energy, LLC v. Aera Energy LLC (Superior Court of State of California, County of Kern, Metropolitan Division, Case No. BCV-21-101467-TSC)
    Client: Vaquero Partners I, L.P. and Madison Energy, LLC (Welborn Sullivan Meck & Tooley, P.C.)

29. Case: John H. Breedlove, et al v. Marathon Oil Permian, LLC (Fifth Judicial District Court, Eddy County, New Mexico, Case No. D-503-CV-2020-00614)
    Client: Marathon Oil Permian, LLC

EXHIBIT 2
Page 16 of 16
16