# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MEWBOURNE OIL COMPANY,** | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 5:24-CV-143-G |
| **YUKON TRADING COMPANY, L.L.C.,** | § § § § | |
| *Defendant.* | § § | |

## MEWBOURNE'S TRIAL BRIEF

Christopher M. Hogan, FBA # 19-175
chogan@hoganthompson.com
Samantha L. Thompson, FBA # 20-53
sthompson@hoganthompson.com
Cody Rutowski, FBA # 23-77
crutowski@hoganthompson.com
Hogan Thompson Schuelke LLP
1001 Fannin Street, Suite 4775
Houston, Texas 77002
Telephone: (713) 671-5630
Facsimile: (713) 671-5632

Stephen D. Beam, OBA # 625
P.O. Box 31
Weatherford, OK 73096
Telephone: (580) 302-5023
sbeamlaw@gmail.com

*ATTORNEYS FOR PLAINTIFF MEWBOURNE OIL COMPANY*

July 14, 2025

As explained in prior filings, this case centers on whether Yukon received the participation election notice that Mewbourne sent Yukon by certified mail and **for which Yukon signed a U.S. Postal Service electronic return receipt** and also whether this Court should enforce the contractual consequences of Yukon's failure to make a timely election after receiving that notice. Mewbourne has already explained its position on those issues and demonstrated that the Court can resolve this dispute on summary judgment without the need for a trial.[1]

But throughout this litigation, Yukon has tried to muddy the waters and transform this case into a dispute about whether Yukon "is being unjustly treated."[2] Yet Yukon has already negotiated for—and received—better treatment than most of the owners of oil and gas interests in the lands at issue ("Section 1" and "Section 12"), both in terms of Yukon's deadlines to elect to participate in and pay its share of the costs of the oil and gas well at issue (the "Well") and in terms of the notice Yukon would receive to trigger those deadlines.

In this lawsuit, Mewbourne has simply asked this Court to enforce the contracts that Yukon negotiated and willingly entered. In contrast, Yukon has asked this Court for an excuse that would allow Yukon to escape the consequences of its failure to elect under those same contracts. This Court should enforce the parties' agreements as written and enter judgment in favor of Mewbourne.

---

[1] Rather than reiterate each of those arguments here, Mewbourne incorporates by reference the arguments made in its previous filings, including its summary judgment briefing, Docs. 52, 58, 68, its *Daubert* briefing, Docs. 53, 57, 69, and its other pretrial filings submitted the same day as this Trial Brief.

[2] *E.g.*, Doc. 43 at 13.

**ARGUMENT**

I. **The rights of most owners of an interest in the property and well at issue are governed only by orders issued by an Oklahoma agency.**

Mewbourne and Yukon do not own all of the oil and gas interests in Sections 1 and 12. To the contrary, dozens of other individuals and entities own oil and gas interests in those sections.[3] Unlike Yukon, most of those owners do not have separate contracts with Mewbourne governing their rights with respect to Mewbourne's development of oil and gas in Sections 1 and 12. Instead, their rights are governed by the pooling orders (the "Section 1 Pooling Order" and the "Section 12 Pooling Order") issued by the Oklahoma Corporation Commission (the "OCC").

Under the Pooling Orders, each of those individuals and entities had to elect whether to participate in the Well within twenty days of either the date the OCC issued the Section 12 Pooling Order (if they own interests in Section 12)[4] or the date they received Mewbourne's proposal for the Well (if they own interests in Section 1).[5] And if they elected to participate, those individuals and entities had to pay their proportionate share of the estimated costs of completing the Well within five days of the end of their election period.[6]

---

[3] PX3 at 11–12 (the Section 1 Pooling Order); PX 4 at 10–12 (the Section 12 Pooling Order).
[4] PX4 § 5, at 6.
[5] PX3 § 6, at 6. Because the Well was the second well that Mewbourne drilled under the Section 1 Pooling Order, elections for the Well were governed by the "Participation in Subsequent Wells" provisions of the Section 1 Pooling Order.
[6] PX3 § 6, at 6; PX4 § 5, at 6.

And Mewbourne did not have to commence operations for the drilling of the Well until six months after the date the OCC issued the Section 12 Pooling Order.[7]

In other words, interest owners whose rights in the Well were governed by only the OCC's Pooling Orders had to elect whether to participate in the Well and (if they elected to participate) pay their share of up-front costs for the well potentially more than five months before Mewbourne had to commence operations on the Well.

And under the Pooling Orders, the method for providing those interest owners notice that they had a deadline to elect to participate and pay their share of costs in the Well was notice sent by "mail"[8] or "first-class mail."[9]

## II. Yukon negotiated more favorable terms than most interest owners in Sections 1 and 12.

By entering into the contracts at issue in this case (the "Section 1 Letter Agreement" and the "Section 12 Letter Agreement") with Mewbourne, Yukon secured better terms than it was entitled to under the Pooling Orders.

Rather than having to make an election in the Well within twenty days of either the date the OCC issued the Section 12 Pooling Order (for its interests in Section 12) or the date Yukon received Mewbourne's proposal for the Well under the Section 1 Pooling Order

---

[7] PX4 § 11, at 8. Under the Section 1 Letter Agreement, Mewbourne had to commence the Well within 180 days of Mewbourne's written proposal for the well. PX3 § 6, at 6. But Mewbourne's written proposal for the Well under the Section 1 Pooling Order, PX6, was dated after the date the OCC entered the Section 12 Pooling Order. So as a practical matter, Mewbourne's deadline to commence the Well was six months after the OCC issued the Section 12 Pooling Order.
[8] PX3 § 6, at 6.
[9] PX4 § 5, at 1.

(for its interests in Section 1), Yukon's deadline to elect to participate in the Well under the Letter Agreements was no more than twenty days before Mewbourne spud the Well.[10]

And rather than having to pay its share of the estimated costs of completing the Well within five days of the end of its election period under the Pooling Orders—which, again, was five months before Mewbourne's deadline to commence operations on the Well—Yukon's deadline to pay its share of estimated costs under the Letter Agreements was no more twenty days before Mewbourne spud the Well.[11] Indeed, Yukon did not have to prepay any portion of the costs of the Well for its interests subject to the Section 12 Letter Agreement.[12]

And instead of the notice that would trigger Yukon's election and payment deadlines being sent by regular or first-class mail as it would be under the Pooling Orders, the Letter Agreements required Mewbourne to send Yukon the notice that triggered Yukon's deadlines to elect to participate in and pay its share of costs for the Well by certified mail—which "creates actual evidence of delivery in the form of a receipt." *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 319 (3d Cir. 2014).

So, in sum, the Letter Agreements gave Yukon later election and payment deadlines than the deadlines set by the OCC in the Pooling Orders, and those deadlines would be triggered only by Yukon's receipt of a spud notice by certified mail.

---

[10] PX1 § 11.C, at 3 (the Section 1 Letter Agreement); PX2 § 4, at 1–2 (the Section 12 Letter Agreement).
[11] PX1 § 11.D, at 3; PX2 § 5, at 2.
[12] PX2 § 5, at 2.

### III. Even though Yukon has already negotiated for special treatment, Yukon now demands even more special treatment.

Under the Letter Agreements, Mewbourne gave Yukon a later deadline to elect to participate in the Well than most of the others that owned an interest in the Well. But Yukon nevertheless missed that deadline and failed to timely elect to participate in the Well before January 20, 2024. Yukon claims it failed to timely elect to participate in the Well because it did not receive the spud notice that triggered Yukon's deadline to elect to participate in the Well. But in compliance with the Letter Agreements, Mewbourne sent that spud notice by certified mail (instead of only regular or first-class mail). **And Yukon signed a return receipt for that notice on January 10, 2024**,[13] which creates a "strong presumption" that Yukon received the Spud Notice. *Lupyan*, 761 F.3d at 319 (emphasis in original).[14]

Yukon appears to have misplaced that spud notice, perhaps because Yukon did not follow its normal mail intake procedures on January 10.[15] Yukon tries to excuse its failure to keep track of that spud notice with an absurd argument that a form of certified mail that the U.S. Postal Service has used for most of this century is not actually certified mail.[16] This futile argument shows the lengths to which Yukon will go to avoid its failure to timely elect to participate in the Well under its agreements with Mewbourne.

Yukon also argues that enforcing the consequences of its failure to timely elect to participate would be inequitable and violate Oklahoma public policy.[17] But those are the

---

[13] PX5.
[14] *See, e.g.*, Doc. 52 at 13–16; Doc. 58 at 15–20; Doc. 68 at 3–6.
[15] *See* Doc. 68 at 5
[16] Doc. 55 at 21–26; Doc. 59 at 22–23; Doc. 67 at 9–10.
[17] *See, e.g.*, Doc. 55 at 13–19.

same consequences that the OCC set out for everyone who owns an oil and gas interest in Sections 1 and 12.[18] And those consequences have been imposed against other interest owners who did not timely elect to participate in the Well.[19] Maybe Yukon could have negotiated for different consequences for not timely electing to participate in a well under the Letter Agreements, but it did not do so.

In short, the Letter Agreements give Yukon more favorable terms than the Pooling Orders give most of the interest owners in the Well. But Yukon nonetheless asks this Court to give it even better terms than the terms Yukon negotiated for in the Letter Agreements.

## IV.   The Court should enforce the parties' contracts.

This case ultimately comes down to a question of whether the Court should enforce the parties' Letter Agreements. The answer is clear under Oklahoma law: "Oklahoma jurisprudence adheres to the principle that even though the result may be harsh, a party will be bound by the unambiguous terms of a contract." *Founders Bank & Tr. Co. v. Upsher*, 1992 OK 35, ¶ 13, 830 P.2d 1355, 1362.

## CONCLUSION

In light of Yukon's voluntary and informed negotiation of these contractual terms, this Court should enforce the unambiguous provisions of the parties' contracts. For the reasons above, in Mewbourne's other filings, and that Mewbourne will present at trial, Mewbourne respectfully requests that the Court grant Mewbourne the declaratory relief it

---

[18] PX1 § 11.C, at 3 (incorporating the Section 1 Pooling Order's nonconsent provisions); PX2 § 4, at 1–2 (incorporating the Section 12 Pooling Order's nonconsent provisions).
[19] *See* PX41, 103–11 (offering shares of acreage relinquished to Mewbourne under the Pooling Orders to other interest owners).

seeks and enter judgment in Mewbourne's favor on its claim and on Yukon's affirmative defenses and counterclaims.

Respectfully submitted,

/s/ Christopher M. Hogan
Christopher M. Hogan, FBA # 19-175
chogan@hoganthompson.com
Samantha L. Thompson, FBA # 20-53
sthompson@hoganthompson.com
Cody Rutowski, FBA # 23-77
crutowski@hoganthompson.com
Hogan Thompson Schuelke LLP
1001 Fannin Street, Suite 4775
Houston, Texas 77002
Telephone: (713) 671-5630
Facsimile: (713) 671-5632

and

Stephen D. Beam, OBA # 625
P.O. Box 31
Weatherford, OK 73096
Telephone: (580) 302-5023
sbeamlaw@gmail.com

**ATTORNEYS FOR PLAINTIFF
MEWBOURNE OIL COMPANY**

### CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served on all parties of record on July 14, 2025 in accordance with the Federal Rules of Civil Procedure.

/s/ Christopher M. Hogan
Christopher M. Hogan